UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


IN RE GENETICALLY MODIFIED    )      Case No.  4:06MD1811 CDP
RICE LITIGATION            )           ALL CASES


## MEMORANDUM AND ORDER

The twenty-one lead plaintiffs in this multi-district litigation have filed a motion to certify their claims as a class action under Fed. R. Civ. P. 23(b)(3). Plaintiffs, the majority of whom are U.S. long grain rice producers, allege that the defendants contaminated the U.S. rice supply with non-approved genetically modified strains of rice, thereby affecting the market price for plaintiffs' crops. Defendants oppose class certification, arguing that the common issues presented in plaintiffs' cases do not predominate over individual disputes concerning plaintiffs' claimed damages. I conclude that this case is inappropriate for class certification because plaintiffs' varying claims for damages are not amenable to class-wide adjudication.

## I.    Background

The following facts are taken from the plaintiffs' master consolidated class action complaint, as well as the affidavits and other evidence submitted by the parties in briefing the motion for class certification.

A.    Contamination of U.S. Rice Supply

On August 18, 2006 the United States Department of Agriculture announced that trace amounts of LLRICE 601, a genetically modified rice strain, had been detected in the U.S. rice supply.  LLRICE 601 is a rice seed developed by Bayer CropScience,[1] and is designed to be resistant to a Bayer herbicide, Liberty Link.  Bayer and its corporate predecessors developed LLRICE through research in Europe, and later conducted field testing of the rice in this country. Plaintiffs allege that as a result of this activity, the genetically-modified rice strain contaminated the U.S. commercial rice supply.  Although LLRICE 601 is now deregulated by the USDA, at the time of the contamination it was not approved for human consumption.

Following the contamination announcement, rice importers reacted by banning the importation of U.S. rice.  Japan announced on August 20, 2006 that it would no longer import U.S. long grain rice.  Three days later, the European Union announced that it would require all incoming U.S. rice to be tested and certified as free of genetically-modified traits.  The nations of Russia, Canada, the

---

[1]Bayer CropScience LP is a U.S. corporation and is the business entity alleged to be primarily responsible for the development and marketing of LLRICE.  Plaintiffs have named Bayer CropScience LP as a defendant, along with numerous other Bayer entities, all of which are owned directly or indirectly by Bayer AG, a German corporation.  For purposes of this opinion, I will refer to the Bayer defendants generally as "Bayer" or "Bayer CropScience."

Philippines, Taiwan, and Iraq also imposed restrictions on U.S. rice imports as a result of the LLRICE contamination.

Plaintiffs allege that the U.S. market price for rice dropped dramatically as a result of Bayer's contamination of the rice supply. The United States is one of the leading producers in the world of rice, accounting for approximately 13% of the worldwide rice trade. Nearly half of the U.S. rice supply is exported to other countries. Thus, even though the USDA ultimately approved LLRICE 601, the export market for rice was substantially affected by contamination from the genetically-modified strain. In addition, in early 2007 Bayer announced that a second genetically-modified strain, LLRICE 604, had also been detected in the commercial rice supply. Unlike LLRICE 601, LLRICE 604 has never been approved by the USDA for human consumption. Neither strain has ever been sold or marketed by Bayer.

B.   Plaintiffs' Claims

The plaintiffs in the master consolidated class action complaint are rice producers from five U.S. states where rice is grown and harvested: Arkansas, Louisiana, Mississippi, Missouri and Texas. Plaintiffs' complaint asserts statutory and common law claims of public nuisance, private nuisance, negligence, products liability, and strict liability for ultrahazardous activities. Plaintiffs' primary claim

for damages, however, is that the defendants' activities caused a market loss injury to the U.S. rice market. Plaintiffs point specifically to the Chicago Board of Trade (CBOT) price of rice for the period from August 18, 2006 to August 23, 2006. Plaintiffs claim that a dramatic price drop during that time period can be attributed to the defendants' actions and the LLRICE contamination announcement. Plaintiffs further claim that the market injury persisted beyond that time frame, causing economic harm to any rice producer who priced his or her 2006 or 2007 crop after August 18, 2006.

Other losses asserted by plaintiffs also relate to the LLRICE contamination. After the LLRICE problem was discovered, two rice varieties – Cheniere and CL 131 – were banned from planting for the 2007 crop year because of contamination. Some plaintiffs allege that as a result of this ban, they were forced to plant alternate, lower-yield seed varieties, thereby reducing the size of their harvests. Other plaintiffs allege that they were unable to obtain any rice seed because of the ban, and had to plant different crops altogether. Plaintiffs who produced rice during the 2007 crop year incurred added costs in testing and segregating their rice to make sure it was free of genetically-modified traits. Land, equipment, and storage facilities were also contaminated and had to be cleaned to prevent further contamination.

C.    <u>Rice Markets and Pricing of Rice Crops</u>

Plaintiffs point to the CBOT market price as the gauge for measuring the harm inflicted by the contamination.  However, to assess a particular plaintiff's actual damages, it is necessary to look at how a plaintiff's sale of rice is actually connected to the CBOT market price index.  Rice producers sell their rice in a variety of ways.  The simplest, most direct sale is done on a cash basis, whereby a producer is paid upon delivery.  The price received is indexed to the current CBOT price per hundredweight.  Other rice producers sell their rice through seasonal pools or cooperatives.  A producer's rice is pooled with rice from other producers, and is then sold collectively at a specified time.  Each producer receives a pro-rata share from the cooperative.  Still other producers sell rice through booking contracts – a producer will contract with a buyer in advance to deliver a specified quantity of rice on a certain date.  The price per hundredweight may be fixed at the time of contract, or time of delivery, or some time in between.  The buyer may specify a particular quality or milling weight for the rice to be delivered, and a deviation from that quality may result in a penalty or premium.

Some rice producers' contracts are dependent on the calculation of a basis, in addition to the CBOT price.  A basis is a specified adjustment between the national CBOT price and the local price offered by a particular buyer.  If, for

example, the CBOT price is listed as $10 per hundredweight, and a local buyer is offering to buy rice at $9.50 per hundredweight, the $0.50 adjustment is that buyer's "basis." Thus, where a basis is involved, the price received by the producer is dependent both on the fluctuating CBOT price and on a particular buyer's fluctuating basis. Basis may fluctuate over time and from one buyer to the next. Under a "basis contract," a rice producer and a buyer agree on a fixed basis before delivery. A contract might call for "30 cents under CBOT." The $0.30 basis would remain fixed, and the market price would continue to fluctuate until delivery. The flip side of a basis contract is a "hedge to arrive contract." Under this arrangement, a price based on the market would be agreed to in advance. The basis term would then be left open and fixed at a later date. Under either of these systems, the entire price paid to a particular producer would not be known until the fluctuating components that make up the price are fixed.

Other rice buyers may set prices without reference to the CBOT price at all. Some buyers correlate their prices with the World Market Price – a price set by the USDA and used in the calculation of farm subsidies. Unlike the CBOT which changes every day, the World Market Price changes once a week, and does not reference the CBOT. Some buyers purchase rice based on the World Market Price, but with an adjusted basis. Other buyers, such as Cargill, may offer a "flat

price" for purchasing rice, or may negotiate a price with a particular producer on an individual basis at the time of sale.

D.    Class Proposal

Plaintiffs propose five separate state-wide classes comprising rice producers from the five respective states where plaintiffs are located. Any rice producer or non-producer[2] who claims to have been injured by the contamination of the U.S. rice supply would be eligible for class membership.

For each state-wide class, plaintiffs further propose two subclasses. The first of these would be the "Market Loss Subclass" – consisting of any rice producer who (1) priced some portion of his or her 2006 or 2007 rice crop after August 18, 2006; and (2) sold rice and claims to have suffered a market loss as a result of the LLRICE contamination. The second subclass would be the "Other Losses Subclass." Members of this subclass would assert non-market losses, including those relating to diminished yield, contamination of seeds, cleaning of farm equipment, and added costs in sorting and testing rice crops.

Plaintiffs seek to have all five classes and ten sub-classes certified under Fed. R. Civ. P. 23(b)(3). Plaintiffs argue that Bayer's liability and culpable

---

[2]Non-producers would be those plaintiffs who do not meet the USDA definition of "producer" but nevertheless claim injury. Examples of non-producers would be farming cooperatives with an economic interest in the rice crops of its members or share-crop landlords.

conduct can be demonstrated through common proof. In addition, plaintiffs argue, the fact of market injury can be shown on a class-wide basis. Once market injury has been conclusively established, individual plaintiffs would undergo a claims process or a series of separate mini-trials to determine individual damages. Plaintiffs propose that their claims be adjudicated as follows: a class action jury would hear the claims raised by the lead plaintiffs in their class action complaint. If the jury found in favor of plaintiffs, that jury would determine a total monetary cost (the market loss) caused by defendants' conduct. The class action jury would also determine (through the evidence produced at trial) the total quantity of U.S. rice affected by the LLRICE contamination. Once the total monetary cost and total rice quantity are known, damage could be calculated on a per-hundredweight basis (i.e., for each hundredweight of rice sold by a producer, the sum by which the value of the rice was reduced). The claims process would then determine the damages owed to individual plaintiffs. An individual producer would merely provide proof of the quantity of rice he or she sold, and that number would be multiplied by the loss-per-hundredweight figure. The result would be that plaintiff's individual damages. More involved individual claims proceedings would be needed to adjudicate damages for the "other losses" subclass.

Defendants raise three primary arguments in opposition to plaintiffs' class

action proposal. First, defendants maintain that a number of the proposed representatives' claims are not typical of the class. Second, they argue that some of the proposed representatives lack the necessary capacity to be adequate class representatives. Finally, defendants argue that the plaintiffs have failed to show that common issues predominate over individual concerns about damages. As a result, defendants urge that a class action is not the superior mechanism by which to resolve plaintiffs' claims.

## II.    Discussion

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974). Although "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," a court has no "authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *Eisen*, 417 U.S. at 177.

### A.    Requirements of Rule 23(a)

In order to determine whether class certification is proper, a court first looks to see whether the prerequisites set forth in Fed. R. Civ. P. 23(a) are satisfied. The

four requirements for class certification in Rule 23(a) are:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). *See also Owner-Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1011 (8th Cir. 2003).

The plaintiffs here easily satisfy the first two prerequisites for class certification. More than 30 named plaintiffs are listed in the consolidated class action complaint. These parties purport to represent more than 200 tag-along plaintiffs who have filed suit in this MDL, as well as hundreds more rice producers alleged to be damaged by Bayer's conduct. Plaintiffs' claims all arise out of the alleged mishandling by defendants of a genetically modified rice seed that contaminated the U.S. long grain rice supply. The claims therefore present common questions of law and fact. *See* Wright, Miller & Kane, Civil 3d, § 1763 at 215-217 (The Rule 23(a) commonality requirement "does not require that all the questions of law and fact raised by the dispute be common; nor does it establish any quantitative or qualitative test of commonality.").

Defendants argue however that the plaintiffs have failed to meet the

typicality and adequacy requirements. First, defendants note that a number of the proposed class representatives failed to preserve samples of the contaminated rice. Therefore, according to defendants, these plaintiffs' claims are subject to a unique spoliation defense, and the claims are not "typical" of the rest of the class. Second, defendants argue that many of the class action plaintiffs are suing in the wrong capacity – either because they are partnerships bringing suit in the partnership's name, or individuals bringing suit on behalf of a partnership where not all partners have joined in the suit. Under Missouri law and the law of a number of the other states in this MDL, these parties lack capacity to sue. Therefore, argue defendants, these plaintiffs are not "adequate" representatives.

Defendants' arguments on these two points are not without merit. However, I need not resolve these issues at this time. For reasons set forth below, I conclude that the predominance and superiority requirements of Rule 23(b)(3) bar class certification. Therefore, I will not further address the issues of typicality and adequacy.

B.     Requirements of Rule 23(b)

Once a group of plaintiffs has satisfied the prerequisites of Rule 23(a), the class may only be certified if it meets the requirements of at least one of the categories listed in Rule 23(b). Plaintiffs seek certification under Rule 23(b)(3).

Under this rule, the class will only be certified if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).

1.    Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The standard for certification imposed by Rule 23(b)(3) is more demanding than the commonality requirement of Rule 23(a), and mandates caution, particularly where "individual stakes are high and disparities among class members are great." *Amchem Prods.*, 521 U.S. at 623; *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 301-302 (5th Cir. 2003).

To establish predominance, a plaintiff must show "that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof." *In re Visa Check/Mastermoney Anti-Trust Litigation*, 280 F.3d 124, 136 (2d Cir. 2001) (quoting *Rustein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000)). The nature of the evidence necessary to resolve a question

determines whether that question is common or individual. If, to make a prima facie showing on a particular issue, plaintiffs will need to present evidence that varries from one class member to the next, then the issue raises an individual question. If the same evidence can suffice for each member of the class on an issue, then it becomes a common question. *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005). In determining whether common issues predominate, a court looks behind the pleadings to conduct a limited preliminary inquiry. "The court must look only so far as to determine whether, given the factual setting of the case, if the plaintiffs general allegations are true, common evidence could suffice to make out a prima facie case for the class." *Id*.

Plaintiffs here present a number of common issues. Their claims all arise out of Bayer's alleged mishandling of a genetically modified strain of rice. Bayer developed the strain, researched it, and tested it in the United States through a cooperative program with Louisiana State University. Plaintiffs allege (though the facts are not entirely clear on this point) that through this research and testing process, the genetically modified strain made its way into and contaminated commercial rice crops, which affected the national rice markets. These facts are common to all plaintiffs' claims.

Additionally, a subset of plaintiffs described as the "market loss subclass"

asserts further common fact issues. This subclass asserts that as a result of the contamination, plaintiffs who sold their rice after August 18, 2006 (the day of the contamination announcement) received a lower price for their crop. This is because, according to plaintiffs, many foreign buyers refused to purchase American rice because it was presumed to be contaminated with a genetically modified strain. With fewer buyers willing to purchase plaintiffs' rice, the market price for the crop decreased, causing a market-loss injury to plaintiffs.

The market-loss plaintiffs also argue that their damages can be calculated on a class-wide basis. According to these plaintiffs, the market damage caused by Bayer was reflected in the Chicago Board of Trade commodity price for U.S. long grain rice. Plaintiffs argue that they can show on a class-wide basis the total amount of economic harm caused by the contamination. Then, plaintiffs can show the total quantity of long-grain rice affected. Using these two market-based figures, plaintiffs will calculate damage on a per-hundredweight basis. This figure will be used to calculate each individual plaintiff's damages. Each plaintiff would attest to the quantity of rice he sold, and that figure would be multiplied by the per-hundredweight loss.

I am not persuaded that the calculation of damages in this case is a common issue. What plaintiffs have proposed is a convenient shorthand calculation that

might represent an estimate of some damages for some plaintiffs. For many plaintiffs, such an award might even be a fair and equitable compensation for their alleged loss. It might be a reasonable basis on which to reach a settlement of the claims. But plaintiffs' proposed method for calculating damages does not represent an actual *adjudication* of any one plaintiff's claims. Rather, calculation of actual damage is an individual issue specific to each plaintiff in this case, involving a unique inquiry into the time, place, and manner in which each plaintiff both priced and sold his rice.

Plaintiffs point solely to the Chicago Board of Trade market price as their reference point for gauging damages. But not every plaintiff had his rice priced according to the CBOT. Defendants have provided evidence showing that some producers sold their rice based on the World Market Price – a separate index that is not tied to the CBOT price. Other producers sold their rice to buyers who offered a flat price, or negotiated specific prices with buyers on an individual basis for a particular transaction. Although it appears the majority of rice producers did sell rice based on the CBOT price, they did so in very different ways. Defendants put forth evidence showing that only a fraction of rice producers sold their crop on a cash basis based on the then-current market price. Many rice producers used a pricing system that was far more complicated.

Some rice producers entered pools or cooperatives to sell their rice. Others sold rice through booking contracts – where a quantity of rice to be delivered or a price to be paid might be set far in advance. Rice producers using basis contracts or hedge-to-arrive contracts employed yet more complicated methods for pricing and selling their rice. The very notion of a localized basis (or a fluctuating deviation from the CBOT) is itself at odds with class-wide adjudication of damages. No individual plaintiff can prevail on a claim without offering proof to show how and when his rice was sold. In this way, each transaction involving the sale of rice was separate. Sales occurred at different times, in different locations, and at different rates. Although the CBOT provided a national index that reflected the fluctuating change in price based on supply and demand, it was not a uniform "price tag" that set the price of the commodity for every seller. Therefore, a drop in the CBOT did not represent a class-wide injury that can be readily calculated for each plaintiff. The issue of plaintiffs' damages is not common to the class.

Having determined that the calculation of damages is an individual issue raised by each plaintiff's claim, I further conclude that this individual inquiry predominates over the common issues raised in the class action complaint. Ordinarily, variation in individual damage amounts is not a bar to class certification. "Even wide disparity among class members as to the amount of

damages suffered does not necessarily mean that class certification is inappropriate." *Bell Atlantic v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2003). Courts have certified classes in cases where an individual claims process is necessary to award actual damages to specific plaintiffs. *See, e.g., In re Visa Check/Mastermoney Anti-Trust Litigation*, 280 F.3d 124, 138 (2d Cir. 2001) (class certified where formula set forth for calculating individual plaintiffs' recovery was "not fatally flawed"); *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001) (calculation of damages for individual employees entailed "a straightforward calculation of which days and how many hours they would have worked, and how much they would have earned in tips").

However, class certification "may not be suitable where the calculation of damages is not susceptible to a mathematical or formulaic calculation, or where the formula by which the parties propose to calculate damages is clearly inadequate." *Bell Atlantic*, 339 F.3d at 306 (citing *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 3420343 (4th Cir. 1998)). *See Blades v. Monsanto Co.*, 400 F.3d 562, 570 (8th Cir. 2005) (affirming denial of class certification and noting that class-wide damage calculation was not feasible because commodity was not sold at a uniform price); *Bell Atlantic*, 339 F.3d at

304 (denying certification where proposed formula used "a nationwide average cost of labor" and did not represent "an adequate approximation of any single class member's damages"); *Owner-Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001 (8th Cir. 2003) (denying certification where damages would be offset by other factors specific to each plaintiff's claim); *Wheeler v. Pilgrim's Pride Corp.*, 246 F.R.D. 532, 542 (E.D. Tex. 2007) (finding that plaintiffs' proposed model for calculating damages "oversimplif[ies] the damage methodology and ignore[s] the fact that individualized proof will be needed to show the damages of each class member").

The claims of the rice producers in this case do not lend themselves to an easy "mathematical or formulaic calculation." An accurate, true assessment of any plaintiff's damages requires an extensive inquiry involving the circumstances of that particular plaintiff. This case is therefore like those cases where class certification was denied because individual damages issues predominated over common elements. The alleged contamination of the U.S. long grain rice supply affected a vast number of rice producers. But this fact alone does not mean that class certification is appropriate. In many respects, the wide-spread contamination of U.S. rice is akin to a "mass accident" tort – the sort of case that the Advisory Notes to Rule 23 say should rarely be afforded class treatment. *See* Advisory

Comm. Note, 39 F.R.D. 69, 103 (1966) ("A 'mass accident' resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice to multiple lawsuits separately tried."). *See also Pruitt v. Allied Chemical Corp.*, 85 F.R.D. 100, 111 (E.D. Va. 1980) (denying class certification for all plaintiffs who claimed to be injured as a result of defendant's pollution of a river, as the pollution affected various groups of plaintiffs in significantly different ways).

The "Market Loss Subclass" proposed by plaintiffs is not appropriate for class certification because individual questions about damages would predominate over common issues. The plaintiffs' proposed "Other Losses" subclass is even less amenable to class-wide adjudication. This proposed subclass is simply a catch-all class for any plaintiff who claims any kind of injury related to genetically modified rice contamination. Plaintiffs point to rice producers who suffered diminished yield because they had to plant alternative seed varieties, as well as to producers who couldn't plant anything at all and producers who incurred added costs in cleaning and testing their production facilities. Sharecrop landlords and

cooperatives that purchased rice from producers and then re-sold to other buyers would also presumably belong to this class. The potential claims that might make up this class would be so numerous and so diverse as to make any trial on the merits wholly unworkable. No jury could be expected to calculate and award damages on a class-wide basis to plaintiffs with such varying and unrelated claims. The proposed "Other Losses" subclass is not an appropriate set of claims for class certification.

2.    <u>Superiority</u>

The second inquiry under Rule 23(b)(3) calls for a court to determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Relevant factors to be considered in making this determination include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A) - (D). These factors do not weigh in favor of class certification here. This MDL represents the consolidation of more than 200 cases across five states. Already, hundreds of plaintiffs have shown significant interest

in prosecuting their claims against Bayer. Not all plaintiffs support class certification. A number of them in fact oppose it, because they believe the individual circumstances of their particular cases require individual adjudication. *See* Individual Plaintiffs' Memorandum in Opposition to Motion to Certify Class, *In re Genetically Modified Rice Litigation*, No. 4:06MD1811 [docket #706] (E.D. Mo. filed May 20, 2008).

A class action would not be the superior method for resolving these claims. If this case were certified, hundreds of rice producers would receive notices about this litigation. But even class members who did not opt out would be required to prosecute their own cases to a great extent. Each class member would still have to undergo a claims process to prove how much rice he sold, to whom he sold it, how he sold it, when he sold it, what price he received, and how those individual figures relate to the CBOT. Many producers sold different lots of rice using different pricing methods, so for these producers the process is multiplied even further. Plaintiffs have not proposed a simple, uniform method for calculating any of this. The claims process would devolve into an endless series of "mini-trials" that would fail to meet the goals of class certification.

Plaintiffs argue that to deny class certification in this case would result in hundreds of full-scale individual trials across five states, all dealing with the same

issues regarding Bayer's conduct and the contamination of U.S. rice. While this scenario may be possible, as a practical matter it is not probable. There are many options available to resolve the hundreds of cases in this MDL. Lead counsel can propose a collection of "test cases" to be tried to verdict before deciding how other cases should be handled. This court also has the option of going to trial on the claims of the plaintiffs named in the master consolidated complaint that was filed in this district. *See generally* Manual for Complex Litigation, Fourth, § 22.36, p. 373 (2004). The decision not to certify a class does not necessarily mean that there will be hundreds of identical cases separately tried.

Finally, plaintiffs suggest that, even if their claims are not certified as a class under Rule 23(b)(3), the common issues should still be certified under Rule 23(c)(4). Whether such an approach is permissible when the over-arching claims are not certified as a class is an open question in the Eighth Circuit. *See In re St. Jude Medical, Inc.*, 522 F.3d 836, 841 (8th Cir. 2008). Even if this type of certification were allowable under the rules, however, I would decline to do it here. Certification of a limited issues class would lead to procedural difficulties, and a trial limited to common issues would not resolve any individual plaintiff's claims. This approach would do little if anything to increase the efficiency of this litigation.

## III.    Conclusion

Individual circumstances affecting the calculation of individual plaintiffs'

damages predominate over the common issues presented in plaintiffs' claims.

Although plaintiffs propose a number of classes, subclasses, and issues-classes for

trying common elements of this litigation, I am not persuaded that any of these

approaches represents a superior method for resolving issues raised in the

consolidated master complaint.  For these reasons, I will deny plaintiffs' motion

for class certification.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion [#499] for certification

of a class action is DENIED.

**IT IS FURTHER ORDERED** that defendants' motion [#693] to file a

rebuttal declaration of Dr. Nicholas Kalaitzandonakes is GRANTED.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 14th day of August, 2008.