**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| **IN RE GENETICALLY MODIFIED RICE LITIGATION** | ) ) ) | **4:06 MD 1811 CDP** **ALL CASES** |
| | ) | |

**BAYER DEFENDANTS' RESPONSE TO PLAINTIFFS' LEAD COUNSEL'S AND PLAINTIFFS' EXECUTIVE COMMITTEE'S MOTION FOR AN ORDER ESTABLISHING A COMMON BENEFIT FUND**

Dated:  September 17, 2009

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................... ii

I.      INTRODUCTION .............................................................................................. 1

II.     BACKGROUND ................................................................................................ 1

III.    ARGUMENT ...................................................................................................... 2

       A.      The Proposed Rates are Significantly Higher than Rates in
           Similar Cases ............................................................................................ 4

       B.      Higher Rates Are More Likely to Impede the Goals of
           MDL Proceedings ..................................................................................... 6

       C.      Any Common Benefit Fund Ought Not Unduly Encourage
           Filing in State Court ................................................................................. 7

IV.     CONCLUSION ................................................................................................... 8

# **TABLE OF AUTHORITIES**

**Cases**

*In re Air Crash Disaster at Florida Everglades on December 29, 1972*,
    549 F.2d 1006 (5th Cir. 1977) ..........................................................................5, 6

*In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*,
    MDL No. 1699, No. 05-CV-01699, Pretrial Order No. 8 (N.D. Cal. Feb. 28,
    2006) .............................................................................................................5

*In re Diet Drugs Prods. Liab. Litig.*,
    MDL Docket No. 1203, No. 99-20593, 2002 U.S. Dist. LEXIS 19396 (E.D. Pa.
    Oct. 3, 2002) ..............................................................................................4, 7

*In re Guidant Corp. Defibrillators Prods. Liab. Litig.*,
    No. MDL 05-1708, 2006 WL 409229 (D. Minn. Feb. 15, 2006)...............................4

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
    496 F.3d 863 (8th Cir. 2007) .......................................................................2

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
    No. MDL 05-1708, 2008 WL 682174 (D. Minn. Mar. 7, 2008) ...........................2, 5

*In re MGM Grand Hotel Fire Litig.*,
    660 F. Supp. 522 (D. Nev. 1987).................................................................5, 6

*In re Ortho Evra Prods. Liab. Litig.*,
    MDL No. 1742, No. 1:-6-40000, Case Management Order No. 9 (N.D. Ohio
    Aug. 28, 2006) ............................................................................................5

*In re Prempro Prods. Liab. Litig.*,
    MDL No. 4:03CV1507, Practice and Procedure Order No. 6 (E.D. Ark. Mar.
    30, 2005) ....................................................................................................5

*In re Silicone Gel Breast Implants Prods. Liab. Litig.*,
    MDL No. 926, No. CV 92-F-10000, Order No. 13 (N.D. Ala. July 23, 1993) .........5

*In re Vioxx Prods. Liab. Litig.*,
    MDL No. 1657, Pretrial Order No. 19 (E.D. La. Aug. 4, 2005)..............................5

**Statutes**

28 U.S.C. § 1407(a) .....................................................................................2, 8

**Other Authorities**

*Manual For Complex Litigation*, Fourth, § 10 ............................................................................ 7

Paul D. Rheingold, *Litigating Mass Tort Cases* § 7:38 (2009) ...................................................... 7

## I.      INTRODUCTION

The Bayer Defendants are reluctant to take sides in a dispute over fees among plaintiffs' counsel.[1]   In this case, however, the common benefit fund proposed by Plaintiffs' Lead Counsel and Plaintiffs' Executive Committee (referred to collectively as the "Executive Committee") may serve to defeat or at least interfere with the purpose of common benefit funds and MDL proceedings: to ease the administrative burden on the court, promote responsible case management, and promote efficiencies.  To best avoid that result, the Bayer Defendants respectfully request that the motion be denied or, at a minimum, that the proposed tax be significantly reduced.

## II.     BACKGROUND

The Executive Committee proposes assessments that total 11% for producers (8% for fees plus 3% for costs) and 10% for non-producers (7% for fees and 3% for costs).  *See* Mem. in Supp. 1.  The Bayer Defendants have had no part in this proposal, and no member of the Executive Committee sought the Bayer Defendants' input before filing their motion for the establishment of a common benefit fund.

Collectively, the members of the Executive Committee represent approximately 519 of all MDL plaintiffs.  Members of the Executive Committee also have approximately 449 recently-filed plaintiffs currently outside the MDL, most of which are headed to the MDL.[2]  There are approximately 6068 plaintiffs combined in the MDL, other federal forums, or state courts,

---

[1] For purposes of this motion, the "Bayer Defendants" are Bayer CropScience LP, Bayer CropScience Holding, Inc., Bayer CropScience LLC, Bayer CropScience Inc., and Bayer Corporation.

[2] The numbers in these approximations count the number of plaintiffs per firm, such that some plaintiffs are counted for more than one firm.  For example, for a number of plaintiffs in Mississippi and Arkansas, Goldman, Pennebaker, & Phipps P.C. co-filed with other firms.

1

meaning that the Executive Committee represents less than 1/6 the total universe of plaintiffs.

Several other plaintiffs' groups represent as many as or more plaintiffs than the members of the Executive Committee.  For example, Hare, Wynn, Newell & Newton LLP ("Hare Wynn") represents approximately 2479 plaintiffs, nearly all of which are or will be in the MDL.[3] Another large group of plaintiffs, totaling approximately 1818, are represented by Goldman, Pennebaker, & Phipps P.C.  Approximately 333 of those plaintiffs are or will be in the MDL.

## III.    ARGUMENT

A "corollary" to the court's power in an MDL proceeding to "appoint a committee to coordinate the litigation and ease the administrative burden on the court" is that "the court must be permitted to compensate fairly the attorneys who serve on such a committee."  *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, No. MDL 05-1708, 2008 WL 682174, *5 (D. Minn. Mar. 7, 2008) (quotations and citations omitted).  But in exercising that power, a court should take care not to undermine the very purpose of coordinated procedures in an MDL: to "promote the just and efficient conduct" of "civil actions involving one or more common questions of fact" in different districts, 28 U.S.C. § 1407(a); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 496 F.3d 863, 867 (8th Cir. 2007) ("Congress established MDL protocols to encourage efficiency.").

Rather than increasing efficient resolution of this litigation, the Executive Committee's proposed assessments likely would decrease the chances of settlement, and also decrease

---

[3] It appears Hare Wynn has entered into a "Joint Prosecution Agreement" with the Executive Committee and therefore now asks that it be exempt from the assessments for fees as proposed by the Executive Committee.  *See* Submission of Schafer and Brann Plfs. in Resp. to Mot. to Assess Fees and Costs for Common Benefit Fund 2 (attached as Ex. 1).  That agreement demonstrates that there are alternative routes to manage how the Executive Committee is equitably compensated.

cooperation among plaintiffs' attorneys.  Neither result would promote just and efficient management of this litigation.

The only reason a court order might be required would be to assess a share of the costs of MDL work upon plaintiffs represented by attorneys who are not part of the Executive Committee.  In this case, as noted above, the majority of plaintiffs are *not* represented by the Executive Committee, and any large "tax" for this purpose could impose a substantial impediment to any broad-based resolution of plaintiffs' claim.  For example, the same settlement offer will be viewed very differently by those on the Executive Committee (who receive additional payments in addition to the settlement amount regardless of what fee arrangements they have with their client) and those excluded (who see their clients'—and presumably their own—payments reduced by payments to the Executive Committee).

The Bayer Defendants do not believe that such a tax is necessary.  The Executive Committee's own clients have sufficient claims to justify the cost that has been invested by members of the Executive Committee, and, as mentioned above, the Joint Prosecution Agreement between the Executive Committee and Hare Wynn demonstrates that the Executive Committee can be compensated without a common benefit fund.  If the Executive Committee is able to recover on those claims, then its members will be fairly compensated pursuant to their respective fee agreements.  In addition, a significant portion of the work performed by the Executive Committee was focused on class certification—an effort that offered potential large rewards but was ultimately unsuccessful.  It is neither appropriate nor fair for the Bayer Defendants or other plaintiffs—some of whom opposed class certification—to compensate plaintiffs for any of that work.

Even if a common benefit fund were warranted, it should look nothing like the fund proposed by the Executive Committee. Rather, it should be much more closely tailored to actual costs expended and should be as minimally disruptive of any potential broad-based resolution that might be otherwise attainable.

### A.    The Proposed Rates are Significantly Higher than Rates in Similar Cases

Although the Executive Committee contends that "MDL transferee courts have imposed fee assessments of the size requested here," it offers no authority where such an extraordinarily high request was granted prior to any global resolution, and the Bayer Defendants are unaware of any. Mem. in Supp. 10. The Bayer Defendants believe that the 11% and 10% assessments requested are much too high. As one recent case has explained in rejecting assessments of 9% for federal cases and 6% for state cases, "6% and 4% assessments are more in keeping with those currently being levied in other MDL's." *In re Diet Drugs Prods. Liab. Litig.*, MDL Docket No. 1203, No. 99-20593, 2002 U.S. Dist. LEXIS 19396, *58 (E.D. Pa. Oct. 3, 2002). The court offered these examples:

> [I]n *In re Baycol Prods. Liab. Litig.*, MDL 1431, the court has established an across the board 6% in both federal and coordinated state cases. Similarly, in *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, MDL 1407, an assessment of 4% in federal cases and 3% in state cases is being used. Finally, in *In re Propulsid Prods. Liab. Litig.*, MDL 1355, and *In re Rezulin Prods. Liab. Litig.*, MDL 1348, the same percentages as chosen here, 6% and 4%, are in place.

*Id.*

Indeed, in the other cases the Executive Committee relies upon, the assessments were several percentage points lower than the 11% or 10% total assessment that the Executive Committee proposes. *See, e.g., In re Guidant Corp. Defibrillators Prods. Liab. Litig.*, No. MDL 05-1708, 2006 WL 409229, *2-3 (D. Minn. Feb. 15, 2006) (imposing 4% total assessment before master settlement, with possible increase for cases filed after later, specified date under certain

circumstances);[4] Ex. H to Levitt Decl., D.E. 1460-9, *In re Prempro Prods. Liab. Litig.*, MDL No. 4:03CV1507, Practice and Procedure Order No. 6 (E.D. Ark. Mar. 30, 2005) (imposing 5% total assessment for federal court cases, 3% total for state court); Ex. F to Levitt Decl., D.E. 1460-7, *In re Ortho Evra Prods. Liab. Litig.*, MDL No. 1742, No. 1:-6-40000, Case Management Order No. 9 (N.D. Ohio Aug. 28, 2006) (imposing 3% total assessment, 5% for later filed cases under certain circumstances); Ex. I to Levitt Decl., D.E. 1460-10, *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, MDL No. 1699, No. 05-CV-01699, Pretrial Order No. 8 (N.D. Cal. Feb. 28, 2006) (imposing 4% total assessment, with possible increase for cases filed after later, specified date under certain circumstances); Ex. G to Levitt Decl., D.E. 1460-8, *In re Vioxx Prods. Liab. Litig.*, MDL No. 1657, Pretrial Order No. 19 (E.D. La. Aug. 4, 2005) (imposing 3% assessment on attorneys cooperating with MDL, 4-6% for other cases depending on circumstances); Ex. J to Levitt Decl., D.E. 1460-11, *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, MDL No. 926, No. CV 92-F-10000, Order No. 13 (N.D. Ala. July 23, 1993) (imposing 5% total assessment, 6% for judgments or settlements after later, specified date); *In re MGM Grand Hotel Fire Litig.*, 660 F. Supp. 522, 529 (D. Nev. 1987) (increasing assessment from 5% to 7% after lead attorneys obtained a "global" settlement).[5]

---

[4] After a global settlement was achieved, the *In re Guidant* court increased the assessment to 15%. *In re Guidant Corp.*, 2008 WL 682174, at *14-15. The global settlement had disposed of "both the MDL and state cases, and included Plaintiffs whose cases had been filed or transferred to the MDL, Plaintiffs whose cases were filed outside the MDL in state court proceedings, and potential Plaintiffs who had not yet filed their cases." *Id.* at *3.

[5] *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006 (5th Cir. 1977), did consider an 8% assessment—the closest to what the Executive Committee proposes, yet still 3% lower than their proposal for producers and 2% lower than for non-producers. And yet that case (1) arose after the plaintiffs' committee was "largely responsible for an ultimate concession of liability" by the defendant and the majority of claims had been thereby collectively settled, *id.* at 1008, and (2) actually remanded the matter back to the district court, *id.* at 1021. In this case, of course, the Executive Committee has asked for much more but has done much less.

If this were a case where an assessment was being proposed with substantial resolution complete or even agreed upon, the Bayer Defendants would not likely be concerned about plaintiffs' counsel's debate over an assessment rate because it would not significantly affect the Bayer Defendants' interests.  *See, e.g., In re MGM Grand Hotel Fire*, 660 F. Supp. at 525 ("The disposition of the instant PLC fee petition could not impose additional liability on the defendants; nor does it affect any defendant in any other way.").  But under the circumstances, the Bayer Defendants are obliged to point out the burden that such an unusually high assessment rate would likely place on all of the Bayer Defendants' interests, as well as those of the Court and the public in timely and efficient resolution of the many cases that have yet to be disposed of.

**B.      Higher Rates Are More Likely to Impede the Goals of MDL Proceedings**

As the Executive Committee itself argues, common benefit funds are not used simply to settle plaintiffs' attorneys' private squabbles; they also serve the public interest in "economy, discourag[ing] duplication of cost and effort, and foster[ing] coordination."  Mem. in Supp. 9 & n.4 (citing *In re Air Crash Disaster*, 549 F.2d at 1012).  Unfortunately, as demonstrated by the disagreement among the plaintiffs' attorneys in this case,[6] a fund with assessments this high will undermine these goals.

----

[6] Even among those plaintiffs' attorneys who support a common benefit fund in this case, there is some disagreement over the assessment rates and structure of the fund.  Patrick W. Pendley, for example, appears to agree with the Bayer Defendants that the 8% assessment (which would have an additional 3% tacked on for costs) is too high, at least if "the litigation" is resolved before a liability trial is "commenced or completed."  Joinder of Producer Parties in This Matter Represented by Patrick W. Pendley, Esq. 2 (D.E. 20 in related Case No. 07-cv-502, Sept. 16, 2009).  Although the Bayer Defendants agree with Pendley that an 8% assessment (plus 3% for costs, totaling 11%) is too high before trial, an 8% assessment is likewise too high after a liability trial has commenced, as demonstrated by the uniformly lower assessments summarized above in Part III.A.

First, assessments this high will decrease cooperation among plaintiffs attorneys, thereby undermining a goal of MDL litigation, *see, e.g., Manual For Complex Litigation*, Fourth, § 10 at 7 ("Fair and efficient resolution of complex litigation requires at least that . . . counsel act cooperatively and professionally," among other things), by (1) creating an incentive to avoid the MDL so as not to pay the high tax, given the amount of work the non-MDL attorneys are themselves performing, *see, e.g.,* Paul D. Rheingold, *Litigating Mass Tort Cases* § 7:38 (2009) ("Some of the state cases may involve great time and expense in their own development, perhaps even as much as the MDL, but separate from it."); (2) creating an incentive not to use discovery material and work product from the MDL in an effort to avoid the high tax, and/or an incentive to try to obtain discovery material but not pay the tax, *see id.*; and (3) generally creating animosity among those who believe the assessments are not justified.

Second, an assessment this high will increase the minimum gross settlement amounts attorneys outside the Executive Committee would require in order to offset the large share they would lose to the Executive Committee.  An inclination to increase settlement demands is a natural consequence of a tax this high.  Together, this inclination and the decrease in cooperation discussed above will undermine the Court's and the public's interest in efficient litigation and settlement.

## C.      Any Common Benefit Fund Ought Not Unduly Encourage Filing in State Court

As proposed by the Executive Committee, the fund would assess claims filed in state court as well as those filed in federal court.  As can be observed by the cases cited above, it is not uncommon for state court assessments to be set several percentage points below the assessment for federal cases, *see, e.g., In re Diet Drugs*, 2002 U.S. Dist. LEXIS 19396, at *58.  Regardless of how the Court resolves the dispute among plaintiffs' attorneys in this case, the Bayer

Defendants respectfully request that the Court set a state court assessment rate close enough to any federal rate in order to avoid creating an incentive for federal litigants and potential litigants to flee the MDL, find ways to join parties, and defeat diversity jurisdiction so as to save on the assessment rate.  Avoiding such incentives will preserve the efficacy of this MDL proceeding and serve the overriding goal of "promot[ing] the just and efficient conduct" of "civil actions involving one or more common questions of fact" in different districts, 28 U.S.C. § 1407(a).

Finally, Hare Wynn's proposal of not opposing a common benefit fund that applies to others while at the same time securing their own confidential arrangement with the Executive Committee should be similarly prohibited.  The Executive Committee should not be permitted to invoke this Court's power to tax recoveries by all plaintiffs while allowing some plaintiffs' counsel to secure other, more favorable deals cloaked in confidentiality.  Such one-off arrangements undermine the core purpose of a common benefit fund and create two classes of counsel: the Executive Committee (and those able to secure favorable deals with them) and all others.

## IV.    CONCLUSION

For the foregoing reasons, the Bayer Defendants request that the Court deny the motion or, in the alternative, significantly reduce the Plaintiffs' Lead Counsel's and Plaintiffs' Executive Committee's proposed assessment rates to a more reasonable rate, and that any assessment be set such that no artificial incentive is created to escape or avoid the MDL proceeding.

Respectfully submitted,

/s/ *Eric R. Olson*
Eric R. Olson

William F. Goodman, III
Joseph J. Stroble
Elizabeth M. Gates
**WATKINS & EAGER**
The Emporium Bldg.
400 E. Capitol Street, Suite 300
Post Office Box 650
Jackson, Mississippi 39205-0650

Mark E. Ferguson
Stephen Cowen
**BARTLIT BECK HERMAN PALENCHAR &**
    **SCOTT LLP**
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, Illinois 60610

Terry Lueckenhoff, #43843
**FOX GALVIN LLC**
One S. Memorial Drive, 12th Floor
St. Louis, Missouri 63102

Glen E. Summers
Lester C. Houtz
Eric R. Olson
John M. Hughes
**BARTLIT BECK HERMAN PALENCHAR &**
    **SCOTT LLP**
1899 Wynkoop Street, 8th Floor
Denver, Colorado 80202

*ATTORNEYS FOR BAYER CROPSCIENCE LP, BAYER CROPSCIENCE HOLDING,*
*INC., BAYER CROPSCIENCE LLC, BAYER CROPSCIENCE INC., AND BAYER*
*CORPORATION*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 17, 2009, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

*/s/ Eric R. Olson*