IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE GENETICALLY MODIFIED RICE LITIGATION | ) ) ) ) ) | 4:06 MD 1811 CDP ALL CASES |

### MEMORANDUM IN SUPPORT OF PLAINTIFFS' OBJECTION TO PLAINTIFFS' LEAD COUNSEL'S AND PLAINTIFFS' EXECUTIVE COMMITTEE'S MOTION TO ESTABLISH A COMMON BENEFIT FUND

TO THE HONORABLE CATHERINE D. PERRY:

Plaintiffs with cases before MDL 1811 under Cause Nos. 4:08-CV-1262; 4:08-CV-1279; 4:08-CV-1259; 4:08-CV-1266; 4:08-CV-1269; 4:08-CV-1270; 4:08-CV-1258; 4:08-CV-1271; 4:08-CV-1275; 4:08-CV-1276; 4:08-CV-1255; 4:08-CV-1277; 4:08-CV-1267; 4:08-CV-1268; 4:08-CV-1278 4:08-CV-1265; 4:08-CV-1274; 4:08-CV-1257; 4:08-CV-1254; 4:08-CV-1286; 4:08-CV-1285; 4:08-CV-1272; 4:08-CV-1273; 4:08-CV-1260; 4:08-CV-1263; 4:08-CV-1261; 4:08-CV-1256; 4:08-CV-1287; 4:08-CV-1261; 4:08-CV-1281; 4:08-CV-1283; 4:08-CV-1284; 4:08-CV-1542; 4:08-CV-1541; 4:08-CV-877; 4:08-CV-878; 4:08-CV-879; 4:08-CV-880; 4:08-CV-881; 4:08-CV-887; 4:08-CV-889; 4:08-CV-1291; 4:08-CV-1543; 4:08-CV-1544; 4:08-CV-1629; 4:07-CV-1762; 4:08-CV-2027; 4:08-CV-0522; 4:08-CV-1253; 4:08-CV-1282 hereby object to the Motion to Establish a Common Benefit Fund filed by Plaintiffs' Lead Counsel and Plaintiffs' Executive Committee.[1]

---

[1] This Memorandum is also on behalf of all cases pending in the Eastern District of Arkansas awaiting transfer to the MDL listed in Exhibit A and all pending Arkansas state court cases listed in Exhibit B.

## A. INTRODUCTION

1.      Plaintiffs filing this objection are approximately 1,815 individual rice farmers, land owners and entities who have sued Defendants and Riceland in federal and state courts for the GMO contamination of the United States rice supply and are represented by a team of attorneys headquartered in San Antonio, Texas led by attorney, Martin J. Phipps. The group of plaintiffs filing this Objection will hereinafter be referred to as "the Phipps Plaintiffs" and their legal team will hereinafter be referred to as "the Phipps team."[2] The Phipps Plaintiffs' cases currently sit in federal court after being transferred and consolidated as a part of MDL 1811 in the Eastern District of Missouri and are awaiting transfer from the Eastern District of Arkansas. (Exhibit A). Other Phipps Plaintiffs' cases continue to sit in many varying Arkansas state courts. (Exhibit B). The Phipps MDL Plaintiffs comprise approximately 15% percent of all plaintiffs involved in this MDL (this percentage includes the recently filed petition in the Eastern District of Arkansas by Hare, Wynn, Newell & Newton of Alabama that is awaiting transfer to this Court that has over a thousand new rice farmers, land owners and entities).  However, the Phipps team believes they represent over 90 percent of all Arkansas state court cases with 1244 individual rice farmers, landlords and entities.

2.      Plaintiffs' Court-Appointed Lead Counsel and Executive Committee ("PLC") have requested this Court establish a common benefit fund to compensate them for "assisting in prosecuting this centralized multidistrict litigation." PLC has requested this Court order Defendants to set aside 11% of any gross recovery obtained by the Phipps producer plaintiffs (8% for attorney's fees and 3% for expenses) and 10% any gross recovery obtained by the Phipps non-producer plaintiffs (7% for attorney's fees and 3% for expenses).

---

[2]The attorneys comprising the Phipps team include: Martin J. Phipps, Larry J. Goldman, Douglas E. Pennebaker, Craig M. Saucier, Clayton J. Smaistrla, John W. McGlothlin, Mikal Watts, Austin Anderson, Kimberly Keller, Alton Todd, Charles Banks, Rob Francis, T. Mark Sledge and Jim Grenfels.

3.      The Phipps Plaintiffs object to any assessment against them or the Phipps team to establish a common benefit fund. The Phipps team has performed over 12,000 hours of work and expended over $850,000 in expenses preparing this litigation for trial. The work performed by the Phipps team has benefited not only the Phipps Plaintiffs, but also all plaintiffs involved in this MDL, including those represented by PLC, because the work and effort put in by the Phipps team has placed additional separate pressure on Defendants. All lawyers have worked hard in this case to represent the individualized interests of their clients, and the work of each team of lawyers has benefited all plaintiffs collectively. Simply put, contrary to PLC's representations, the Phipps Plaintiffs are not "free riders," and neither they nor their counsel should be penalized by an assessment.

## B. PLC MAY NOT SEEK AN ASSESSMENT FROM THIS COURT AGAINST STATE COURT PLAINTIFFS

4.      PLC's Motion is so broadly worded that the Phipps Plaintiffs were unable to determine the scope of plaintiffs request from which PLC seeks attorney's fees and expenses. It is unclear whether PLC seeks a 10% or 11% of the recovery from only plaintiffs governed by this MDL or all plaintiffs suing Defendants, including those prosecuting their claims in state court against Defendants and Riceland and not subject to this MDL. The Phipps Plaintiffs object to any contention by PLC that this Court has jurisdiction to order an assessment against the recovery of state court plaintiffs outside this MDL litigation.  This Court has recognized in some instances its lack of jurisdiction by remand.  If the court lacks jurisdiction to require a case to be included in the MDL, then how could it snatch back jurisdiction to assess fees and expenses on a claim that is not before it?

5.      It is well-established that MDL courts lack jurisdiction to order assessments against plaintiffs' prosecuting claims in state courts. "The issue of assessing state cases with

costs of a discovery process that benefits all cases, state and federal, should, in the first instance, be left to state court judges." *In re Zyprexa Prods., Liability Litig.,* 476 F.Supp.2d 256, 268-69 (E.D. NY 2006). *See also In re Showa Denko K.K. L-Tryptophan Prod. Liab. Litig.-II,* 953 F.2d 162, 166 (4th Cir. 1992) (holding that a federal district court cannot order contribution of costs from parties not before it); *Hartland v. Alaska Airlines*, 544 F.2d 992, 1002 (9th Cir. 1976) (ordering MDL court to return contributions obtained from non-party claimants as a condition of approving settlements); *In re Linerboard Antitrust Litig.*, 292 F.Supp.2d 644, 664 (E.D. Pa. 2003) (finding that court lacked jurisdiction over cases not formally transferred into the MDL, and refusing to order sequestration of funds from settlements and other recoveries in untransferred cases); *see also Howery v. Allstate Ins. Co.,* 243 F.3d 912, 916 n.6 (5th Cir. 2001) ("Where a federal court proceeds in a matter without first establishing that the dispute is within the province of the controversies assigned to it by the Constitution and statute, the federal tribunal poaches upon the territory of a coordinate judicial system"). Consequently, this Court should deny PLC's quest for an assessment against Plaintiffs not governed by this MDL proceeding.

### C. STATE LAW, NOT FEDERAL LAW, GOVERNS AWARDS OF ATTORNEY'S FEES IN FEDERAL CASES BASED ON DIVERSITY JURISDICTION

6.      Upon removal by Defendants, *see* 28 U.S.C. §1441(a), this Court determined it has jurisdiction over these cases based on a finding of diversity of citizenship. 28 U.S.C. § 1322(a)(1). This case, thus, is governed by the *Erie* doctrine, whereby this Court applies state law to substantive matters and federal law to procedural matters. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *Scenic Holding, LLC v. New Bd. of Trustees of Tabernacle Missionary Baptist Church, Inc.*, 506 F.3d 656, 665 (8th Cir. 2007).

7.     The question of whether attorney's fees should be awarded is a question of substantive law. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 245 n.31 (1975); *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.,* 418 F.3d 168, 177 (2d Cir. 2005) (stating, in diversity case based on plaintiff's quantum meruit claim, "We apply New York substantive law to resolve the dispute regarding plaintiff's entitlement to attorney's fees"); *Corrosion Rectifying Co. v. Freeport Sulphur Co.*, 197 F.Supp. 291, 292 (S.D. Tex. 1961) ("Texas authorities and other cases clearly hold the issue of attorneys' fees to be one of substantive rights").

8.     In *Alyeska*, the Supreme Court of the United States discussed exceptions to the American Rule governing attorney's fees awards, stating "[a] very different situation is presented when a federal court sits in a diversity case. '[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed.'" *Alyeska,* 421 U.S. at 259, n. 31 (quoting 6 Moore, FEDERAL PRACTICE ¶ 54.77[2], pp. 1712-1713 (2d ed. 1974)). The creation of a common benefit fund, which takes attorney's fees from one client or his counsel and gives them to another, absent contract or other legal authority, is a matter of substantive right; thus, the question of the appropriateness of such an arrangement is governed by state law.

9.     In this case, PLC relies on the federal common benefit fund doctrine, established by federal common law and other federal courts' application of the common benefit fund in class action litigation, as authority to allow (and calculate) a noncontractual shift in attorney's fees from the attorneys contracted with by the client to attorneys who have no contractual relationship with the clients receiving the recovery. To rule on this request, this Court necessarily delves into

5

the substantive rights of the parties involved. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 2136-37 (1991); *N. Heel Corp. v. Compo Indus., Inc.*, 851 F.2d 456, 475 (1st Cir. 1988) (ruling method of calculating award substantive and hence rejecting district court's use of federal "lodestar" method of calculating attorney's fees in favor of Massachusetts law which looked to party's engagement agreement with its lawyers); *Blanchette v. Cataldo*, 734 F.2d 869, 878 (1st Cir. 1984) (applying state law mandatory fee provision to reverse district court's denial of attorney's fees); *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 232 (1st Cir. 1980) (remanding to district court for calculation of attorney's fees in accordance with state law and noting that "[t]o the extent [state] law is silent or incomplete on the calculation of attorney's fees, [federal law] may well be relevant"); *cf. Powell v. Old S. Life Ins. Co.*, 780 F.2d 1265, 1267-68 (5th Cir. 1986) (acknowledging but not deciding whether method of calculation is substantive).

10.     As argued above, state law, not federal law, should be used to determine if any assessment is allowed. When the assessment requested involves a fee shifting arrangement from attorneys contractually bound to represent clients and who have actively participated in representing those clients to attorneys who have no contractual relationship, substantive rights are implicated, requiring application of state law.

11.     PLC has cited no state law and the Phipps Team has not been able to locate any state law authority allowing for a shift of attorney's fees in multidistrict litigation. The available Texas law appears to disallow such a shift because, as discussed below, Texas's ethical rules disallow fee sharing absent client consent in advance of any fee sharing arrangement. Moreover, notwithstanding Texas's Disciplinary Rules, there is also no state case law supporting an assessment in a case where all attorneys have substantially performed and prosecuted their

client's cases. As such, this Court should summarily deny PLC's request to establish a common benefit fund.

### D. RELIANCE ON CLASS ACTION PRINCIPLES TO REQUEST AN ASSESSMENT IN MULTIDISTRICT LITIGATION IS IMPROPER

12.     In their request for the establishment of a common benefit fund, PLC refers to federal case law that ultimately relies on the authority granted courts to assess fees in class action cases.[3] However, no statutory authority exists allowing a court to assess fees in multidistrict litigation cases. The statute governing a court's power in an MDL, 28 U.S.C. §1407, is silent as to attorney's fees. While the statutory authority does permit a federal judge to grant fee awards "that are authorized by law," it does not address the question of what "law," if any, authorizes fee awards to lead attorneys in MDLs. FED. R. CIV. P. 23(H).

13.     Most lead counsel in MDLs point to the common fund doctrine and case law involving class actions to support creation of a common benefit fund.[4] Class actions are underscored by public policies supporting application of the common benefit fund. These same public policies, which support application of the common benefit fund, are not present in MDLs. While class actions and MDLs are similar in that they involve numerous plaintiffs, it is the distinction between the two types of litigation that renders the common fund doctrine inappropriate for MDLs. This distinction is discussed in detail in the commentary of the most recent draft of the *Restatement (Third) of Restitution & Unjust Enrichment*:

> [b]y comparison with [fee awards in] class actions, court-imposed fees to appointed counsel in consolidated litigation frequently appear inconsistent with restitution principles, since litigants may

---

[3] *See In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006); *see also In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, No. 05-1708, 2008 WL 682174, at *18 (D. Minn. Mar. 7, 2008); *In re: Vioxx Prods. Liab. Litig.*, 574 F.Supp. 2d 606 (E.D. La. 2008).

[4] Charles Silver, *A Restitutionary Theory of Fee Awards in Class Actions*, 76 CORNELL L. REV. 656 (1991); *see Alyeska*, 421 U.S. at 245 (describing origins and justification for the common fund doctrine).

have no choice but to accept and pay for certain legal services as
directed by the court.

RESTATEMENT (THIRD) OF THE LAW OF RESTITUTION AND UNJUST ENRICHMENT § 30 cmt. b
(Tentative Draft [T.D.] Nov. 3, 2004). The infrastructure of the class action system has a built-in
component to ensure consent to the common benefit fee. Specifically, only absent claimants who
choose not to opt out ultimately pay common benefit fees, and thus, class members, by not
opting out, are impliedly agreeing to pay fees. *Id.* ("The class members' right . . . to opt out . . .
tends to resolve, insofar as practicable, remaining objections on the score of forced exchange.").
MDLs with an imposed assessment work the opposite way: claimants cannot exclude themselves
from MDLs, and, thus, judges cannot imply claimants' consent to pay lead attorneys. Indeed,
many claimants have hired their own individual attorneys to prosecute their claims.

14.     The *Restatement* goes on further to state the "predominant rationale [for fee
awards in consolidations] is not unjust enrichment but administrative convenience." *Id.* This
explains why, on the one hand, the common fund doctrine fits a class action model, the purpose
of which is to make claimants better off by generally facilitating litigation of small claims. *See
Mace v. Van Ru Credit Corp.,* 109 F.3d 338, 344 (1997) ("The policy at the very core of the class
action mechanism is to overcome the problem that small recoveries do not provide the incentive
for any individual to bring a solo action prosecuting his or her rights. A class action solves this
problem by aggregating the relatively paltry potential recoveries into something worth someone's
(usually an attorney's) labor").

15.     Comparing the class action model to MDL, the same principles are not at work
and plaintiffs are not receiving the same level of benefits. The primary purpose of MDL is to
conserve resources by, *inter alia,* providing administrative convenience and prohibiting plaintiffs

from opting out of the MDL.[5] Indeed, although there is a consensus that class actions benefit plaintiffs by bringing forth claims that would not be practically actionable individually, legal commentators generally contend the opposite of MDLs. *See DeLaventura v. Columbia Acorn Trust*, 417 F.Supp.2d 147, 155 (D.Mass 2006). As stated by one court:

> Over the past decades, judges have gained increasing authority over the pretrial process and the configuration of lawsuits themselves. One source of that control . . . is the ability of judges to insist that litigants combine their actions, by consolidation and multi-district litigation, so that the judiciary can consider related problems together. This increased judicial authority has come at the expense of the autonomy of at least lawyers, if not also their clients. . . . In actuality, however, this marginalization of juror fact finding perversely and sharply skews the MDL bargaining process in favor of defendants. . . . Once trial is no longer a realistic alternative, bargaining shifts in ways that inevitably favor the defense. After all, a major goal of nearly every defendant is to avoid a public jury trial of the plaintiff's claims. Fact finding is relegated to a subsidiary role, and bargaining focuses instead on ability to pay, the economic consequences of the litigation, and the terms of the minimum payout necessary to extinguish the plaintiff's claims. Commentators generally agree that MDL practice favors the defense.

*Id.* at 149-58.

16.     The common fund doctrine is also inapplicable to MDLs for other reasons. The doctrine is not based on civil law, but rather, the law of restitution. RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 30 cmt. a (T.D. No. 3, 2004) ("It is misleading, more fundamentally, because it suggests that "the common fund doctrine" is a peculiarity of civil procedure and the law governing lawyers, when it is more accurately perceived as an application

---

[5]*See* Charles Silver, *A Restitutionary Theory of Attorneys' Fees in Class Actions*, 76 CORNELL L. REV. 656 (1990) (setting out conditions for the application of the common fund doctrine in class actions); Charles Silver, *Comparing Class Actions and Consolidations*, *supra* note 21 (explaining differences between class actions and consolidations that make it difficult to apply the common fund doctrine in the latter); James M. Wood, *The Judicial Coordination of Drug and Device Litigation*, 54 FOOD & DRUG L.J. 325, 337 (1999); *see* Desmond T. Barry, Jr., *A Practical Guide to the Ins and Outs of Multidistrict Litigation*, 64 DEF. COUNS. J. 58, 66 (1997) (stating that "the procedures are intended only as a guide to promote the fair and efficient resolution of complex litigation"); *id.* at 59 (noting the purpose of MDL is to "eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save time and effort on the part of the parties, the attorneys, the witnesses and the courts").

of basic restitution principles to answer one of restitution's basic questions, in a setting that happens to involve lawyers"). "The law's strong preference for contractual over restitutionary liability accounts for the general rule by which a person who seeks compensation for benefits conferred on another . . . must ordinarily found the claim on an agreement with the recipient." RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 30 cmt. f (T.D. No. 3, 2004). In class actions, there is no contractual bargaining between attorney and client. RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 30 cmt. b (T.D. No. 3, 2004) ("The fundamental premise of class certification—that the class is too numerous to permit individual joinder—tends to support a critical element of the restitution claim in these circumstances, namely, that the claimant was justified in proceeding in the absence of contract with the defendant here, the individual class member or common-fund 'beneficiary'"). Contrarily, in MDLs, all attorneys involved are operating and providing services based upon a contractual relationship with their clients. As a result, the law of restitution and doctrines emanating from it should be set aside to allow the bargaining power of the parties to govern the attorney's fees and expenses in MDLs.[6]

---

[6] *See, e.g., Vincent v. Hughes Air W., Inc.*, 557 F.2d 759, 770 (9th Cir. 1977) ("[A]s a general rule, if the third parties hire their own attorneys and appear in the litigation, the original claimant cannot shift to them his attorney's fees."); *Id.*, at 771-72 ("[T]he reimbursement of the representative attorneys beyond the terms of their individual contracts was limited to that portion of the fund allocated to beneficiaries which had not participated in the suit [by hiring attorneys of their own]."); *Nolte v. Hudson*, 47 F.2d 166, 168 (2d Cir. 1931) ("[W]here [litigants] are represented by counsel of their own choice, who do in fact act for them, they cannot be compelled to share in the expenses incurred by the employment of other counsel by other [litigants]."); *Draper v. Aceto*, 33 P.3d 479, 484 (Cal. 2001) ("[A] court may award attorney's fees from a common fund to an attorney who has succeeded in preserving a fund when equity requires it, but [] this cannot be where there are multiple beneficiaries of the fund and all – or substantially all – are represented by various counsel.") (quoting *Estate of Korthe*, 9 Cal. App. 3d 572, 575, 88 Cal. Rptr. 465, 467 (Cal. Ct. App. 1970); *Traveler's Ins. Co. v. Williams*, 541 S.W.2d 587, 590 (Tenn. 1976) (The common fund doctrine "is never applied against persons who have employed counsel on their own account to represent their interests."); *Means v. Montana Power Co.*, 191 Mont. 395, 404 (Mont. 1981) ("[O]nly inactive or passive beneficiaries should be forced to bear the costs of litigation under the common fund doctrine"); *Blue Cross and Blue Shield of Alabama v. Freeman*, 447 So.2d 757, 759 (Ala. 1983) (The common fund doctrine does not apply to "one who joins as a party in the suit, assists in the prosecution or contributes toward the expense of the recovery of the

17.     PLC argues this Court should not allow "free riders" to benefit from their services. However, in this case the Phipps Plaintiffs are not "free riders." They have established a formidable legal team, expending thousands of hours and hundreds of thousands in resources to prosecute their claims. *See* Jean F. Rydstrom, Annotation, *Construction and Application of 'Common Fund' Doctrine in Allocating Attorney's Fees Among Multiple Attorneys Whose Efforts Were Unequal in Benefiting Multiple Claimants*, 42 A.L.R. FED. 134 § 2b (2005) (noting the common benefit doctrine does not "permit the allowance of fees from a fund created where all the parties interested are represented by counsel of their own selection, *each counsel in such case being required to look to his own client for compensation*") (emphasis added). Only in the limited situation where the benefiting claimants have sat by idly, such as absent class members do, has forced payment be possible:

> Common-fund recovery is rarely available from a party who has retained and paid his own legal counsel.  While the difficulty of comparing the lawyers' respective contributions is presumably part of the explanation, the more influential fact is simply that such a party cannot be characterized as a passive recipient of benefits provided by others.

RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 30 cmt. e (T.D. No. 3, 2004).

---

fund . . . ."); *Valder v. Keenan*, 129 P.2d 966, 972 (Ariz. 2006) (holding common benefit fees could not be assessed on party "[b]ecause of the presence of counsel, actively involved on behalf of [the client]"); *Steinberg v. Allstate Ins. Co.*, 226 Cal. App. 3d 216, 221, 276 Cal. Rptr. 554 (Cal. Ct. App. 1990) ("The [common fund] doctrine does not apply [] when each party has retained counsel, and each counsel actively prosecuted the case or actively participated in the creation of the settlement."); *Hurst v. Cavanaugh*, No. 90-J-7, 1992 WL 208918, at *5 (Ohio Ct. App. Aug. 21, 1992) (holding that common fund doctrine cannot apply to persons represented by counsel who were active in the litigation); *Estate of Korthe*, 9 Cal.App.3d 572, 575, 88 Cal. Rptr. 465, 467 (Cal. Ct. App. 1970) (explaining that the accepted rationale for common-fund recovery "applies only where a single beneficiary undertakes the risk and expense of litigation while the remaining beneficiaries sit on their hands."); *Estate of Kierstead,* 121 Neb. 423, 237 N.W. 299, 300 (1931) (denying recovery, notwithstanding "substantial benefit" conferred on defendants, where claimants "were notified that the defendants had employed another as their attorney"); *DuPont v. Shackelford*, 235 Va. 588, 369 S.E.2d 673 (Va. 1988) (No "free rides" where all parties are represented by counsel).

18.     PLC's argument that they have contributed "more" than the attorneys representing the other groups of plaintiffs is misplaced. The law of restitution generally denies compensation when many sources have contributed to a successful result. A common fund is allowed only when the "beneficiary, whether in person or by counsel, has made *no significant contribution* to the transaction by which the common fund is created, preserved, or enlarged." RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 30(3)(c) (T.D. No. 3, 2004) (emphasis added). This situation does not arise in a class action where most class members are unrepresented, class counsel does all the work, and no other lawyer contributes. Unlike class actions, many hands contribute to the success of MDLs. While the law of restitution allows a transfer from free-riding lawyers to hard working lawyers, it does not allow a transfer from one hard working attorney to another. This is true even if one lawyer "performed the greater part of the work." RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 30(3)(c), illus. 1 (T.D. No. 3, 2004).

19.     As stated by Harvard Law Professor, William B. Rubenstein, in MDLs, "[t]he common benefit lawyers simply do not do 100% of the legal work." William B. Rubenstein, *On What A "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS ACTION ATTORNEY FEE DIGEST 87, 89 (March 2009) (attached to this Memorandum as Exhibit C). In MDLs, all lawyers contribute to the final result. *Id.* In many MDLs, the bargaining power in settlement negotiations is directly attributed to the quantity and quality of plaintiffs represented. Non-lead lawyers oftentimes have a larger group of plaintiffs than the lead counsel. Additionally, non-lead lawyers help create this leverage by identifying and activating potential clients, evaluating their claims, contracting with them, and filing lawsuits for them.

20.     More significantly, non-lead lawyers create bargaining leverage by keeping clients out of MDLs. This strategy forces defendants to do battle on several fronts and preserves the possibility of obtaining trial verdicts in state courts chosen by plaintiffs. One commentator, examining the Vioxx MDL, noted that Merck had to defend thirteen trials "before juries in state courts in New Jersey, California, Texas, Alabama, Illinois, and Florida" because non-lead lawyers kept their clients' cases *out* of the *Vioxx* MDL. Eldon E. Fallon, Jeremy T. Grabill and Robert Pitard Wynne, *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2335 (2008). Because some of these trials produced enormous verdicts, Merck was pressured to pay more in settlement.[7] The same phenomena is likely to take place in this case, and it will be the Phipps Team and lawyers other than the PLC trying the state court cases and putting pressure on the defendants to the benefit of all plaintiffs in the MDL.   Specifically, the Phipps Team currently has the following trial settings in Arkansas state courts:

a.      February 10, 2010 - Cause No. CV-2008-107; *Lenny Joe Kyle, et al. v. Bayer AG, et al.*, In the Circuit Court of Woodruff County, Arkansas

b.      August 2, 2010 - Case No. CV-2008-133; *Keith Warren, et al. v. Bayer AG, et al.*, in the Circuit Court of Mississippi County, Arkansas

c.      September 17, 2010 - Case Number CV-2009-173-5; *Jesse Briggs, et al. v. Bayer CropScience, LP, et al.*, in the Circuit Court of Jefferson County, Arkansas

Additionally, the Phipps Team is in the process of setting additional state court cases for trial.

21.     The case most often cited as support for application of the common fund doctrine to MDLs is *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1005 (5th Cir. 1977). This

---

[7] *See, e.g.*, Snigdha Prakash *Vioxx Jury Adds $9 Million in Punishing Merck*, http://www.npr.org/templates/story/story.php?storyId=5336787&ps=rs (visited Sep. 1, 2009) (reporting that a New Jersey jury added $9 million in punitive damages to a $4.5 million compensatory award in favor of a Vioxx plaintiff); Aaron Smith, *Jury: Merck negligent, Merck blamed for death in Vioxx suit; jury awards $253 million in damages. Drug giant to appeal*, CNNMONEY (August 19, 2005), http://money.cnn.com/2005/08/19/news/fortune500/vioxx/index.htm (visited Sep. 1, 2009) (reporting that a Texas jury ordered Merck to pay $253 million in compensatory and punitive damages to a Vioxx plaintiff).

case is heavily relied upon by PLC in the case before this Court. In *In re Air Crash Disaster,* the Fifth Circuit Court of Appeals affirmed an award of $270,000. The trial judge allowed all lawyers with cases in the MDL to participate and develop the litigation, but only required payment into the common fund by lawyers who had elected to do nothing and "free ride" the litigation efforts of the other lawyers. *Id.* at 1009 (stating, "[T]he [trial] court ... made clear ... that all counsel were free to participate in discovery" and that lawyers taxed to pay the lead attorneys "conceded" that they allowed others to do the work"). The lawyers who continued to participate in the litigation process were not required to pay into the common fund. *Id.* at 1019 (stating, "[t]he district judge ... exclud[ed] ... attorneys who continued to be active"). *In re Air Crash Disaster,* which involved a common fund assessment of two lawyers who had voluntarily chosen to "free ride" instead of participating in the case, is clearly distinguishable from the case before this Court where the Phipps legal team has participated at all allowed instances.

### E. DETERMINATION OF AN ASSESSMENT, EVEN IF AUTHORIZED AND WARRANTED, IS PREMATURE AT THIS STAGE

22.     At the outset, the Phipps Plaintiffs object to any ruling on this Motion at this stature of the case. Even if this Court has jurisdiction to consider an assessment and even if this Court has authority to establish an assessment, this Court lacks the requisite information to determine what, if any, percentage of the recovery would reasonably compensate PLC for the services it has claimed to have rendered on behalf of all MDL plaintiffs. The Phipps Plaintiffs contend discovery may be necessary to investigate what was and was not done by PLC, as compared to what was and was not done by the Phipps team, to allow this Court to make a reasonable determination of what, if any, assessment is warranted.[8]

---

[8] Additionally, PLC's motion for common benefit fund and supporting motions filed by other producer and non-producer counsel, indicate that agreements have been made with them regarding an assessment. In determining

23.     As of yet, discovery and only one dispositive motion has been heard by this Court. It has not been shown that the work done by PLC justifies any assessment.  They have not prevailed at a trial and their work has not generated a substantial offer of settlement consistent with the farmers' losses.   There have been no trials, so verdict outcomes at this point are speculative. There has been no summary or final adjudication as to any claims upon which PLC seeks a share. The only informed way to determine what contribution PLC has made to the value of all MDL plaintiffs' claims is to wait until more data can be developed and to then comparatively analyze what PLC has contributed to what the Phipps team has contributed. At the conclusion, the Phipps Plaintiffs contend no assessment, assuming jurisdiction and authority to do so are presented, will be warranted.

24.     The Phipps Plaintiffs have retained two experts for purposes of responding to PLC's request for an assessment, Harvard Professor William B. Rubenstein and University of Texas School of Law Professor Charles Silver. The Phipps Plaintiffs request additional time to allow their experts to analyze the relevant documents and provide reports to this Court on the issue of whether an assessment is authorized under the facts of this case and, if so, what the recommended assessment should be.

**F. A SHIFT OF FEES FROM THE PHIPPS TEAM TO PLC IS NOT WARRANTED IN THIS CASE**

25.     If this Court determines it has authority to establish a common benefit fund by assessing a percentage of the recovery, the Phipps Plaintiffs request this Court determine that, as to the Phipps Plaintiffs, an assessment is not warranted. PLC contends that the attorney's fees received from its own clients' recovery is insufficient compensation for the work done in this case. This contention lacks merit for two reasons. One, PLC has done no work, over and above

---

what assessment is fair, if any, the terms of these agreements need to be discovered and evaluated before determining an assessment towards producer and non-producer counsel who did not reach an agreement.

the work it would have done to represent its own clients, and thus, is not entitled to compensation over and above the contingency fee collected from its clients.[9] Specifically, PLC has not shown that any of the work done was superfluous to the work it would have incurred had it been representing its clients in individual suits against Defendants. There has been almost no communication between PLC and the Phipps Team. If PLC did no work above and beyond what needed to be done to represent its clients, then PLC is entitled to no fees in addition to those received as a result of its clients' recovery.

26.    In fact, PLC, by being classified as "lead counsel" received a tremendous benefit. As described by one legal scholar studying the controversy of awarding assessments in MDLs:

> Serving as [PLC] in a high-profile products liability MDL is a plum assignment. Lead attorneys gain prestige, enhance their ability to obtain clients and referrals, develop valuable skills, and so on.[10]

*Exh.C* at 49-50. This is exactly what took place in this case. PLC, when describing the services provided in its Motion, did not discuss in detail the website it created and maintains, www.bayerricelitigation.com. This website does not provide a service to all plaintiffs involved in the MDL other than to post deposition notices. Rather, this website allows PLC to take advantage of its designation as PLC and use that designation to advertise its services to prospective clients. PLC has the biographies of its attorneys and, at the top of the list of the documents provided is the court order appointing PLC as "leadership counsel." Also, in the

---

[9]Lead Counsel handles "substantive and procedural issues during the litigation. Typically they act for the group—either personally or by coordinating the efforts of others—in presenting written and oral arguments and suggestions to the court, working with opposing counsel in developing and implementing a litigation plan, initiating and organizing discovery requests and responses, conducting the principal examination of deponents, employing experts, arranging for support services, and seeing that schedules are met." MANUAL FOR COMPLEX LITIGATION (FOURTH) §§ 10.22, 10.224, and 22.62.

[10]Charles Silver and Geoffrey Miller, *The Quasi-Class Action Method of Managing Multi-District Litigation: Problems and a Proposal* at 49-50. This article, written by the McDonald Endowed Chair of Civil Procedure at the University of Texas School of Law and the Stuyvesant P. Comfort Professor of Law at New York University School of Law is expecting publication by the Vanderbilt Law Review in 2010. The currently available draft from of this Article, which is available for download in the electronic library of the Social Science Research Network (http://ssrn.com/abstract=), is attached to this Memorandum as Exhibit D.

"Q&A" section of the website, PLC provides visitors of the site with information regarding why they were appointed as lead counsel and how prospective clients can contact them to join the litigation. This website was not built in service to the MDL, it was built to capitalize on PLC's designation as "lead counsel" and to use that designation to collect more clients. Just by being named "lead counsel," PLC has received, in all likelihood, more attorney's fees by virtue of signing up additional clients and/or referrals of clients by other lawyers because they were "lead counsel."[11]

27.     PLC, in its Motion, highlights that other plaintiffs' groups have reached an agreement on an assessment. However, it should be noted that many of these groups are represented, at least in part, by a member of PLC or the Executive Committee:

> Moreover, judges are often told that [Plaintiffs' Steering Committee] members have "agreed" to the fee level, which sounds significant since they themselves have large inventories and are therefore essentially taxing themselves. Of course, this is a fudge – since they are going to *get* the common benefit fee, they are only truly taxing the non-[Plaintiffs' Steering Committee] attorneys; their own taxes will indeed go into the fund, but will then go right out of the fund and back into their pockets. To be sure, some [Plaintiffs' Steering Committee] members may pay a 6% tax and, depending on their common benefit work, only get a 4% fee – but that still means that they have effectively lost only 2% of their fee, not the 6% the local lawyer has lost.

William B. Rubenstein, *On What A "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS ACTION ATTORNEY FEE DIGEST 87, 89 (March 2009) (attached to this Memorandum as Exhibit C).

28.     Second, considering the amount of work done on the case by the Phipps team and its operation, wholly independently, of PLC, a shift in fees from the Phipps team to PLC is not warranted. As stated by Professor Rubenstein:

---

[11] Interestingly, the website also has an August 23, 2007 article printed in the *Delta Farm Press* where the lead PLC counsel argue against lawyers seeking to represent individual farmers. Clearly, this is only to the PLC's benefit.

> But here's the hitch – in the mass tort case there are also local
> counsel who have contingent fee contracts with the claimants, and,
> more importantly, who contributed important attorney work
> product to producing the settlement as well. The common benefit
> lawyers simply do not do 100% of the legal work in the case. It's
> not just that claimants have local counsel in common benefit cases
> and not in class action cases, it's that the local counsel in common
> benefit cases perform important functions. These functions include
> publicizing the problems at issue through advertising, advising
> clients of their legal rights, performing intake evaluations and
> screening cases, working up all of the individual aspects of the
> cases, reviewing common benefit documents, negotiating
> settlements, advising clients on settlement rights, finalizing
> settlements, etc. It is precisely because of the many individual
> issues in these cases that classes are rarely certified (except
> perhaps for settlement purposes); yet, sadly the lawyers who do
> much of the individual work are outside the purview of the MDL
> court and can be easily short-changed by the judge there.

William B. Rubenstein, *On What A "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS

ACTION ATTORNEY FEE DIGEST 87, 89 (March 2009) (attached to this Memorandum as Exhibit

C).

29.     This Court should consider the underlying motivation for the legal services being

provided in this case. Unlike attorneys who seek out groups of plaintiffs hoping to certify a class,

the Phipps team became involved in this case and individual plaintiffs have joined the Phipps

Plaintiffs because the Phipps team has and will continue providing individualized prosecution of

the farmers' claims. In August 2006, the Phipps team was established when Phipps Team

member and attorney, Clayton Smaistrla, was contacted by his father, a fourth generation rice

farmer, who called his son for help due to the USDA announcement of contamination of the U.S.

rice industry. The Phipps team began meeting with other Texas rice farmers who also asked for

help.  Phipps team member, Doug Pennebaker, grew up in the Mississippi Delta on a cotton farm

with family members who were cotton, soybean, and rice farmers. The Phipps team then began

meeting with Mississippi rice farmers who also asked for help for their families. Phipps team

member, Martin Phipps, comes from a family deeply rooted in Arkansas. It is the firm belief of the Phipps team that many farmers have joined their group because it has been the Phipps team's philosophy from the beginning that this is an **individual** case not a **class action**.[12]

30.    The quantity of plaintiffs represented is also an important factor. In this case, the size of the varying plaintiffs groups reveals that the Phipps Plaintiffs are, if not the largest, one of the most substantial groups of plaintiffs in this litigation (MDL and state courts). All Phipps Plaintiffs have signed individual contracts with the Phipps team and have had or are having each of their cases worked up independently and individually by the Phipps team. In comparison, the Phipps team believes the group of plaintiffs represented by the varying attorneys comprising the PLC is no larger than the Phipps Plaintiffs.

31.    PLC relying on its discovery efforts, points to *In re Linerboard Antitrust Litigation*, 292 F.Supp.2d 644, 662-663 (E.D. Pa. 2003), as class action suit, as support for the requested assessment. However, in *In re Linerboard*, Judge DuBois, deemed the assessed plaintiffs as "tag alongs" because they joined the suit after class certification had occurred and after a settlement had been negotiated by class counsel; additionally, Judge DuBois specifically distinguished the case from other cases where the plaintiffs sought "through counsel, were actively engaged in the cases from the outset." *Id.* at 663. In this case before this Court, as opposed to *In re Linerboard,* the Phipps Team has conducted substantial discovery in this case independent of PLC's efforts.  Contrary to the assertions made by the PLC, the Phipps Team is conducting extensive discovery in the Arkansas state court cases.  The Phipps team is the only lawyers in the United States outside of the MDL, that we are aware, that are taking trial

---

[12] As this Court is aware, the Phipps team was the **only** attorneys in the United States representing farmers who filed a motion against the PLC's request for class certification arguing that the farmer's claims were individual and were not appropriate for class treatment.  *See Individual Plaintiffs' Memorandum Of Law In Opposition To Class Plaintiffs' Motion For Class Certification* (Docket #706).  This Court cited the Phipps team's motion in its order denying class certification.  *See Memorandum and Order Denying Plaintiff's Motion for Class Certification* (Docket # 781).

depositions in the Arkansas state court cases of key current and former Bayer employees. These depositions will provide key information not obtained in the MDL depositions for trial. Moreover, although PLC has championed its "turning over" of documents procured during the MDL discovery, it should be noted that PLC has provided no consistent method of organizing or identifying the documents turned over. Thus, although PLC may have spent numerous hours developing its own organizational method of reviewing, documenting, and analyzing the discovery documents, the Phipps team has been required to jump through the same hoops in order to properly review and analyze the discovery documents due to PLC's simple "dumping" of the multitude of documents onto electronic storage devices provided to the Phipps team.

32.     The two groups, PLC and the Phipps team, have operated wholly independently in their strategy of working up and prosecuting their respective plaintiffs' claims. The Phipps team has expended a large amount of resources hiring and developing its own independent expert testimony to address the scientific and economic issues involved in this case. First, the Phipps team is the **only** lawyers they are aware of in the United States who have retained completely separate liability and damage experts from the PLC. The Phipps team **is not** sharing any experts with the PLC and are not using any of the PLC's experts. In that regard, the Phipps team has spent an enormous amount of time, money and energy developing an individual damage model for the last three years – something no other lawyers the Phipps team is aware has done. By having separate experts and damage theories and models, the Phipps team has not been "free riding" and in fact has done the opposite. They are preparing their cases for trial separate and apart from the PLC. The Phipps team is unaware of any other individual producer plaintiffs who are doing this.

33.     The Phipps team has also not been "free riding" in the MDL.  The Phipps team has attended every status conference they were aware of both telephonically and in Court. Additionally, the Phipps team volunteered to designate its Texas cases to be in the first wave of cases remanded back to state federal courts for trial.  As such, independent discovery of the 19 Texas cases has occurred and is occurring.  The Phipps team will be preparing and attending depositions of its individual Texas farmers in the next three months before the individual fact discovery deadline in January 2010.  Many other PLC members and other lawyers may have not volunteered to designate their cases to be in the initial trial pools and submit their farmers to individual discovery and depositions.

34.     The Phipps team attended the mediation separately and offered Defendants and Riceland an independent Power Point presentation, expert opinions, and negotiation stance in this case. When the Phipps team discovered a meeting of counsel was scheduled to discuss a possible process of settling the case, the Phipps team requested to be present (this request was denied by PLC). The Phipps team, intent on participating in the prosecution of its clients' claims, filed a motion with the Court requesting permission to attend, but the meeting was held before the motion could be considered. After the initial meeting, the Phipps team contacted Settlement Master Judge Limbaugh and explained to him that the Phipps team's view of the case varied materially from the viewpoint held by PLC. Judge Limbaugh invited the Phipps team to attend the February 9-11, 2009 Settlement Conference and authorized the Phipps team to prepare a presentation for Defendants separate from PLC.

35.     Because the Phipps team had previously limited, if any, contact with Defendants in light of MDL procedures, the Phipps team saw this as an opportunity to present its viewpoint, including the clear evidence of Bayer's liability and the Phipps teams analysis of the Phipps

Plaintiffs' damages. The Phipps team worked several weeks preparing the presentation. At the settlement conference, after an initial opening session by the PLC that proved unfruitful, Judge Limbaugh asked the Phipps team to step forward and give its presentation. All other counsel were asked to leave the room. The Phipps team addressed the Bayer Defendants and Riceland because Riceland is also a defendant in the Phipps Plaintiffs' Arkansas state cases. Not only did the Phipps team demonstrate why it believed Bayer's liability was clear, but also discussed in detail the individual damage models of an Arkansas and Texas rice farmer, who were brought to the meeting to provide Defendants with a personal reminder of each of the plaintiffs' claims in this case. As a part of the presentation, the Phipps team asked the rice farmer clients to speak directly to Defendants about their damages and the impact on them and their farming operations. Defendants stated they were hearing some evidence for the first time.

36.    The Phipps team at the outset of litigation, added to its legal team an appellate attorney experienced in farming cases and preemption issues to conduct the research and drafting that it knew would take place in this unique case. The Phipps team retained appellate attorney, Kimberly S. Keller, who was counsel of record on the petition for writ of certiorari granted by the Supreme Court of the United States in the recent substantive preemption case, *Bates v. Dow Agrosciences*, 544 U.S. 431 (2005), which involved a large group of peanut farmers who had sued based on damages to crops allegedly occurring from herbicide application. In the case before this Court, Keller has performed numerous hours of research preparing the Phipps Plaintiffs' claims. For example, Keller drafted the Phipps team's response to Defendants' preemption motion and traveled to St. Louis for the hearing to perform, if necessary, oral argument on the issues presented. As noted in footnote 1 of Bayer Cropscience LP's Reply Brief in Support of Its Motion for Partial Summary Judgment, the Phipps team raised arguments

contesting preemption that had been omitted by PLC. Thus, Defendants were forced to divide their efforts to respond to PLC's arguments and those that were raised independently by the Phipps team. These arguments, which, *inter alia,* included the presumption against preemption, were focused upon by Defendants in their reply and the subject of discussion by this Court during the hearing on the motion.[13]

37.    The Phipps team began this case, and has continued to prosecute this case, viewing the claims as individualized cases. The Phipps team has easily spent over 12,000 hours prosecuting their clients' cases. Additionally, the Phipps team has incurred over $850,000 in litigation expenses. To argue that PLC's work has been any more effective or important to the Phipps Plaintiffs than the work put in by the Phipps team is mere sophistry. The Phipps Plaintiffs are not free riders. They have assembled a hard working team of attorneys who have diligently prosecuted their claims and, at all allowed instances, participated fully in the litigation process to fight for the rights of their clients. To award an assessment to PLC from the Phipps Plaintiffs' recovery would result in a windfall for PLC.

## G. Ethical Rules Prohibit the Fee Sharing Arrangement Contained within the Requested Assessment

38.    Each state also differs in how it allows its attorneys to share contingency fees. In Texas, Arkansas, and Mississippi, fee sharing amongst lawyers of different law firms is prohibited absent client consent. Ark. R. Prof'l Conduct 1.5(e); Miss. R. Prof'l Conduct 1.05(e); Tex. Disc. R. Prof'l Conduct 1.04(f)-(g). The Texas Rule provides, if the attorney representing the client wishes to compensate another attorney in another law firm for providing

---

[13]Keller, although present at the hearing and prepared to present argument to this Court, did not ultimately argue before the Court. This, however, should not be interpreted as a failure to participate by the Phipps team. In light of the lengthy discussion already having taken place between Defendants, PLC, and this Court, some of which involved the newly-raised arguments presented by the Phipps team's response, Keller elected to abstain from presenting additional argument to the Court as a substantial amount of time had been used.

services in the case, he or she may only do so if a "fee sharing" agreement is in writing and signed by the client ***before the association*** with another counsel is permitted to occur:

> A division or arrangement for division of a fee between lawyers who are not in the same firm may be made only if:
>
> (1)    the division is:
>
> > (i)    in proportion to the professional services performed by each lawyer; or
> >
> > (ii)    made between lawyers who assume joint responsibility for the representation; and
>
> (2)    the client consents in writing to the terms of the arrangement ***prior to the time of the association or referral proposed***

TEXAS DISCIPLINARY RULES OF PROF'L CONDUCT 1.04(f) (emphasis added).

39.    The written client consent, which must be obtained before any association is made, is insufficient unless it identifies the names of all law firms who will participate in the fee-sharing agreement, whether fees will be divided based on the proportion of services rendered or by assumption of joint responsibility, and the share of the fee that each lawyer or firm will receive. *Id.* Rule 1.04(f)(2). *Thus, a clause in a contingency fee contract authorizing the attorney, in general, to associate with "other counsel" is insufficient to constitute the required consent under Rule 1.04*. *Id.* 1.04(g) (providing that consent by a client "without knowledge of the information specified in subparagraph (f)(2) does not constitute a confirmation within the meaning of this rule"). An attorney seeking to receive a share of attorney's fees in the absence of pre-association written consent from the client compliant with Rule 1.04(f)(2) is limited to seeking recovery on an hourly basis for the hours of services actually rendered on behalf of the client. *Id.*

## H. CONCLUSION

40.     The Phipps Plaintiffs respectfully request this Court deny PLC's request for an assessment or, alternatively, postpone consideration of this Motion to allow more information to be gathered to afford the parties and this Court adequate data to make an informed decision as to whether PLC is entitled to an assessment of the Phipps Plaintiffs' recovery and, if so, what percentage accurately reflects the independent work product provided to the Phipps Team by PLC.

Respectfully submitted,

**GOLDMAN, PENNEBAKER & PHIPPS, P.C.**
One International Centre
100 N.E. Loop 410, Ste 1500
San Antonio, Texas  78216
Telephone: (210) 340-9800
Telecopier: (210) 340-9888
Email: mphipps@gpplaw.com


BY:    /s/ Martin J. Phipps
        MARTIN J. PHIPPS
        State Bar No. 00791444


Mikal C. Watts
Austin Anderson
**MIKAL C. WATTS, P.C.**
555 N. Carancahua St., Suite 1400
Corpus Christi, Texas 78478
Phone:  (361) 887-0500
Fax:  (361) 887-0055
Email:         mcwatts@wgslawfirm.com
               aanderson@wgclawfirm.com

Charles A. Banks
**BANKS LAW FIRM, PLLC**
100 Morgan Keegan Drive, Suite 100
Little Rock, AR 72202
Telephone:    (501) 280-0100
Telecopier:    (501) 280-0166
Email:         cbanks@bankslawfirm.us

Alton Todd
**LAW FIRM OF ALTON C. TODD**
312 S Friendswood Drive
Friendswood, Texas 77546-3904
Telephone:    (281) 992-8633
Telecopier:    (281) 648-8633
Email:         alton@actlaw.com

T. Mark Sledge
**GRENFELL, SLEDGE & STEVENS, PLLC**
Attorneys at Law
1535 Lelia Drive
Jackson, Mississippi 39216
Telephone:    (601) 366-1900
Telecopier:    (601) 366-1799
Email:         tmshunts@aol.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, the undersigned, do hereby certify that I have this 17th day of September, 2009, electronically filed a copy of the foregoing with the Clerk of the Court to be served by operation of the court's electronic filing system upon the parties of record.

/s/ Martin J. Phipps
MARTIN J. PHIPPS