**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

|  |  |
|---|---|
| IN RE GENETICALLY MODIFIED RICE LITIGATION | ) ) ) ) ) ) ) ) |

4:06 MD 1811 CDP

ALL CASES

**REPLY MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFFS'**
**LEAD COUNSEL'S AND PLAINTIFFS' EXECUTIVE COMMITTEE'S**
<u>**MOTION TO ESTABLISH A COMMON BENEFIT FUND**</u>

**Dated:** October 5, 2009

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

I.    INTRODUCTION ................................................................................. 1

II.   ARGUMENT .......................................................................................... 2

    A.    The Court Should Establish a Common Benefit
        Fund and Adopt the Requested Hold-Back Percentages ........................... 2

        1.    A Majority of Plaintiffs Support the Leadership Group's Motion.................... 2

        2.    The Court Has the Inherent Authority to
            Impose Common Benefit Hold-Backs ............................................... 6

        3.    The Requested Hold-Backs Should Also
            Apply to Parallel State Court Actions ............................................... 14

        4.    The Proposed Hold-Back Percentages Are Reasonable................................. 19

        5.    Bayer's "Burden" Arguments Are Self Serving .............................................. 20

        6.    The Plaintiff Objectors Have Received a Common Benefit ........................... 22

            a)    The Producer Plaintiff Objectors Have Received
                Substantial Benefits From the Leadership Group's Efforts .................. 26

            b)    The ENP Objectors Have Received Substantial
                Benefits from the Leadership Group's Efforts ...................................... 29

                (1)  The Objecting ENPs and the Leadership
                    Group Have Sufficiently Similar Interests.................................... 35

        7.    This Fee Assessment Request Is Ripe........................................................... 37

III.  CONCLUSION ....................................................................................... 39

i

# TABLE OF AUTHORITIES

**CASES**                                                                                      **Page(s)**

*In re Air Crash Disaster at Florida Everglades,*
  549 F.2d 1006 (5th Cir. 1997) ..................................................................... passim

*Alyeska Pipeline Service Co. v. Wilderness Society,*
  421 U.S. 240 (1975) ..........................................................................................9

*In re Bausch & Lomb Contact Lens Solution Products Liability Litigation,*
  MDL No. 1785, Civ. No. 2:06-MN 77777-DCN, 2008 WL 2330571
  (D.S.C. May 21, 2008) ...................................................................................7, 10

*In re Baycol Products Litigation,*
  MDL No. 1431 (MJD/JGL), 2003 WL 22023449 (D. Minn. Mar. 21, 2003) ...............13

*In re Bextra and Celebrex Marketing Sales*
*Practices and Product Liability Litigation,*
  MDL 1699, Nos. M:05-CV-01699-CRB, 2006 WL 471782
  (N.D. Cal. Feb. 28, 2006) ...........................................................................6, 7, 10

*Boeing Co. v. Van Gemert,*
  444 U.S. 472 (1980) ........................................................................................11

*In re Cabletron Systems Securities Litigation,*
  239 F.R.D 30 (D.N.H. 2006) ............................................................................6

*Case v. Continental Airlines Corp.,*
  No. 91-1156, 974 F.2d 1345, 1992 WL 201080,
  1992 App. LEXIS 19148 (10th Cir. Aug. 11 1992) .......................................35

*In re Charter Communications, Inc., Securities Litigation,*
  Nos. MDL 1506, 4:02-CV-1186-CAS, 2005 WL 4045741
  (E.D. Mo. June 30, 2005) .................................................................................11

*In re Chrysler Motors Corp. Overnight Evaluation Program Litigation,*
  736 F. Supp. 1007 (E.D. Mo. 1990) ........................................................11, 14

*Corrosion Rectifying Co. v. Freeport Sulphur Co.,*
  197 F. Supp. 291 (S.D. Tex. 1961) ....................................................................9

*In re Diet Drugs Products Liability Litigation,*
  MDL No. 1203, Civ. No. 99-20593, 2002 WL 32154197
  (E.D. Pa. Oct. 3, 2002) ................................................................................ passim

*In re Diet Drugs Products Liability Litigation,*
   553 F. Supp. 2d 442 (E.D. Pa. 2008) ...........................................................................10

*In re Diet Drugs Products Liability Litigation,*
   401 F.3d 143 (3d Cir. 2005)..........................................................................................20

*Draper v. Aceto,*
   33 P.3d 479 (Cal. 2001) ................................................................................................25

*In re Education Testing Services Praxis Principles of*
*Learning and Teaching: Grades 7-12 Litigation,*
   555 F. Supp. 2d 661 (E.D. La. 2007)............................................................................14

*In re Guidant Corp. Implantable Defibrillators Products Liability Litigation,*
   MDL No. 05-1708 (DWF/AJB), 2008 WL 682174 (D. Minn. Mar. 7, 2008)...........8, 14

*In re Guidant Corp. Implantable Defibrillators Products Liability Litigation,*
   MDL No. 05-1708 (DWF/AJB), 2006 WL 409229 (D. Minn. Feb. 15, 2006) ..............10

*Hartland v. Alaska Airlines,*
   544 F.2d 992 (9th Cir. 1976) ........................................................................................16

*Haynes v. Rederi A/S Aladdin,*
   362 F.2d 345 (5th Cir. 1966) ........................................................................................26

*In re Latex Gloves Products Liability Litigation,*
   MDL No. 1148, 2003 U.S. Dist. LEXIS 18118 (E.D. Pa. Sept. 5, 2003)...........15, 16, 18

*Market Street Securities, Inc. v. Midwest Air Group, Inc.,*
   No. 07-CV-345, 2009 WL 2985451 (E.D. Wis. Sept. 15, 2009).....................................9

*Mid-Hudson Catskill Migrant Ministry, Inc. v. Fine Host Corp.,*
   418 F.3d 168 (2d Cir. 2005)............................................................................................9

*Nolte v. Hudson Nav. Co.,*
   47 F.2d 166 (2d Cir. 1931)......................................................................................25, 26

*In re Ortho Evra Products Liability Litigation,*
   No. 1:06-40000, Case Management Order 9 – Common Benefit Order
   (N.D. Ohio Aug. 28, 2006) .............................................................................................6

*In re Orthopedic Bone Screw Products Liability Litigation,*
   MDL No. 1014, 1996 WL 900349 (E.D. Pa. June 17, 1996) .........................................20

*In re Prempro Products Liability Litigation,*
　　MDL No. 04:03CV1507, Practice and Procedure Order No. 6
　　(E.D. Ark. Mar. 30, 2005) .................................................................................6

*In re Protegen Sling and Vesica System Product Liability Litigation,*
　　Nos. 1:01-01387, 2002 WL 31834446 (D. Md. Apr. 12, 2002) ....................20

*In re Showa Denko K.K. L-Tryptophan Product Liability Litigation-II,*
　　953 F.2d 162 (4th Cir. 1992) ...................................................................15, 16

*In re Silicone Breast Implants Products Liability Litigation,*
　　MDL No. 926, 92 cv 10000, Order No. 13 (N.D. Ala. July 23, 1993) ........6, 7

*Smiley v. Sincoff,*
　　958 F.2d 498 (2d Cir. 1992) .....................................................................7

*Sprague v. Ticonic National Bank,*
　　307 U.S. 161 (1934) ....................................................................................7

*In re St. Paul Travelers Securities Litigation,*
　　No. Civ. 04-3801 (JRT/FLN), 2006 WL 1116118 (D. Minn. Apr. 25, 2006) ...............11

*Turner v. Murphy Oil USA, Inc.,*
　　422 F. Supp. 2d 676 (E.D. La. 2006) .................................................... passim

*United States v. Tobias,*
　　935 F.2d 666 (4th Cir. 1999) .......................................................................35

*In re Vioxx Products Liability Litigation,*
　　MDL No. 1657, Pretrial Order No. 19 (E.D. La. Aug. 4, 2005) ....................6

*In re Vioxx Products Liability Litigation,*
　　___ F. Supp. 2d ___, MDL No. 1657, 2009 WL 2408884
　　(E.D. La. Aug. 3, 2009) ......................................................................... passim

*In re WorldCom Inc. Securities Litigation,*
　　02 Civ. 3288, 2004 U.S. Dist. LEXIS 22991 (S.D.N.Y. Nov. 10, 2004) ...........35, 37, 38

*Zilhaver v. UnitedHealth Group, Inc.,*
　　No. 06-CV-2237 (JMR/FLN), 2009 WL 2581387 (D. Minn. Aug. 20, 2009) ...............11

*In re Zyprexa Products Liability Litigation,*
　　424 F. Supp. 2d 488 (E.D.N.Y. 2006) ...............................................7, 8, 14

*In re Zyprexa Products Liability Litigation,*
　　467 F. Supp. 2d 256 (E.D.N.Y. 2006) ...................................................18, 19

*In re Zyprexa Products Liability Litigation,*
   MDL No. 1596, 2007 WL 2340790 (E.D.N.Y. Aug. 17, 2007)....................................10


**STATUTES & RULES**
28 U.S.C. § 1407(a) .........................................................................................................13

**OTHER AUTHORITIES**

Charles Silver and Geoffrey Miller, *The Quasi Class Action Method of Managing
Multi-District Litigation: Problems and a Proposal* 4 (N.Y. Univ. Law & Econ.
Working Paper No. 09, 2009) .........................................................................................12

R. Eric Kennedy, *Class Action Attorney Fees: The Key Role of the Federal
District Judge in Fashioning & Monitoring Mass-tort Common Fund
Distributions to Assure a Settlement Deemed Equitable by Both Represented &
Unrepresented Class Members, & Both Private & Class Counsel,*
6 Sedona Conf J 173, 177 (2005)....................................................................................26

I.       **INTRODUCTION**

As the Leadership Group explains in its opening brief, and as further confirmed by the briefs filed by numerous producer and non-producer plaintiffs in support of the Leadership Group's pending motion, courts overseeing large mass tort multidistrict litigation ("MDL") such as this one regularly order the implementation of a common benefit hold-back to compensate court-appointed leadership and those working under the leadership's authorization and supervision, for common benefit work such as that which the Leadership Group has performed (and continues to perform) here.

Only a minority of plaintiffs represented by three small groups of attorneys: the Phipps Group,[1] the Murray Group,[2] and the ENP Objectors,[3] oppose this motion.  These objectors ignore the common practices of similar MDLs and improperly attempt to skirt their obligations to pay for the substantial common benefits conferred on *all* plaintiffs, including their clients.

The Bayer Defendants ("Bayer") also oppose this motion.  As explained below, however, Bayer's opposition is nothing more than a cynical and legally unsupportable attempt to foster disharmony among plaintiffs' counsel and to impede any resolution of this MDL that is not on

---

[1] The Phipps Group is a group of rice farmers, landowners, and other entities represented by Goldman, Pennebaker & Phipps, P.C., Mikal C. Watts, P.C., Banks Law Firm, PLLC, Law Firm of Alton C. Todd and Grenfell, Sledge & Stevens, PLLC.  Those counsel contend that the Phipps Group comprises 1,815 such plaintiffs.

[2] The Murray Group consists of rice producer plaintiffs represented by the Murray Law Firm, Cox Cox Filo Camel & Wilson LLC, Larry A. Roach Inc., and Edwards Stefanski & Zaunbrecher LLP.  Counsel for the Murray Group contend that they represent approximately 200 producer plaintiffs.

[3] The ENP Objectors are European non-producer ("ENP") plaintiffs Rickmers Reismuehle GMBH ("Rickmers"), Tilda Ltd ("Tilda"), Van Sillevoldt Rijst, BV ("VSR"), and Westmill Foods ("Westmill"), and are represented by Barber, McCaskill, Jones & Hales, P.A., Mitchell Williams, and Frost Brown Todd.  European non-producer plaintiff Veetee Rice Limited ("Veetee"), did not object to the Leadership Group's motion.

terms solely in Bayer's favor.   Indeed, Bayer has no legitimate interest in this motion whatsoever.  Any common benefit hold-back the Court orders would come out of, and not be on top of, any settlement by, or judgment against Bayer.  Bayer would thus not have to pay a penny more if the Court grants the requested relief.  It is ironic that Bayer would oppose the motion based on its counterintuitive assertion that the requested assessment would impede settlement, because, as virtually every other party to this litigation would agree, it is *Bayer* that has been the primary impediment to settlement to date.  Bayer's improper and self-serving arguments should be ignored.

These minority oppositions raise four principal arguments: (i) this Court lacks jurisdiction to order a common benefit hold-back on cases pending in state court; (ii) plaintiffs should be relieved of their payment obligations because they are represented by counsel who have worked on their cases; (iii) the requested hold-back percentages are too high; and (iv) this motion is premature.  As set forth below, each of these arguments is without merit.

## II.   ARGUMENT

### A.    The Court Should Establish a Common Benefit Fund and Adopt the Requested Hold-Back Percentages

#### 1.    A Majority of Plaintiffs Support the Leadership Group's Motion

What the few objections to the Leadership Group's motion obscure is the unmistakable fact that the majority of plaintiffs in this litigation, represented by dozens of law firms – as well as plaintiffs with pending state court actions against Bayer arising out of the same conduct,

support the motion.[4]   Many of these plaintiffs submitted briefs in support of the motion to establish a common benefit fund.[5]

Each member of this majority group of producers and non-producers supporting this motion has acknowledged that it has materially benefited from the Leadership Group's efforts. For example, non-producer plaintiff Riviana, asserts:

> Riviana wholeheartedly agrees that all producer and non-producer parties who have sued the Bayer defendants, either directly in affirmative cases or through cross claims and third-party complaints in cases in which the non-producers may be defendants, have enjoyed substantial and significant benefits from the efforts of [the Leadership Group] . . . . [The Leadership Group] "have undertaken massive discovery efforts  directed to the Bayer defendants, including document production, depositions and requests for admission.  They have engaged and developed expert witnesses on causation issues that will be shared with other producer and non-producer claimants seeking recovery from Bayer.  They have filed motions that have benefitted producer and non-producer claimants.

---

[4] Indeed, based on the List of Pending Related Cases (D.I. 1545), that Bayer filed on September 21, 2009, as many as 4,000 of the 6,000 plaintiffs in this MDL support the instant motion.

[5] Including the more than 1,500 Arkansas producer plaintiffs (the "*Schafer* and *Brann* Plaintiffs"), represented by Hare, Wynn, Newell & Newton (D.I. 1562); over 430 producer plaintiffs in Louisiana and Texas represented by Morrow, Morrow, Ryan & Bassett (D.I. 1515); over 245 producer plaintiffs in Mississippi represented by Westerfield, Janoush & Bell, P.A. (D.I. 1523); multiple producer plaintiffs in the action captioned *Bell v. Bayer CropScience LP*, 4:07-CV-00324-CDP (E.D. Mo.) represented by Jinks, Crow & Dickson, P.C. and Nix Holtsford Gilliland Higgins & Hitson, P.C. (D.I. 1516); 66 producer plaintiffs represented by Davis Bethune & Jones, LLC (D.I. 1538); as well as non-producers, Riviana Foods, Inc. (D.I. 1511); Planters Rice Mill and Kennedy Rice Dryers (D.I. 1538); Beaumont Rice Mills (D.I. 1513); Producers Rice Mill, Inc. (D.I. 1517); and 11 non-producer plaintiffs represented by Lyons & Cone, PLC (D.I. 1536); and 63 producer plaintiffs in Louisiana and Arkansas represented by Pendley, Baudin & Coffin LLP (D.I. 1534).  Mr. Pendley supports the Leadership Group's approach in all respects after the first trial begins in November.  While Mr. Pendley may disagree about the percentage assessment imposed before the commencement of the first trial, this disagreement will likely be immaterial since the first trial will begin on November 2nd.  It also bears noting that Leadership Group members with significant numbers of clients (close to 1,000) have agreed that the proposed set-asides are reasonable with absolutely no promises or assurances of any return.

Joinder of Riviana Foods Inc. in Pls.' Mot. to Establish Common Benefit Fund (D.I. 1511) at 3; *accord* Beaumont Rice Mills Joinder in Pls.' Mot. to Establish a Common Benefit Fund (D.I. 1513) at 1 (same); Joinder of Planters Rice Mill, *et al.*, in Pls.' Mot. to Establish Common Benefit Fund (D.I. 1538) at 2 (same); Joinder of Producers Rice Mill, Inc. in Pls.' Mot. to Establish Common Benefit Fund (D.I. 1517) at 1-2 (same).

Correspondingly, the *Schafer* and *Brann* Plaintiffs support the requested common benefit hold-back for both MDL and state cases, stating:

> The *Schafer* and *Brann* counsel assert that the [Leadership Group] have done an excellent job in preparation and prosecution of the claims of all rice farmers harmed by the genetically modified LLRICE escape into the commercial channel. *That work has inured to the benefit of cases pending not only in this Court, but in the various state courts as well*.

Submission of Schafer and Brann Pls. in Response to Mot. to Assess Fees and Costs for Common Benefit Fund (D.I. 1562) at 1-2 (emphasis added).

Likewise, the 430 plaintiffs comprising the Louisiana Trial Pool Plaintiffs group, as well as non-producers Cache River Valley Seed, LLC; Cullum Seeds, LLC; East Arkansas Seeds, Inc., Farm Service, Incorporated d/b/a Northeast Arkansas Seeds; Lawhon Farm Services, Inc.; Riceland Seed Company d/b/a Stratton Seed Company; Cox & Luter, Inc. d/b/a Carter-Cox Seeds, Inc.; Lawrence County Seed Co., Inc.; Tanner Seed Company, LLC; G&H Seed Company, Inc and Terral Seed, Inc., recognize the tremendous common benefits provided by the Leadership Group's labors:

> [T]he Plaintiffs, and other similarly situated plaintiffs, have benefitted from the work product and efforts of Lead Counsel.  Lead Counsel has performed significant work related to discovery including, but not limited to, document production, depositions and requests for admission.  Further, Lead Counsel has engaged expert witnesses and performed subsequent work, which will also be shared with and used by the Plaintiffs.

4

Joinder of Louisiana Trial Pool Pls., *et. al.*, in Pls.' Mot. to Establish Common Benefit Fund (D.I. 1515) at 1-2; *accord* Joinder by Cache River Valley Seed, LLC, et al., to Mot. to Establish Common Benefit Fund (D.I. 1536) at 2 (same).

Finally, the more than 245 plaintiffs comprising the Mississippi Pool Plaintiffs, *et al.*, support the present motion and the imposition of the requested hold-backs because:

> The Plaintiffs [Leadership Group] ha[s] undertaken *massive discovery efforts* to produce very *technical interrogatories*, *requests for production and requests for admissions*, along with *numerous depositions* of the Defendants and of the parties herein.  *They have engaged and developed expert witnesses on causation and damages of which all other producers shall receive benefit.  Further, [the Leadership Group] ha[s] likewise directed and managed this litigation which has required substantial time and expense on their behalf that will directly benefit all claimants in this litigation.*

*Joinder* of Mississippi Pool Pls., *et al*, in Pls.' Mot. to Establish Common Benefit Fund (D.I. 1523) at 1-2 (emphasis added).

Support for the Leadership Group's common benefit work and the scope and size of the hold-back percentages requested in their pending motion is further evidenced by the joint prosecution agreements ("JPAs") that the Leadership Group has entered into with numerous producer and non-producer plaintiffs, including European non-producer Veetee, non-producer Riviana, non-producer Beaumont Rice Mills, and the *Schafer* and *Brann* Plaintiffs.[6]  Under the

---

[6] The *Schafer* and *Brann* Plaintiffs entered into a JPA with the Leadership Group on March 9, 2009, when the *Schafer* and *Brann* cases were pending in the Arkansas state courts.  At that time, counsel in those cases declined use of the Leadership Group's economic experts and thus negotiated a 7% assessment percentage – a level equal to that offered to the non-producers who also declined use of the Leadership Group's economic experts.  (If requested, the *Schafer* and *Brann* Plaintiffs have agreed to submit the agreement to the Court for *in camera* inspection.).  In addition to paying the common benefit assessment in the range that the Leadership Group seeks here, the *Schafer* and *Brann* Plaintiffs have also "consent[ed] to the Court entering an Order requiring Bayer to withhold three percent (3%) of the proceeds of any judgment or settlement as expense reimbursement to those contributing to the common benefit of Rice farmer claimants." (continued…)

terms of those JPAs, these plaintiffs agreed that the Leadership Group will be compensated at a rate within the range proposed in this motion.  The fact that a majority of plaintiffs have voluntarily agreed to these assessment rates illustrates their reasonableness.  *See In re Cabletron Sys. Secs. Litig.*, 239 F.R.D. 30, 39-40 (D.N.H. 2006) (discussing "market mimicking approach" to determine reasonableness of attorneys' fees, which looks at "what the lawyer would receive if he were selling his services in the market rather than being paid by court order").[7]

### 2. The Court Has the Inherent Authority to Impose Common Benefit Hold-Backs

The Phipps Group maintains that the Court may not implement the requested hold-backs because its authority in these diversity jurisdiction-based actions derives exclusively from state law and certain states forbid fee-splitting absent client consent.  Phipps Group's Brief ("Phipps Br.") (D.I. 1527) at 4-6, 23-24.  The Phipps Group is incorrect, as the requested relief has *nothing* to do with fee-splitting, nor have the many courts adjudicating this issue considered it to be so.  *See e.g.,* the common benefit fund orders entered in *In re Ortho Evra Prods. Liab. Litig.* (N.D. Ohio)*, In re Vioxx Prods. Liab. Litig.* (E.D. La.), *In re Prempro Prods. Liab. Litig.* (E.D. Ark.) *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.* (N.D. Cal.)*,* and *In re*

_____

(…continued)

Schafer and Brann Pls.' Response to Mot. to Assess Fees and Costs for Common Benefit Fund (D.I. 1562) at 2.

[7] In opposition to this motion, Bayer contends that a common benefit hold-back is unnecessary because the Leadership Group could simply enter into JPAs with all plaintiffs. *See* Bayer Br. (D.I. 1524) at 3.  Separate and apart from the issue of whether Bayer even possesses standing to interpose itself into the present motion practice – Bayer's argument misses the mark.  For example, the Leadership Group has approached the objecting plaintiffs' counsel in an effort to obtain their assent to the terms of the JPA, but their efforts were rebuffed, leaving the Leadership Group with no alternative but to engage in the present motion practice.  *See also* p. 22 (*infra*).

*Silicone Gel Breast Implants Prods. Liab. Litig.* (N.D. Ala.) attached to the Declaration of Adam J. Levitt, dated Aug. 19, 2009 ("Levitt Decl.") as Exhibits F through J, respectively. (D.I. 1460).

Indeed, the Leadership Group is not seeking any fees from Mr. Phipps or any other plaintiff's counsel, nor does the requested relief interfere, in any manner, with the contractual relationships between plaintiffs' counsel and their clients. This argument further fails for two fundamental reasons.

*First*, the Court's authority to assess the requested hold-back derives from its inherent equitable authority and managerial power over this MDL, especially in the realm of allocating responsibility for the costs of prosecuting claims; it does not derive from state law. *E.g.*, *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164 (1939) (allowance of common benefit fee and cost awards "is part of the historic equity jurisdiction of the federal courts"); *Smiley v. Sincoff*, 958 F.2d 498, 501 (2d Cir. 1992) (district courts are "vested with broad discretion . . . [and] power to establish fee structures designed to compensate committee members for their work on behalf of all plaintiffs involved in consolidated litigation") (citing cases); *In re Air Crash Disaster at Fla. Everglades* 549 F.2d 1006, 1011 (5th Cir. 1977) (MDL court's fee assessment derives from its "managerial power," which "is not merely desirable[,] [i]t is a critical necessity," even if it "effectuates a deduction from the amount of attorneys fees originally contemplated by an attorney at the time of his undertaking representation of a claim").[8]

---

[8] *Accord In re Vioxx Prods. Liab. Litig.*, ___ F. Supp. 2d ___, MDL No. 1657, 2009 WL 2408884, at *3 (E.D. La. Aug. 3, 2009) ("[A]ny court presiding over a mass tort proceeding possesses equitable authority to examine fee arrangements."); *In re Bausch & Lomb Contact Lens Solution Prods. Liab. Litig.*, MDL No. 1785, Civ. No. 2:06-MN-77777-DCN, 2008 WL 2330571, at *1 (D.S.C. May 21, 2008) (court's authority to order common benefit assessment "derives from the Supreme Court's common benefit doctrine") (collecting cases); *In re Bextra and Celebrex Mktg. Sales Practices and Prod. Liab. Litig.*, Nos. M:05-CV-01699-CRB, MDL 1699, 2006 WL 471782, at *1 (N.D. Cal. Feb. 28, 2006) (same; citing cases); *see also In re* (continued…)

Thus, as one MDL court explained:

> It is now commonly accepted in complex multiparty litigation that a court can and in fact should appoint a committee . . . to coordinate the litigation and ease the administrative burden on the court.   As a corollary to this appointment, the court must be permitted to compensate fairly the attorneys who serve on such a committee.  . . . [I]f lead counsel are to be an effective tool the court must have means at its disposal to order appropriate compensation for them.  The court's power is illusory if it is dependent upon lead counsel's performing the duties desired of them for no additional compensation.

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.* ("*Diet Drugs*"), MDL No. 1203, Civ. No. 99-20593, 2002 WL 32154197, at *17 (E.D. Pa.  Oct. 3, 2002) (citations and internal quotation marks omitted); *id.*, 2002 WL 32154197, at *21 (importance of MDL transferee court's "power to appoint and compensate a plaintiffs' committee by levying an assessment against all other plaintiffs . . . is necessary to carry out the will of Congress for the good of the public as a whole").  Therefore, even accepting the Phipps Group's flawed premise that a common benefit set-aside would "take[] attorney's fees from one client or his counsel and give them to another," Phipps Br. at 5, this MDL Court would plainly have the authority to do so.[9]  *See Turner v. Murphy Oil USA, Inc.*, 422 F. Supp. 2d 676, 681 (E.D. La. 2006) ("[T]he substantial benefits of consolidation and the appointment of lead

_____

(…continued)

*Zyprexa Prods. Liab. Litig.,* 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (employing same analysis as *Vioxx* MDL court); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.,* MDL No. 05-1708 (DWF/AJB), 2008 WL 682174, at *17 (D. Minn. Mar. 7, 2008) (same, noting court's "inherent right and responsibility to supervise the members of its bar in both individual and mass actions, including  . . .  the authority to inquire into fee arrangements") (citing cases).

[9] The distinction that the Phipps Group draws – that MDL courts may not impose hold-backs or set-asides in diversity cases – is unavailing.  Most mass tort MDL cases involve constituent cases based on diversity jurisdiction.

counsel outweigh[] the lesser interest that a plaintiff may have in obtaining his or her own representation.").[10]

Second, the Phipps Group repeatedly confuses the concept of a common *benefit assessment* in MDL litigation with that of a common *fund award* of attorney's fees in class action litigation. *See* Phipps Br. at 7-10. Although the principle behind common benefit assessments and common fund fee awards is similar – to fairly compensate counsel who have performed valuable services commonly on behalf of a larger group of individuals besides their own clients and to guard against windfalls to litigants and their counsel who would otherwise reap the fruits of such common efforts free of charge – there are important distinctions that render the Phipps' Group's arguments on this point inapposite and inapplicable to the present analysis.

A common benefit assessment is a deduction, set-side, or "hold-back" and is typically

---

[10] The Phipps Group's authorities are inapposite. *See* Phipps Br. at 5. In *Alyeska Pipeline Service Co. v. Wilderness Soc'y*, 421 U.S. 240, 265-68 (1975), the Supreme Court held that the prevailing plaintiffs could not recover attorneys' fees *from the defendant* because to do so violated the general "American Rule" that a litigant cannot look to its adversary for its attorneys' fees in the absence of positive statutory authority so allowing. Similarly, in *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 177-80 (2d Cir. 2005), the Second Circuit looked to New York law to resolve the issue of whether the plaintiff was entitled to attorney's fees *from its adversary* in connection with its state law claims of breach of contract and, alternatively, *quantum meruit* and unjust enrichment. Likewise, in *Corrosion Rectifying Co. v. Freeport Sulphur Co.*, 197 F. Supp. 291, 293 (S.D. Tex. 1961), the plaintiff sought to recover attorneys' fees from the defendant in a breach of contract action, which Louisiana law did not permit absent an provision in the contract. Here, the Leadership Group is not asking the Court to award legal fees at Bayer's expense over and above any settlement consideration or judgment that it may have to pay. *See Market Street Secs., Inc. v. Midwest Air Group, Inc.*, No. 07-CV-345, 2009 WL 2985451, at *5 (E.D. Wis. Sept. 15, 2009) ("The common fund and common benefit doctrines are not mechanisms to shift the fee to an opposing party, but rather are mechanisms to spread the fee among the beneficiaries of the litigation."). Therefore, the requested common benefit hold-back does not require any positive statutory authorization, much less under state law.

9

(although not always) made "off the top" of any recovery.[11]   Or, to borrow the pejorative

employed by Bayer, *see*, *e.g.*, Bayer  Br. at 1, 3, it is in the nature of a "tax" on the gross

recovery.  It is "entered to provide for the fair and equitable sharing among plaintiffs of the cost

of services performed and expenses incurred by attorneys acting for MDL administration and

common benefit of all plaintiffs in . . . complex litigation."  *In re Bausch & Lomb Contact Lens*

*Solution Prods. Liab. Litig.*, 2008 WL 2330571, at *1; *accord Turner*, 422 F. Supp. 2d at

681 ("It is important to note that these are set-asides, not disbursements:  no amounts are paid to

attorneys from the set-aside fund until the attorneys demonstrate that they have worked for the

common benefit.").  Put another way, the hold-back is used to create a pool from which those

attorneys who have conferred a benefit common to all plaintiffs may at some later date be

compensated and reimbursed for their outlays of costs.  *E.g.*, *In re Diet Drugs*, 553 F. Supp. 2d

442, 490 (E.D. Pa. 2008) (court "established an assessment on every federal and coordinated

state case in the MDL to create a fund from which the common benefit attorneys could recover

attorneys' fees and costs").

A common fund award, on the other hand, is, as the term suggests, a payment of

attorney's fees *out of a recovery* generated by an attorney's efforts that were expended on behalf

of a broad group of similarly-situated litigants – *i.e.*, the "common fund" – and is employed most

---

[11]   *E.g.*, *In re Bextra and Celebrex*, 2006 WL 471782, at *1 (directing defendants "to withhold
the amount of [the common benefit] assessment from any amounts paid to plaintiffs and their
counsel, and to pay the assessment directly into the common benefit fund as a credit against the
settlement or judgment"); *In re Guidant Defibrillators Prods. Liab. Litig.*, No. MDL 05-1708
(DWF/AJB), 2006 WL 409229, at *1 (D. Minn. Feb. 15, 2006) (same); *see also In re Zyprexa
Prods. Liab. Litig.*, MDL No. 1596 (JBW) (RLM), 2007 WL 2340790, at *1 (E.D.N.Y. Aug. 17,
2007) (directing that "common benefit fund set-aside shall be paid at the time each individual
plaintiff's settlement or judgment becomes final and funds are paid or released to the individual
plaintiff," with one-half deducted from plaintiff's share of gross recovery and one-half from
attorney's fees portion of gross recovery).

often (although not exclusively) in class action cases.  As this Court has explained:

> The common fund doctrine reflects a traditional equitable practice and stands as a well-recognized exception to the general rule that each litigant must bear his attorneys' fees.  Under the doctrine, it is well recognized that a lawyer who recovers a common fund for the benefit of others or his client is entitled to a reasonable attorney's fee from the fund.  The notion that an attorney creating a fund is entitled to a reasonable fee is premised upon the equitable principles of the prevention of windfall and unjust enrichment.  Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorneys' fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, 736 F. Supp. 1007, 1012 (E.D. Mo. 1990) (citations and internal quotation marks omitted).[12]

As the Court is aware, this litigation started out at as a prospective class action.  Had a class been certified, the Leadership Group would have been looking to a common fund award as compensation for their services.  But following the Court's denial of class certification, this litigation has been prosecuted through a common benefit/mass tort approach.  Were the Court now to deny a common benefit set-aside, that would create a strong disincentive to plaintiffs' attorneys in other MDL litigation to continue prosecuting meritorious claims in the event that a court determines that a case cannot proceed on a class basis.

Citing a law professor's article, the Phipps Group asserts that the MDL Leadership Group

---

[12] *Accord In re Charter Commc'ns, Inc., Secs. Litig.*, Nos. MDL 1506, 4:02-CV-1186-CAS, 2005 WL 4045741, at *12 (E.D. Mo. June 30, 2005) ("'[A] litigant or lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole.'") (quoting *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980)); *see also Zilhaver v. UnitedHealth Group, Inc.*, No. 06-CV-2237 (JMR/FLN), 2009 WL 2581387, at *7 (D. Minn. Aug. 20, 2009) (awarding attorney's fees amounting to 14% of common fund in ERISA action); *In re St. Paul Travelers Secs. Litig.*, No. Civ. 04-3801 (JRT/FLN), 2006 WL 1116118, at *1 (D. Minn. Apr. 25, 2006) (noting that requested attorney's fees award of 15% of common fund in securities fraud action was "a smaller percentage of the common fund than is usually awarded in the Eighth Circuit," and citing cases awarding 33.3% and 36%).

"'simply do not do 100% of the legal work.'"  Phipps Br. at 12 (citation omitted).  That deceptive argument misses the point.  The Leadership Group does not claim that it has done "100% of the legal work"; nor does it contend that individual plaintiffs' counsel should not be compensated for their efforts on behalf of their clients.  Rather, the Leadership Group has performed a great deal of work of common benefit to all plaintiffs and, accordingly, should receive a small fraction of each plaintiff's recovery as fair, just, and reasonable compensation for that work.  Indeed, the article cited by the Phipps Group *directly supports* this motion.  While stating that lead counsel in mass tort cases generally do not perform 100% of the work for all plaintiffs and therefore should not receive *100%* of the attorney's fees, Professor Rubenstein advocates that lead counsel *should* receive a fee for common benefit work performed – precisely what the Leadership Group seeks here.  *See* D.I. 1525-4, at 5-6.  In fact, the percentage of individual recoveries that would be withheld here for common benefit purposes pales in comparison to the far larger share that their own attorneys will receive as payment of their fees.

Equally unconvincing is the Phipps Group's contention that non-lead counsel "oftentimes has a larger group of plaintiffs than the lead counsel." *Id.*  Putting to one side that the Phipps Group's argument collapses of its own weight because this motion has the support of a majority of the plaintiffs in this MDL, compensation of common benefit work does not turn on a "nose-count."  The test is not who has been retained by the most clients.[13]  Rather, the critical inquiry is who has principally done court-authorized work that is of value to all plaintiffs and furthers the

---

[13]  The draft article that the Phipps Group relies upon acknowledges that appointing lead attorneys based on who has the largest number of clients would go against existing practices. *See* D.I. 1525-5 at 5 (Charles Silver and Geoffrey Miller, *The Quasi Class Action Method of Managing Multi-District Litigations: Problems and a Proposal* 4) (N.Y. Univ. Law & Econ. Working Paper No. 09, 2009)).

goal of MDL centralization, which is to streamline pre-trial proceedings[14] – even if some plaintiffs choose not to avail themselves of that work and thereby unnecessarily perform parallel work that is not for the greater good (as the Phipps Group claims it has done).  *See In re Diet Drugs*, 2002 WL 32154197, at *21 n.31 ("[S]ome of 'plaintiffs' individually retained attorneys' discovery efforts were duplicative, and thus frustrated the goal of efficiently conducting discovery through a plaintiffs' committee for the benefit of all plaintiffs in an MDL.") (quoting earlier pretrial order).[15]

Also without merit is the Phipps Group's assertion that "class action principles" may not apply to this MDL litigation.  Phipps Br. at 7-10.[16]  The instant matter does not concern an application for attorney's fees out of a class action common fund.  That aside, the Phipps Group's argument is one that MDL courts have repeatedly rejected because, as noted above, those courts have concluded that the distinct similarities between class actions and MDL litigation such as this – often entailing thousands of lawsuits by similarly-situated plaintiffs asserting claims arising out of a common nucleus of operative fact – "warrant the treatment of an

---

[14] *See* 28 U.S.C. § 1407(a) (authorizing centralization to "promote the just and efficient conduct" of cases presenting common questions); *In re Baycol Prods. Litig.*, MDL No. 1431 (MJD/JGL), 2003 WL 22023449, at *2 (D. Minn. Mar. 21, 2003) ("A primary objective of consolidating pretrial proceedings into an MDL under 28 U.S.C. § 1407 is to avoid or minimize conflict and duplication in discovery and other pretrial procedures in related cases by providing centralized management under court supervision.") (citation and  internal quotation  marks omitted).

[15] Bayer makes a similar nose-count argument, contending that "the members of the [plaintiffs'] Executive Committee [sic] represent less than . . . 1/6 of the total universe of plaintiffs."  Bayer Br. at 1-2.  Not only is Bayer's argument unavailing for the reasons stated above, but it misses the fact that the number of plaintiffs supporting the Leadership Group's motion far exceeds Leadership Group membership.

[16] The Phipps Group contends that the Leadership Group's motion relies on class action precedent.  *See* Phipps Br. at 7.  Even a cursory examination of the Leadership Group's opening brief demonstrates that this assertion is false because the Leadership Group relied almost exclusively on authorities from analogous MDL mass tort litigation.  *See* D.I. 1459, at 8-13.

MDL as a quasi-class action." *In re Vioxx,* 2009 WL 2408884, at \*3; *accord In re Zyprexa Prods. Liab. Litig.,* 424 F. Supp. 2d 488, 491 (E.D.N.Y. 2006) (same); *In re Guidant Corp.,* 2008 WL 682174, at \*\*12, 17 (same; citing cases).   As the district court in *Guidant* explained in rejecting this precise argument:

> Contrary to the Opposition's assertion, just as common benefit assessments are used in a supplementary role to provide compensation to attorneys for work performed for plaintiffs' general benefit, so too is a common fund set-aside. Further, as mentioned above, this MDL essentially is a quasi-class action. Therefore, the line that the Opposition and other objectors attempt to draw between MDLs and class actions does not apply when the Court is determining the appropriateness of the amount for a common benefit set-aside here.

*In re Guidant Corp.*, 2008 WL 682174, at \*12.   The Phipps Group cites no case law to the contrary.   Their discourse about restitution principles, resting chiefly on hornbook law, is irrelevant and completely misses the point.[17]

### 3.     The Requested Hold-Backs Should Also Apply to Parallel State Court Actions

The Phipps Group and Murray Group assert that the Court may not levy an assessment on recoveries in state court actions proceeding parallel to this MDL.   Phipps Br. at 3-4; Murray

---

[17] The Phipps Group's unsupported assertion that common fund fee awards do not apply in MDL cases is frivolous.  *See* Phipps Br. at 9.   MDL courts, including in this District, often render common fund attorney's fees awards in connection with a class action recovery.  *E.g.*, *In re Educ. Testing Serv. Praxis Principles of Learning and Teaching Grades 7-12 Litig.*, 555 F. Supp. 2d 661, 663 (E.D. La. 2007) (court set aside 29% of settlement as common fund for payment of attorney's fees); *In re Chrysler Motors Corp.*, 736 F. Supp. at 1012 (awarding 15.5% of common fund created by MDL class action settlement).   Correspondingly, their contention that implementing a common benefit hold-back on all plaintiffs would violate various state ethics rules regarding contingency fee sharing arrangements, Phipps Br. at 23-24, is incorrect.   Simply stated, a common-benefit set-aside is not akin to fee-splitting, since, as discussed above, it has nothing to do with the fees other attorneys receive.   Rather, it takes the form of a hold-back on a gross settlement figure before the terms of an attorney's contract with his client even comes into play.   Such an arrangement does not violate – or even implicate – in any manner, the ethical rules the Phipps Group cites in support of its argument.

Group's Brief (D.I. 1532) ("Murray Br.") at 4-6.  That objection also fails, particularly with respect to state court plaintiffs with lawyers who also represent plaintiffs in this MDL proceeding – *a group that includes **all** of the producer plaintiff objectors here*.

Both groups principally rely on *In re Showa Denko K.K. L-Tryptophan Products Liability Litigation-II*, 953 F.2d 162 (4th Cir. 1992).  But more recent decisions of MDL courts have rejected such a categorical approach to the regulation of cognate state court actions, with one of them expressly rejecting *Showa Denko*, noting that the Fourth Circuit's decision there is not controlling outside that jurisdiction.  *See In re Latex Gloves Prods. Liab. Litig.*, MDL No. 1148, 2003 U.S. Dist. LEXIS 18118, at *5 (E.D. Pa. Sept. 5, 2003); *see also In re Vioxx,* 2009 WL 2408884, at *4 (noting that court "possesses the authority" to regulate contingent fee contracts of individual attorneys for plaintiffs enrolled in global settlement, "regardless of whether their cases were filed in state or federal court").

Unlike *Showa Denko*, where the Fourth Circuit observed that state court plaintiffs "ha[d] not voluntarily entered the litigation before the district court," 953 F.3d at 166, in the instant matter, attorneys representing a majority of the plaintiffs either initially or presently pursuing state court actions against Bayer *support* the instant motion; thus those plaintiffs have "voluntarily entered" this litigation or are otherwise voluntarily submitting to this Court's assessment power.[18]  Thus, as to that majority, there can be no genuine argument that the Court would be improperly "expanding its jurisdiction" by approving a hold-back on recoveries in the

---

[18] *See e.g.,* note 6 *supra*.  As explained in that footnote, at the time the Hare Wynn firm, who now represents at least 1,500 producer plaintiffs, entered into the joint prosecution agreement with the Leadership Group, by which it agreed, among other things, to pay an assessment on each of its cases in the percentage range sought by this motion, it had no cases in the MDL, only in Arkansas state court.  This point is particularly acute in this situation where all of the plaintiffs in the state court actions are represented by counsel who also have plaintiffs in the MDL.

parallel state court actions.

Putting that important distinction to one side, *Showa Denko* should not be followed because it rested on form over substance. Even if most state court plaintiffs did not affirmatively support this application (which is not the case), requiring that state court plaintiffs formally enter an MDL or expressly consent to a fee set-aside ignores the realities of MDL proceedings generally and is, at any rate, inapplicable to this particular MDL. Here, state court plaintiffs have for all intents and purposes entered this MDL because, to the Leadership Group's knowledge, *every* state court plaintiff is represented by an attorney who also represents a plaintiff in this MDL. Consequently, every state court plaintiff has access or potential access to the work performed by the Leadership Group. Under these circumstances, as the district court in *Latex Gloves* observed, permitting plaintiffs in cognate state court actions "to use discovery information in their state cases without charge would produce an anom[a]lous and undesirable predicament." *In re Latex Gloves Prods. Liab. Litig.*, 2003 U.S. Dist. LEXIS 18118, at *5.[19] Some state court plaintiffs who have already benefitted from the Leadership Group's work and had the fruits of that common benefit work available to them if they so chose to avail themselves of it, through counsel present in this Court should not obtain this benefit without compensating the Leadership Group.[20]

---

[19]  That distinguishes this case from *Hartland v. Alaska Airlines*, 544 F.2d 992 (9th Cir. 1976). *See* Phipps Br. at 4; Murray Br. at 5. There, the Ninth Circuit directed the district court to return assessments deposited with the clerk of the district court (amounting to 5% of the total award or one-fifth of every attorney's fees, whichever was greater) that it had ordered withheld from all individuals settling claims against the defendant in connection with an airplane crash. 544 F.2d at 997-98. Unlike the situation here, there was no evidence in *Hartland* that the settling parties, one of whom had not even filed suit, were, in any way, the beneficiaries of MDL counsel's work.

[20] The practical impossibility of lawyers with cases within the MDL not using common benefit materials obtained through that representation in their cases outside of the MDL is epitomized by (continued…)

Indeed, compelling policy considerations militate against exempting from a common benefit assessment, cognate state cases that, like those in this MDL, have been brought by counsel who are also present in the MDL.  To do so would encourage counsel to file just a fraction or maybe even as few as only one case in federal court, merely to get a "foot in the door" of the MDL and thereby avail themselves of an MDL leadership group's work while warehousing the bulk of their cases in state court – and presumably beyond the reach of an MDL court's assessment.  Even worse, it would encourage entire groups of attorneys to band together and rely on just one colleague to file a single federal action and serve as a conduit to funnel – free of charge – documents, deposition transcripts, expert reports, research memoranda, and the like to the group.  That would be an untenable result, not only because of the inequities visited upon MDL leadership groups that perform common benefit work, but also because it would provide a strong incentive to counsel to circumvent and undermine the purpose of MDL centralization in the first place, which is to streamline pre-trial proceedings.  *See supra* at 13 n.14.

Bayer itself recognizes the need to discourage forum shopping, inasmuch as it argues that whatever fee assessment the Court adopts should apply *equally* to state court actions in order "to

_____

(…continued)

the recent conduct of the attorneys representing the Phipps Group.  In April 2009, those attorneys admitted to using confidential discovery documents produced in the MDL proceeding to solicit potential clients who were not even state court plaintiffs, let alone parties to the MDL. *See* Transcript of April 16, 2009 Hearing at 102:4-103:9, attached as Exhibit M to the Supplemental Declaration of Adam J. Levitt dated October 5, 2009 in further support of the motion to establish a Common Benefit Fund ("Supplemental Levitt Declaration").  This rogue use of common benefit discovery materials confirms the inevitable free flow of information across MDL and non-MDL cases being prosecuted by the same counsel.  In the face of that inevitable (and (continued…)

avoid creating an incentive for federal litigants and potential litigants to flee the MDL . . . so as to save on the assessment rate."  Bayer Br. at 8.  Thus, it is notable that while it raises certain objections to the request for an assessment altogether or, alternatively, to the specific percentages requested, Bayer does not question the Court's authority to assess plaintiffs in parallel state litigation.

Accordingly, an assessment of plaintiffs in all cognate state court actions is warranted here because they have, in fact, either (a) voluntarily submitted to the Court's jurisdiction through their affirmative support of this motion, or (b) have cases of the type that the *Latex Gloves* court found appropriate for assessment of a hold-back – namely, the state court plaintiffs have been furnished materials generated in this MDL, or have access to MDL-generated materials because they are represented by counsel who also represent plaintiffs in this MDL.[21] *See In re Latex Gloves Prods. Liab. Litig*., 2003 U.S. Dist. LEXIS 18118, at *5 (fee assessment was "restricted to plaintiffs who ha[d] access to the discovery materials in the depository").[22]

_____

(…continued)

proven) reality, failing to mandate a common benefit set-aside for all such cases would result in the very free-riding situation that has demonstrably occurred here.

[21]  This would be administratively feasible to enforce here because the Leadership Group can provide the Court a list of those state court plaintiffs whose counsel fit within any of these categories.

[22]  The Phipps Group's and Murray Group's reliance on *In re Zyprexa Products Liability Litigation*, 467 F. Supp. 2d 256 (E.D.N.Y. 2006), is also misplaced.  *See* Phipps Br. at 4; Murray Br. at 5-6.  There, Judge Weinstein noted that "[t]he benefits conferred on state plaintiffs as a result of [the first phase lead counsel's] work in federal court [had been] substantial."  467 F. Supp. 2d at 268.  That work included, as here, "maintenance of a depository for all documents produced by defendant in discovery," with "free access to these documents to state plaintiffs."  *Id.*  In addition, like here, depositions in the MDL had been cross-noticed in the related state court litigation.  *Id.*  The *Zyprexa* court "suggested that the parties voluntarily resolve the issue of payment for [the second phase lead counsel's] work by agreeing that attorneys in state cases (continued…)

4.      **The Proposed Hold-Back Percentages Are Reasonable**

Bayer and the Murray Group also assert that the proposed set-aside percentages of 8% for producer plaintiffs' cases and 7% for non-producer plaintiffs' cases to cover attorney's fees, and 3% additional in both categories of cases to cover costs, are higher than rates in similar cases. Bayer Br. at 4-6; Murray Br. at 6-8.  Setting aside whether a defendant such as Bayer even has standing to challenge a set-aside being sought only against plaintiffs, these arguments are unavailing for two reasons.

*First*, each case stands on its own facts.  The extensive common benefit work that the Leadership Group has done to date and the expenditures that it has incurred, as well as work and expenditures that are anticipated going forward – which are detailed in paragraphs 6-28 of the supporting Levitt Declaration (D.I. 1460) and summarized on pages 3-6 of the Leadership Group's opening memorandum (D.I. 1459) – justify the requested percentages.  Importantly, a majority of all plaintiffs either support or do not object to the requested percentages.

*Second*, Bayer and the Murray Group construct their argument by combining the separate fee and cost percentages, so as to arrive at an inflated percentage that appears disproportionate to other cases.  But as the precedents cited in the Leadership Group's opening memorandum illustrate, other courts have adopted similar percentage assessments for attorney's fees, *see* D.I.

_____

(…continued)

w[ould] assume an equitable proportionate share of the costs of discovery in this litigation." *Id.* at 269.  Accordingly, the *Zyprexa* court merely left the issue of compensating MDL lead counsel to the judges in the cognate state court actions "*in the first instance*." *Id.* at 268 (emphasis added).  Thus, that court did not hold or suggest that it was ultimately without power to levy an assessment on plaintiffs in parallel state actions.  In the instant case, given the refusal by certain counsel to have their state court clients assume an equitable proportion of the costs of prosecuting the claims against Bayer, it is appropriate for this Court to impose an assessment.

1359 at 10-11 (citing cases approving fee assessments of 6%-8%), and other cases demonstrate further that the total percentages requested are well within the norm.  *E.g.*, *In re Diet Drugs*, 401 F.3d 143, 149 (3d Cir. 2005) (9% set-aside adopted); *Turner*, 422 F. Supp. 2d at 683 (approving combined set-aside of 12%, representing 10% for fees and 2% for costs); *In re Protegen Sling and Vesica Sys. Prods. Liab. Litig.*, Nos. 1:01-01387, 1387, 2002 WL 31834446, at *1 (D. Md. Apr. 12, 2002) (approving total 9% set-aside for federal MDL cases and 6% for state cases); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, MDL No. 1014, 1996 WL 900349, at **3-4 (E.D. Pa. June 17, 1996) (approving combined hold-back of 17%, representing 12% for fees and 5% for costs).

## 5.     Bayer's "Burden" Arguments Are Self Serving

Bayer also contends that the requested set-aside percentages would "burden" its interests, suggesting that they would impede a negotiated resolution of this litigation.  *See* Bayer Br. at 6; *see also id.* at 7 (asserting that requested percentages will fuel higher settlement demands).  This is simply a hollow, circular argument, as is revealed by the preceding sentence in the same paragraph, wherein Bayer argues that these cases are far from "substantial resolution" so as to warrant the requested percentages.  *See id.* at 6.  Moreover, Bayer never explains – nor could it – how reducing the uncertainty of the hold-back the Leadership Group would receive through the requested relief here, would make these cases more difficult to settle.  In other words, Bayer tries to have it both ways.  It contends that the requested percentages are not warranted because the cases are not close to resolution, and then turns around and argues that if, adopted, the requested percentages could stymie the litigation's resolution.  This is a "Catch-22" argument, as Bayer has done nothing to advance any settlement dialogue.  Indeed, following several rounds of Court-ordered settlement discussions with the Special Master, it is clear that Bayer has no interest in seriously discussing settlement of any sort.

20

Similarly, Bayer's contention that the proposed set-aside percentages will decrease cooperation and foster "animosity" among plaintiffs' attorneys in this MDL, *see* Bayer Br. at 7, is completely baseless.  It has been almost two and one-half *years* since this Court issued its first Case Management Order (D.I. 183).  Much fact and expert discovery has taken place since that time, along with extensive motion practice on a host of issues.  The first bellwether trials are to commence less than one month from now.  Simply stated, plaintiffs' counsel have already been working cooperatively and harmoniously for quite some time on a wide array of matters, and these cases now stand on the verge of trial.  The fact that so many plaintiffs' counsel have, to date, engaged in cooperative work in this MDL litigation is too clear for Bayer to seriously contend that the were the Court to approve the requested hold-backs, plaintiffs' counsel would suddenly come to blows.[23]

Bayer also incorrectly contends that the requested hold-back will only benefit the "Executive Committee [sic]."  *Id*.  As discussed above, any law firms contributing authorized common benefit work will be eligible for compensation from the common benefit fund sought by this motion – including firms outside of the Court-appointed leadership.  *See* Leadership Group's

---

[23] Particularly specious is Bayer's speculation that the set-asides would give some plaintiffs' counsel an incentive not to avail themselves of the work done by the Leadership Group.  Bayer Br. at 7.  Indeed, it is actually the opposite that is true, as implementing the requested hold-back regime would clarify the common benefit situation and further foster plaintiffs' unified efforts. Moreover, to the extent that some plaintiffs' attorneys may have, to date, chosen not to draw on the work done by the Leadership Group (which does not include *any* of the minority objectors each of whom, as demonstrated below, to date, have each substantially partaken of the Leadership Group's common benefit work) – when there has been no assessment in place – there is no reason to believe that granting the requested relief will do anything to make matters worse. Nor does Bayer suggest that, for its part, it would be amenable to a reopening of discovery to accommodate such non-cooperating plaintiffs' counsel.

Opening Memorandum (D.I. 1459) at 10.[24]

Finally, Bayer's contention that the Leadership Group's entry into JPAs with several producers and non-producers "demonstrates that there are alternative routes to manage how the Executive Committee [sic] is compensated," Bayer Br. at 2 n.3, is incorrect as well.  Indeed, the Leadership Group attempted to enter into such agreements with the objecting plaintiffs' counsel.[25]  Had they agreed to enter into those agreements, then it is arguable that this motion may not have been necessary.  The reality, however, is that counsel for the plaintiffs opposing the present motion have refused to enter into such agreements, thereby necessitating this motion to ensure that all plaintiffs would pay for the common benefit work performed here and to prevent the "free-rider" problems discussed below.[26]

### 6.     The Plaintiff Objectors Have Received a Common Benefit

All plaintiffs, including the minority group of plaintiff objectors have benefitted from the Leadership Group's common benefit work that is detailed in the Levitt Declaration and opening

---

[24] Both Bayer and the Phipps Group also incorrectly assert that the Leadership Group "will be fairly compensated pursuant to their respective fee agreements."  Bayer Br. at 3; *see also* Phipps Br. at 15  This argument is demonstrably false, in that it is based on the erroneous presumption that the Leadership Group jointly represents the plaintiffs that its constituent firms represent. But that is not the case, as each law firm in the Leadership Group separately represents its own clients.  Moreover, that argument ignores the jurisprudence relating to common benefit work and compensation therefor, which does not limit compensation in the manner Bayer and the Phipps Group suggest.  Even if plaintiffs' counsel in the Leadership Group (or outside the Leadership Group, for that matter), recover fees based upon their agreements with their individual clients, by this argument, they would be precluded from being compensated for the common benefit work they performed for the good of countless individuals who were not their clients.

[25] Because Rickmers is not suing any of the Bayer entities in its litigation, it would not be subject to the requested hold-back.  Therefore, the Leadership Group did not reach out to counsel for Rickmers to enter into a JPA.

[26] Moreover, Bayer's speculative arguments relating to the JPAs themselves – which it has not seen – are incorrect as well, as the assessment percentages in those contracts are at or within the (continued…)

memorandum.  The fact that some plaintiffs' counsel, including these objectors, may *also* have performed *additional* work specific to their clients' cases neither detracts from the common benefits that they have received (and continue to receive) from the Leadership Group's efforts, nor diminishes those common benefits.  Indeed, that argument was rejected long ago in a similar situation.

In *In re Air Crash Disaster at Florida Everglades*, 549 F.2d 1006, the Fifth Circuit held that when lead counsel bore greater responsibilities than non-lead counsel and their efforts served more than just their specific clients, they were entitled to additional compensation from other non-lead counsel.  The court reasoned that, in complex litigation matters, lead counsel serve to a degree, as officers of the court and, therefore, the court must be instilled with the power necessary to order appropriate compensation to lead counsel which represents the services lead counsel provide to all parties involved.  *Id*. at 1016 ("The court's power is illusory if it is dependent on lead counsel's performing the duties desired of them for no additional compensation.")  The same is true here.  By their efforts, undertaken on behalf of all producer and non-producer plaintiffs in this MDL, the Leadership Group (and firms working under its authority and direction) has provided valuable common benefits to all plaintiffs, and its work is precisely the kind for which other courts have imposed fee assessments.[27]

_____

(…continued)

range of the hold-back requested here.  The signatories to the Joint Prosecution Agreements also support the 3% expense assessment sought here as well.  To that, Bayer has no response.

[27] While the district court in *Air Crash Disaster* "excluded from the 8% contribution attorneys who continued to be active [in the litigation]," that is an outdated minority position in the jurisprudence on this issue, which reaches a markedly different conclusion on this issue by focusing on the common benefits conferred, rather than the procedural construct of whether a specific plaintiff who has received those common benefits also has a contract with his own (continued…)

Conspicuously absent from the plaintiff objectors' briefs is the fact that had those objectors been required to separately engage in the deposition, written, and documentary discovery – which the Leadership Group formulated, structured, and led – the costs of such an endeavor for each of those groups would have exponentially exceeded the amount of the modest hold-back percentages for fees and expenses that the Leadership Group seeks.[28]   In effect, the Leadership Group facilitated the streamlined and efficient prosecution of these cases for all plaintiffs – including these minority objectors – and have attained the precise salutary effect that courts addressing this issue have recognized as a critical and positive factor.[29]

_____

(…continued)

lawyer who is pursuing aspects of the litigation unique or specific to that plaintiff's own case.  It is also directly contrary to the position espoused by Professor Rubenstein, upon whose article the Phipps Group bases much of its opposition argument (addressed at p. 12, *supra*) – which advocates that regardless of other attorney-client relationships that may exist, lead counsel should receive a fee for common benefit work performed – which is exactly what the Leadership Group seeks here.  See D.I. 1525-4, at 5-6.  Moreover, and as explained throughout this brief, the minority objectors have all directly benefitted from the Leadership Group's common benefit efforts.  To permit them to evade their payment obligations based upon the formalistic minority position taken by a district court many years ago – and early in the development of the jurisprudence in this area – would be grossly inequitable.

[28] Indeed, if the minority objectors were correct, then each plaintiff would be entitled to conduct duplicative discovery, which is directly contrary to the purpose of MDL centralization.  *See* 549 F.2d at 1011 ("*The goal of the expeditious processing of all actions arising from a common disaster, each claim for relief being a potentially protracted case can only be accomplished by avoiding* duplic[*ative*] *discovery, conflicting contemporaneous rulings by coordinate district and appellate courts, and fostering the convenience of parties and witnesses*.") (emphasis added); *see also id.* at 1017 ("It is uncertain that appellants or any other plaintiff lawyers would have been able to conduct prompt, orderly, precise and fruitful discovery if there had been a multitude of diligent lawyers pushing for the front seat and the maximum advantage.").

[29] *Air Crash Disaster* also rejected the same suggestion that the Phipps Group makes here – that to award the requested common benefit hold-back would result in a "windfall" for the Leadership Group:

> After careful scrutiny of such conscientious execution of appointed counsels'
> preparation of the plaintiffs' case, this Court is constrained to observe that *if, in*

(continued…)

Faced with clear precedent supporting the establishment of a common benefit fund in cases such as this, the plaintiff objectors resort to citing inapposite cases and law review articles lacking precedential value[30] to argue against their common benefit obligations here.[31]   For example, the Phipps Group relies on inapposite worker's compensation, insurance subrogation, wrongful death, and estate distribution cases to suggest that it should be excused from a common benefit assessment.  *See* Phipps Br. at 10 n. 6.  *None* of the Phipps Group's cited cases, however, pertain to or otherwise address in any manner mass tort or MDL litigation, or the equities and law strongly supporting the common benefit relief that the Leadership Group seeks here.[32]

The ENP Objectors similarly rely on unpersuasive authority to support their incorrect and unsupportable contention that because they are represented by their own counsel, they should not be subject to any common benefit fund assessment.  Like the Phipps Group, however, the cases the ENP Objectors cite fail to support their argument.  Indeed, *Nolte v. Hudson Nav. Co.*, 47 F.2d

———————————————

(…continued)

> fact, an element of unjust enrichment exists in the Court's percentage award of attorneys fees, the beneficiaries are the attorneys whose time was not so consumed in the manner outlined above, but who shall receive all but eight percent (8%) of the attorneys fees originally contemplated by them.

549 F.2d at 1011 (quoting district court's opinion; emphasis added).

[30] Including, incredibly, an incomplete "draft" article, which proposes a novel and unaccepted approach to MDL practice.  *See* Phipps Br., Ex. D (D.I. 1525-4).  That the Phipps Group needed to support its argument from the fringe speaks volumes about the eccentric approach that it urges the Court to adopt.

[31] Tellingly, the Murray Group fails to cite *any* legal authority in support of its argument that it has "not been 'free riding.'"  *See* Murray Br. at 2-4.

[32] For example, *Draper v. Aceto*, 33 P.3d 479 (Cal. 2001), was a worker's compensation case where no lead counsel was appointed.  The *Draper* court held that when settlement proceeds recovered from a third party through the joint efforts of attorneys separately representing the employer and the employee do not exceed the employer's reimbursable compensation costs, the employee cannot have her attorney's fees paid from those settlement proceeds.

166 (2d Cir. 1931) (cited by both the Phipps Group and the ENP Objectors) actually *supports* the Leadership Group's position that a common benefit fund assessment should be imposed against all plaintiffs.  In *Nolte*, the Second Circuit reversed the district court and held that the petitioning attorneys who represented 12% of the unsecured creditor claims *could* seek fees under the common benefit theory.  The only entities that the court held should not be required to contribute to the fund were bondholders, who were the unsecured creditors' *adversaries*, and thus received no benefit from the petitioning counsel's work.  *See* 47 F. 2d at 168.[33]

a)     **The Producer Plaintiff Objectors Have Received
Substantial Benefits From the Leadership Group's Efforts**

Although the Phipps Group denies having received any benefit from the work of the Leadership Group and claims that it has prosecuted its claims independently, the inescapable fact is that "[h]owever invaluable many of the described tasks performed by private counsel were, such work did nothing to directly advance the interests of the mass."[34]

Contrary to its assertions, the Phipps Group (as well as the Murray Group, for that matter) has directly benefited from the common benefit work the Leadership Group has performed.  Suggesting that it has not benefited from such work and bragging about the work

---

[33] *Haynes v. Rederi A/S Aladdin*, 362 F.2d 345 (5th Cir. 1966), was a worker's compensation case.  An employee recovered damages from a third party for injuries he sustained on the job. The insurer for plaintiff's employer intervened in the litigation to recover compensation and medical benefit payments it paid to the plaintiff, from the damages plaintiff received from the third party.  Plaintiff's attorney then attempted to recover his attorney's fee out of the recovery by the insurer. The court found that the common benefit fund did not apply because the insurer explicitly stated that it would handle its own litigation as opposed to using the plaintiff's attorney.  362 F.2d at 351.

[34] R. Eric Kennedy, *Class Action Attorney Fees: The Key Role of the Federal District Judge in Fashioning & Monitoring Mass-tort Common Fund Distributions to Assure a Settlement Deemed Equitable by Both Represented & Unrepresented Class Members, & Both Private & Class Counsel*, 6 Sedona Conf J 173, 177 (2005).

that it is doing independently of it, the Phipps Group suggests that it is "taking trial depositions in the Arkansas state court cases of key current and former Bayer employees.  Those depositions will provide key information not obtained in the MDL depositions for trial."  Phipps Br. at 19-20.

At first blush, one would have to wonder how the Phipps Group could make such a comparative statement without knowing exactly *what* information was obtained in the "MDL depositions."  In fact, the Phipps can make such a representation because it knows precisely what information was gathered "in the MDL depositions," as the Leadership Group is aware that the Phipps Group has ordered transcripts of *several dozen* depositions that the Leadership Group took or that were undertaken under the Leadership Group's direction.  The Phipps Group is thus in possession of, and has directly benefitted from, the Leadership Group's substantial common benefit work in those depositions.

Indeed, the tremendous benefit of reviewing witness' prior, sworn testimony, with reference to pertinent documents, before taking that witness' trial deposition is obvious and cannot be overstated.  Instead of slogging through hours of questioning with the goal of ascertaining usable nuggets of testimony or information, the Phipps Group – because of work done by the Leadership Group – can now frame a cohesive line of questioning, for use at trial, with the benefit of already knowing the witness' answer.  The Leadership Group has essentially provided the Phipps Group a road map for any future depositions it intends to notice.[35]  The fact

---

[35] Mr. Murray, or an attorney from his firm, attended most depositions.  His questioning was always at the conclusion of the deposition.  Mr. Murray thus benefitted by the Leadership Group's prior questioning of the witness and use of pertinent documents.  This allowed Mr. Murray to summarize witnesses' testimony into short snippets for use in any of his state court trials.

that the Phipps Group *does not want to pay for* the benefits it has received in this respect – as well as others in this litigation – is another matter.

It is also important to note that many, if not most, of the initial depositions taken were true discovery depositions.  At the time the depositions began, other than a very general understanding based on documents, *no* plaintiff's counsel had an appreciation of the inner workings of Bayer or the LLRICE project, who the real decision-makers were, or any specific information about the specific negligent acts of Bayer that caused the LLRICE Contamination, upon which *all* of the claims in these actions are based.  After much hard work and hours and hours of preparation and deposition testimony, all counsel now have a clear understanding of the dysfunctional LLRICE project and how Bayer's actions led to the contamination.  The Leadership Group's work undoubtedly provided that roadmap for all counsel, including the producer objectors here.

The Phipps Group's complaint that the Leadership Group failed to provide a "consistent method of organizing or identifying documents turned over," Phipps Br. at 20, also rings hollow since literally thousands of pertinent documents were attached to depositions as exhibits and discussed during those depositions.  All plaintiffs, including the producer objectors here, have had access to all of that information, as well as explanation of the importance of the cited documents, because they ordered those deposition transcripts.  Those producer objectors have thus benefitted greatly from the Leadership Group's work.  They should not be permitted to enjoy that benefit for free.

b)      **The ENP Objectors Have Received Substantial Benefits
from the Leadership Group's Efforts**

The ENP Objectors' arguments that they have not benefitted from the Leadership Group's efforts are also unavailing.[36]   The Court appointed the Leadership Group to act on behalf of *all* plaintiffs.  *See* Apr. 18, 2007 Leadership Order at 5 (Levitt Declaration, Ex. A (D.I. 1460-2).  In fact, the Leadership Order makes clear that William Chaney was appointed to the Plaintiffs' Executive Committee, in part, so that the interests of the non-producer plaintiffs, such as the ENP Objectors, would be adequately represented:

> Attorney William B. Chaney *represents a number of farmer and non-farmer plaintiffs* who would prefer to have their cases litigated individually and in state court. While it may be unusual to appoint an attorney who does not even want to be in this forum, Mr. Chaney has indicated a willingness to cooperate with the litigation, and *his addition will ensure that the interests of similarly situated plaintiffs or potential plaintiffs will also be considered.*

*Id*. at 2 (emphasis added).

Moreover, the ENP Objectors' denials of any benefit from the Leadership Group's labors are in vain.[37]   All plaintiffs, including the ENP Objectors, benefitted from these efforts.[38]

---

[36] VSR and Westmill's joinder in the entirety of the ENP response is disingenuous.  Their complaints were filed May 11, 2009, and May 18, 2009, respectively, in the Eastern District of Arkansas, and were not transferred and docketed in this Court until June 12, 2009.  As a result, they cannot claim to have performed substantial work of their own prior to May 2009, inasmuch as they were not even in the MDL prior to that time.

[37] The ENP Objectors state that there were no major disputes regarding the production of Defendants documents.  *See* ENP Br. at 15.  This is simply not true.  The fact is that there were numerous disputes regarding the scope of discovery in this case.  That the parties were ultimately able to reach a resolution regarding these disputes without seeking the Court's intervention is another reason *why* the Court should adopt the requested assessments, and should not be a basis for penalizing the Leadership Group.

[38] That the ENP Objectors have not sued the Foreign Bayer Defendants does not detract from the fact that they received all documents produced by the Domestic Bayer Defendants as a result of Lead Counsel's efforts.

29

Indeed, of the four ENP Objectors, only Tilda propounded any additional discovery against Bayer or asked any questions at the depositions of Bayer personnel.  *See* ENP Br. at 4.

Counsel for the ENP Objectors misstate the events in this litigation.  For example, the ENPs admit that the Leadership Group has conducted extensive discovery of Bayer and its personnel, "but, because of the difference in the nature of the claims, the ENPs were not able to rely upon the efforts of [the Leadership Group] in this regard. . . . Thus, from the outset, the ENPs have had to pursue their own interests in conducting discovery against Bayer."  *Id*.  In fact, however, the Leadership Group reached out to the ENP Objectors in an effort to collaborate on written discovery.[39]  ***Not once***, however, did the ENP Objectors respond to the Leadership Group's overtures or provide any input on written discovery.

The Leadership Group, led by William Chaney, went further by drafting, circulating, and negotiating with ***all non-producer plaintiffs' counsel***, Plaintiffs' Lead Counsel, and Bayer's counsel what eventually became Case Management Order No. 4 to alleviate the non-producer plaintiffs' (and not just the ENPs') concerns that they would be permitted to move forward with case-specific discovery in their individual actions.  Although the non-producer plaintiffs were permitted to conduct case-specific written discovery, Case Management Order No. 4 contained extensive limitations on discovery from Bayer – 10 interrogatories, 20 requests for admissions, 20 requests for production, and a prohibition against duplication – that render incredible the ENP Objectors' contention that they did not receive any benefit from the Leadership Group's written

---

[39] The Leadership Group's efforts to collaborate with non-producers regarding written discovery is evidenced in an e-mail from Adam Levitt to counsel for non-producer plaintiffs dated July 6, 2007.  However, because this document contains attorney work product, the Leadership Group did not attach is as an exhibit, but it is prepared to offer the e-mail to the Court for an *in camera* review, upon request.

merits discovery, particularly with respect to the issue of Bayer's liability.  CMO No. 4 at 3-5 (D.I. 371).

The ENP Objectors also contend that the Leadership Group "never communicated with the ENPs seeking [sic] their thoughts or input with respect to topics for consideration of personnel of Bayer and/or of third parties, and never provided to the ENPs, any outlines of the topics they believed warranted exploration during such depositions."[40] Affidavit of John K. Baker (D.I. 1520-2) ("Baker Aff."), ¶ 7.  That assertion is false.  Mr. Chaney's firm was in regular contact with counsel for another European non-producer, Veetee, which gave input on topics for upcoming depositions, coordinated the scheduling of depositions, and suggested additional deponents.[41]  Mr. Chaney's firm also provided explanations of the proposed deponents to all plaintiffs who requested it.  Indeed, counsel for Veetee received clarification from Mr. Chaney, as well as from J.R. Whaley, a partner with Neblett Beard and Arsenault, a firm that is part of the Leadership Group, on several proposed deponents, including Peg Cherney, Sue McIntosh, and Paul Schmidt, and proposed lines of questioning for several deponents, including, among others, Ray Shilito.

Moreover, counsel for some of the ENP Objectors attended some of the Bayer witness depositions and were given the opportunity to ask follow-up questions if they so desired.  In some cases, the ENP Objectors counsel took advantage of that opportunity, but, relying on the

---

[40] The ENP Objectors also argue that the Bayer litigation website set up by Lead Counsel was of no benefit to them whatsoever.  ENP Br. at 5.  However, the ENP Objectors admit that at a minimum, the website provided the list of upcoming depositions in one central location.

[41] Mr. Chaney's discussions with European non-producer Veetee are evidenced in emails between Mr. Chaney's firm and, *inter alia*, Debra Brown and John Perkins.  However, because these documents contain attorney work product, the Leadership Group has not attached them as (continued…)

Leadership Group's efforts in the case-in-chief against Bayer, directed their lines of questioning strictly toward the actions of the mills that they are suing or to issues pertaining to LLRICE 62.[42]

The ENP Objectors also incorrectly contend that they had to "offensively fight to carve out deposition time" so as to not interfere with Lead Counsel's schedule.  ENP Br. at 10.  This argument is belied by the fact that Mr. Chaney's firm was in frequent contact with counsel for the ENPs to schedule the Bayer depositions in Amsterdam, in an effort to minimize interference with depositions scheduled by the ENPs.[43]  Any suggestion that the Leadership Group somehow impeded the ENP Objectors' deposition scheduling or questioning efforts is thus inaccurate.[44]

_____

(...continued)

exhibits to this reply brief, but is prepared to proffer them to the Court, for an *in camera* review, upon request.

[42] Examples of the ENP Objectors' conduct in this respect can be seen in the deposition transcripts of, among others, Kirk Johnson and Margaret Gadsby.  As the transcripts of those depositions have been designated "confidential," pursuant to the confidentiality orders applicable to this litigation (D.I. 290, 1202), the Leadership Group has not attached them to this reply brief – but will proffer them to the Court, upon request, for an *in camera* review.

[43] The ENP Objectors also argue that the Court's appointment of John Baker as liaison counsel for the ENPs somehow confirms that the Leadership Group was insufficiently representing the ENPs interests.  *See* ENP Br. at 10.  This contention is incorrect, however, because the Court's appointment of Mr. Baker as ENP liaison counsel did not stem from a dispute between plaintiff factions but, rather, was simply based on a recognition that the ENPs have some discrete concerns, especially in the settlement context, that would be best served by appointing a liaison counsel for them.

[44] Indeed, it was the ENP Objectors who initially failed to confer with Lead Counsel prior to issuing deposition notices, as required by Paragraph 4(a) of Case Management Order No. 4. (D.I. 371).  Despite those failures by the ENP Objectors, the Leadership Group permitted the depositions to go forward and only gently reminded the ENP Objectors of their meet-and-confer obligations and requested that they remember to do so in the future.  Following the initial round of ENP case depositions, the ENP Objectors sought additional depositions.  The dates sought overlapped with proposed dates for depositions of Bayer witnesses.  Although other parties opposed the double-tracking, the Leadership Group did not.  Mr. Chaney, in his role as non-producer liaison counsel, attempted, but was unable to resolve the dispute between the ENPs and the objecting parties.

Significantly, the ENP Objectors readily disclose the common benefits they have received from the Leadership Group's efforts.  For example, they admit that they purchased copies of the multitude of depositions taken by the Leadership Group in this litigation, ENP Br. at 4, thereby availing themselves of the Leadership Group's numerous hours of time and work product that went into the preparation and taking of each deposition.  They also received the Leadership Group's work product when they accessed the deposition exhibits used for each deponent, and also received documents produced by Bayer in response to document requests drafted and negotiated by members of the Leadership Group.  Despite these enormous benefits, the ENP Objectors maintain that they should be exempt from paying for the common benefit work undertaken by the Leadership Group because they had to occasionally ask additional questions specific to their cases at the end of some depositions and pursue some case-specific discovery.  *See* ENP Br. at 4-5.  As discussed above, the fact that a party in an MDL may have to perform some *extra* work to advance its individual claims does not vitiate the common benefit that it has otherwise received from work performed by court-appointed case leadership, or firms working under that leadership's authority and direction.

The ENP Objectors further contend that they did not rely upon Lead Counsel's submissions concerning Bayer's motion for partial summary judgment on federal preemption grounds.  ENP Brief at 6.  This contention is flatly contradicted by the court filings in this case.  For example, the first page of Tilda's three-page *supplemental* response to Bayer's motion states that it incorporated, *in their entirety*, both Plaintiffs' Memorandum in Opposition to Defendants' Motion for Partial Summary Judgment and Plaintiffs Response to Defendants' Statement of

Material Facts.  (D.I. 1138).[45]  Likewise, as set forth in the Levitt Declaration, Lead Counsel argued the motion for plaintiffs and the Court praised its performance when it ruled in plaintiffs' favor.  Levitt Decl. at 9 n.3.  Counsel for two of the ENPs (and only one of the ENP Objectors) spoke at the hearing, with counsel for Veetee asserting that his client's claims against Bayer were the same negligence and negligence *per se* claims alleged by the Leadership Group, Tr. of Apr. 16, 2009 Hr'g at 36:16-24 (Exhibit M to the Supplemental Levitt Declaration), and counsel for Rickmers spoke even less, chiming in simply to clarify that his client was not suing Bayer. *Id.* at 39:7-18.  Clearly, the ENPs, as well as all other plaintiffs' counsel with claims against Bayer, have extensively relied on the Leadership Group to lead the charge in protecting all interested plaintiffs seeking redress from Bayer and arguments to the contrary are merely an effort to rewrite history.

The ENP Objectors also contend that because they are not using the Leadership Group's expert witnesses, they should be exempt from the requested hold-back.  What they overlook, however, is that the Leadership Group has already taken this into account by seeking an assessment from non-producers that, at 7% for attorney's fees, is one percent lower than the 8% assessment sought from producer plaintiffs.[46]

---

[45] Rickmers' opposition to Bayer's Motion for Partial Summary Judgment also explicitly cites to the Leadership Group's opposition.  *See* D.I. 1134 at 2.  Additionally, the Court rendered its ruling denying Bayer's motion one month before VSR and Westmill even initiated their lawsuits. Consequently, those two ENP plaintiffs received the benefit of having those partial summary judgment issues resolved in their favor before even arriving on the scene.

[46] The ENP Objectors also argue that because they attended a mediation session with Judge Limbaugh without Lead Counsel, they received no common benefit from the Leadership Group. That the ENP Objectors had a private meeting with Judge Limbaugh on their clients' behalf is hardly surprising.  This is simply a variation on the producer plaintiffs objectors' unavailing theme that because they did *something* of specific benefit only to their clients, they should be (continued…)

**(1)      The Objecting ENPs and the Leadership
<u>Group Have Sufficiently Similar Interests</u>**

The ENP Objectors further contend that their interests in this litigation are dissimilar to
the Leadership Group's interests and have thus not received any tangible benefits from the
Leadership Group's common benefit efforts.  ENP Br. at 12-13.  This argument, however, is
belied by the facts of these cases.[47]  At a minimum, both groups (producers and non-producers)
have sued overlapping Bayer entities and both groups must prove Bayer's contamination of the
U.S. rice crop with the LLRICE 601 and 604.  Thus, in their respective trials, those ENP
Objectors that have sued Bayer will need to establish Bayer's liability.  The Leadership Group
has undertaken a substantial effort to provide the ENP Objectors with sufficient evidence to meet
their needs.  The fact that the ENP Objectors and the Leadership Group may be alleging *some*

_____

(…continued)

responsible for *nothing* with respect to the common benefits that they obtained from the
Leadership Group that facilitated that representation.

[47]   The ENP Objectors again cite to inapposite authority for this argument.  *See* ENP Br. at 13.
In *Case v. Continental Airlines Corp.*, No. 91-1156, 974 F.2d 1345 (table), 1992 WL 201080,
1992 U.S. App. LEXIS 19148 (10th Cir. Aug. 11, 1992) (unpublished), the party opposing the
assessment had been specifically excluded from access to any of the discovery obtained by lead
counsel as well as the pretrial procedures and from benefitting from an exemplar trial.  *See id.*,
1992 WL 201080, at **2, 4, 1992 U.S. App. LEXIS 19148 at **5, 10-11.  Here, the ENPs were
able to take part in, and partake of, the common benefit discovery obtained and created.  In
*United States v. Tobias*, 935 F.2d 666 (4th Cir. 1999) (ENP Br. at 15), counsel was seeking a
common benefit fund assessment *from his adversary* – which is clearly not the case here.  And in
*In re WorldCom Inc., Secs. Litig.*, 02 Civ. 3288 (DLC), 2004 U.S. Dist. LEXIS 22991 (S.D.N.Y.
Nov. 10, 2004), liaison counsel for plaintiffs who had opted out of a class action in favor of
individual actions sought a common benefit fee from both the class action settlement and from
counsel with individual actions.  The court granted liaison counsel's motion as to the other
individual actions, but denied it as to the class action settlement because the individual litigants
had expressly chosen not to participate in the class action and, therefore, an assessment on behalf
of the individual plaintiffs would amount to a subsidy from class members.  *Id.*, 2004 U.S. Dist.
LEXIS 22991, at **8-9.  Here, the Leadership Group requests a set-aside to compensate counsel
(continued…)

unique claims and pursuing different categories of remedies on behalf of their respective clients does not alter the tremendous overlap of the factual and other allegations underlying all of these cases.

The ENP Objectors also contend that they should not have to pay their fair common benefit share (or any share at all) because a few rice mill plaintiffs which the ENP objectors have sued have also obtained and are using the Leadership Group's common benefit discovery, pre-trial, and other materials.  *See* ENP Br. at 13.  This argument is incorrect for several reasons. *First*, the fact that some plaintiffs (who are defendants in other cases in the MDL) have obtained common benefit materials for the purpose of prosecuting their claims *against Bayer* does not render the Leadership Group's interests divergent from those of the ENP Objectors.  Members of both of these groups continue to prosecute their claims against Bayer and both have gained from the common benefit materials generated by the Leadership Group's efforts.

*Second*, the Leadership Group is decidedly neutral with respect to beneficiaries' use of those common benefit materials.[48]  Indeed, the fact that another plaintiff chooses to use the fruits of the Leadership Group's common benefit efforts is simply a testament to the value of those

_____

(…continued)

for the work that it had done that is of common benefit to all; it is *not* seeking to have the ENP Objectors subsidize the producer plaintiffs' cases.

[48] With the exception of the limitation of the use of those materials to the prosecution of claims against the Bayer defendants.  Indeed, those plaintiffs who have consented to the requested hold-back percentages and who have executed Joint Prosecution Agreements have agreed, as part of those agreements, to limit their use of the common benefit materials obtained thereunder to prosecute their claims against the Bayer defendants.  Assuming a signatory plaintiff has elected to use those materials in a manner contrary to their agreement, that would be a breach of contract, *not* a divergence of interests between the Leadership Group and the ENP Objectors.

efforts.[49]  *Third*, that the ENP Objectors believe that they have had to pursue discovery against those mills on their own – rather than rely on the Leadership Group's common benefit efforts for those materials as well – does not mean the Leadership Group is not representing their interests. As noted above, a party's need to conduct some discovery unique to its case does not diminish the common benefit nature of work performed by the court-appointed leadership and other firms working at their behest.

Moreover, and contrary to the ENP Objectors' arguments, a majority of non-producer plaintiffs agree that the Leadership Group has performed beneficial services to them and support the common benefit fund approach.  *See* pp. 2-6.  Indeed, the fact that another European non-producer, Veetee, has acknowledged the numerous common benefits and voluntarily entered into a JPA with Lead Counsel, belies the ENP Objectors' argument that the Leadership Group's interests are not sufficiently similar to theirs and have not provided the ENPs with any common benefit.[50]

### 7.    This Fee Assessment Request Is Ripe

The Phipps Group also contends that the Leadership Group's motion is premature. Phipps Br. at 14-15.  That argument is without any legal or factual support for its contention, which is unsurprising because the applicable case law supports the Leadership Group's timing. As the court noted in *In re WorldCom*:

> It is important to establish a set-aside fund immediately.  Without the entry of a
> set-aside order in advance of Individual Action settlements or judgments,

---

[49]   The ENP Objectors could also have access to the expert witnesses, but they chose to obtain their own experts.

[50]  Similarly, the ENP Objectors' argument that this Court's denial of their motion to intervene in the *Riviana* litigation, somehow establishes that their interests are divergent from the Leadership Group's defies logic.  *See* ENP BR. at 8.  The Leadership Group does not represent Riviana.

> Individual Actions could be dismissed after settlement or a judgment, requiring Liaison Counsel to pursue separate compensation claims in any number of jurisdictions around the country….Nor is it premature to find that all Individual Action plaintiffs have benefitted enormously from the work already performed by [Liaison Counsel] and to predict that they will continue to so benefit.

2004 U.S. Dist. LEXIS 22991, at * 13; *see also Turner*, 422 F. Supp. 2d at 681 ("the fact that there is no common fund at this stage in the litigation is of no moment. . . .  The set-asides would be imposed to ensure that there will be adequate funds available if the plaintiffs are successful.") (internal citation omitted); *In re Diet Drugs Prods Liab. Litig*., MDL Docket No. 1203 Pre-Trial Order 467 (E.D. Pa. Feb. 10, 1998) (establishing a common benefit fund prior to trial) (Exhibit N to Supplemental Levitt Declaration).

The parties are less than one month away from the start of the first bellwether trial – an event that will implicate much of the common benefit work that the Leadership Group has performed.  As the court in *WorldCom* recognized, a common fund must be established now so that the attorneys who have contributed – and continue to contribute – substantial common benefit efforts can be assured that they will be properly and efficiently compensated for those efforts.[51]

Also without merit is the Phipps Group's demand that the Court permit them to engage in discovery "to investigate what was and was not done by PLC as compared to what was and was not done by the Phipps team, to allow this Court to make a reasonable determination of what, if

---

[51] The Phipps Group's demand for the Court to defer creating a common benefit fund until after the conclusion of the litigation, Phipps Br. at 15, is contrary to the case law and is little more than an argument in support of a "success fee" – which is irrelevant to the common benefit analysis – rather than a common benefit hold-back for benefits conferred on all plaintiffs' counsel based upon common benefit work performed and conferred on all plaintiffs, including, as noted above, the Phipps Group.

any, assessment is warranted."[52]  Phipps Br. at 14.  As discussed above, that the Phipps Group
(or any attorney representing individual plaintiffs) needed to undertake work specific to those
individual plaintiffs' cases neither defeats nor diminishes the common benefit work the
Leadership Group performed or the salutary effect of that work for all plaintiffs, including those
the Phipps Group represents.[53]

## III.   CONCLUSION

For the reasons set forth above and in the opening memorandum filed on August 19, 2009
(D.I. 1459), the Court **(i)** establish a common benefit trust fund, and **(ii)** direct defendants to hold
back and set aside (a) 8% of any gross recovery obtained by producer plaintiffs and 7% of any
gross recovery obtained by non-producer plaintiffs, by way of judgment, settlement, or
otherwise, in each genetically-modified rice-related action for attorney's fees; and (b) an
additional 3% of any gross recovery obtained by any plaintiff, by way of judgment, settlement,
or otherwise, in each genetically-modified rice-related action for common benefit costs and
expenses incurred by the Leadership Group herein.  The Court should direct that this be done in
all cases that have been or will be (i) part of this MDL litigation; (ii) pending in a state court

---

[52] Likewise, not only is the Phipps Group's demand to review JPAs privately reached between
the Leadership Group and counsel representing the majority of plaintiffs here, Phipps Br. at 14-
15 n.8, entirely off-base, *but the Phipps Group has already seen that agreement and is aware of
its terms* because the Leadership Group reached out to the Phipps Group in order to conclude a
similar agreement, only to be rebuffed.  For the Phipps Group to claim that it needs discovery
about something with which it is fully familiar is disingenuous.

[53] Finally, the Phipps Group's request for discovery into the substance of the common benefit
work and its demand for additional time, so that its "experts" can analyze some unidentified
documents and submit "reports" to the Court is nothing but an attempt to divert the Court from
the issues at hand.  Such highly irregular fishing expeditions in connection with a common
benefit assessment motion would be inappropriate as a general matter.  They border on the
astonishing when demanded by attorneys making dubious claims that they have independently
(continued...)

where a plaintiff's counsel includes at least one attorney who also serves as counsel for one or more plaintiffs, producer or non-producer, in an action that is, has been, or will be part of this MDL litigation; and/or (iii) include any claim resolved that benefitted from plaintiffs' common benefit efforts.  Further, the Court should direct defendants to place the held-back and set-aside amounts into a "common benefit trust fund" established and maintained by Lead Counsel.

**Dated:**  October 5, 2009

Respectfully submitted,

**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLC**

By: /s/  Adam J. Levitt
Adam J. Levitt
Stacey T. Kelly
55 West Monroe Street, Suite 1111
Chicago, Illinois  60603
Tel:  (312) 984-0000
Fax:  (312) 984-0001
levitt@whafh.com

*Plaintiffs' Designated Co-Lead and Co-Interim Class Counsel*

**GRAY, RITTER & GRAHAM, P.C.**

By:  /s/  Don M. Downing
Don M. Downing, Bar # 41786
Gretchen Garrison, Bar # 3189
Jason D. Sapp, Bar # 5218238
701 Market Street, Suite 800
St. Louis, Missouri  63101-1826
Tel:  (314) 241-5620
Fax:  (314) 241-4140
ddowning@grgpc.com

_____

(…continued)

have expended over *12,000 hours* of work (*i.e.*, the equivalent of *six* attorneys billing an entire year on nothing else) and over $850,000 in expenses preparing for trial.  *See* Phipps Br. at 23.

***Plaintiffs' Designated Co-Lead, Co-Interim Class
and Liaison Counsel***

Stephen A. Weiss
Diogenes P. Kekatos
**SEEGER WEISS LLP**
One William Street
New York, New York  10004
Tel:  (212) 584-0700
Fax:  (212) 584-0799

Richard J. Arsenault
John Randall Whaley
Jennifer M. Hoekstra
**NEBLETT BEARD & ARSENAULT, LLP**
2220 Bonaventure Court, P.O. Box 1190
Alexandria, Louisiana  71301
Tel: (800) 256-1050
Fax: (318) 561-2591

Scott E. Poynter
**EMERSON POYNTER LLP**
500 President Clinton Avenue, Suite 305
Little Rock, Arkansas  72201
Tel:  (501) 907-2555
Fax:  (501) 907-2556

Joe R. Whatley Jr.
Deborah Clark Weintraub
Adam P. Plant
 **WHATLEY DRAKE & KALLAS LLP**
2001 Park Place North, Suite 1000
Birmingham, Alabama  35203
Tel: (205) 328-9576
Fax: (205) 328-9669

William Chaney
James L. Reed
William J. French
Michael Kelsheimer
Drew York
**LOOPER REED & MCGRAW**
1601 Elm Street Suite 4100
Dallas, Texas  75201
Tel:  (214) 237-6403
Fax:  (214) 953-1332

41

Ralph E. Chapman
Sara B. Russo
**CHAPMAN, LEWIS & SWAN**
501 First Street
P. O. Box 428
Clarksdale, Mississippi  38614
Tel:  (662) 627-4105
Fax:  (662) 627-4171

***Plaintiffs' Executive Committee***

15235

## <u>CERTIFICATE OF SERVICE</u>

I, the undersigned, do hereby certify that I have this 5th day of October 2009, electronically filed a copy of the foregoing with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the parties of record.


<u>/s/ Adam J. Levitt</u>