UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


IN RE GENETICALLY MODIFIED    )      Case No.  4:06MD1811 CDP
RICE LITIGATION               )            ALL CASES


## <u>MEMORANDUM AND ORDER</u>

The parties have filed a number of motions for summary judgment and to

exclude or limit expert testimony.  This multi-district litigation relates to the

claims of U.S. long-grain rice producers, and others in the rice business, who

allege that certain defendants contaminated the U.S. rice supply with non-

approved genetically modified strains of rice.  The first of a series of bellwether

trials will begin shortly; the first trial involves Missouri farmer plaintiffs.

Although the motions now before me relate to the claims of both Missouri and

Arkansas plaintiffs, this order rules on only the portions of the motions directed to

the claims of the Missouri plaintiffs.  I will rule on the motions directed to the

claims of the Arkansas plaintiffs in a separate order.

For the reasons that follow, I will grant defendants' motions for summary

judgment on plaintiffs' claims under the North Carolina Unfair Trade Practices

Act and on plaintiffs' claims for public nuisance and negligence *per se*.  I will

grant plaintiffs' motions for summary judgment directed to certain affirmative

defenses. I have determined as a matter of law that the regulations under the Plant Protection Act do not allow for low level or adventitious presence of regulated genetically modified rice in the commercial rice supply, and so I will not allow any of defendants' expert witnesses to opine to the contrary. I have limited the testimony of various expert witnesses in minor ways. Otherwise, I have denied the remaining motions.

## I. **Background**

In August of 2006 the United States Department of Agriculture announced that trace amounts of LLRICE 601, a genetically modified rice strain, had been detected in the U.S. long-grain rice supply. LLRICE 601, and a related seed, LLRICE 604, were developed by Bayer CropScience,[1] and designed to be resistant to a Bayer herbicide, LibertyLink. Bayer and its corporate predecessors developed LLRICE through research in Europe, and later conducted field tests in this country. Before the 2006 USDA announcement, LL601 and LL604 were not being sold commercially and had not been approved for human consumption.[2]

---

[1]Bayer CropScience LP is a U.S. corporation and is the business entity alleged to be primarily responsible for the development and marketing of LLRICE. Plaintiffs have named Bayer CropScience LP as a defendant, along with numerous other Bayer entities. I will discuss the corporate relationships later, in the discussion of plaintiffs' motion for summary judgment to establish agency and successor liability.

[2]In November of 2006 the USDA deregulated LL601, which would allow it to be sold commercially and for human consumption. To date neither LL601 or LL604 have been sold

Following the announcement, the regulatory bodies of several other countries reacted by banning or placing stringent testing requirements on any U.S. long-grain rice imports.

Many farmers and others involved in the rice business brought suit against Bayer and others, claiming that they were damaged by the contamination of the rice supply and the effect the announcement had on the market for rice. Cases from other districts were transferred here for pretrial proceedings under 18 U.S.C. § 1407. The first bellwether trial will begin on November 2, 2009 and will involve the claims of Missouri plaintiffs Kenneth Bell and J.H. Hunter Farms (and the various entities through which they grow rice).

The Missouri plaintiffs seek damages under theories of negligence, public and private nuisance, negligence *per se* and the North Carolina Unfair Trade Practices Act.[3] Although the complaint also alleges claims for strict liability,[4] plaintiffs have indicated that they do not intend to pursue strict liability claims on behalf of these Missouri plaintiffs. Plaintiffs claim damages from the drop in market price for rice, losses they suffered because they either could not plant or

---

commercially. There is no contention in this case that either is harmful to human health if consumed.

[3]Counts 20 - 25 and 33 of Plaintiffs' Master Consolidated Complaint (docket # 1010).

[4]Counts 26 and 27.

had to plant different crops or varieties the following year, and expenses for cleaning their equipment and property.

## II. __Liability Issues__

Defendants seek summary judgment on all of the claims.[5]  They assert that the economic loss doctrine bars all the common-law claims and that, even aside from that doctrine, there are no genuine disputes of fact with respect to any theory other than negligence.  Bayer also seeks to limit the testimony of three of plaintiffs' liability expert witnesses, Rene VanAcker, Mark E. Halsey, and Jeffrey Stein.

Plaintiffs seek summary judgment on certain of defendants' affirmative defenses.  In those defenses, Bayer contends it cannot be liable because any damage was caused by the intervening negligence of others, because it complied with all industry standards, and because it complied with all government laws and regulations.  Plaintiffs seek to exclude the testimony of defendants' liability expert witnesses, Alan McHughen and Ronnie Helms.  Plaintiffs also seek summary judgment to establish the status of various defendants as agents, successors, and

---

[5]In ruling on all the summary judgment motions, I have viewed the facts and inferences in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).  The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

partners of one another.

## A.  Economic Loss Doctrine

The economic loss doctrine bars recovery of purely pecuniary losses in certain tort cases if there is no personal injury or physical damage to property other than the property at issue in the case – usually an allegedly defective product in a products liability case.  Many states have adopted the economic loss doctrine for products liability cases, and some states have applied the doctrine to other torts as well.  *See*, *e.g.*, *Transp. Corp. of Am., Inc. v. Int'l Bus. Machs. Corp.*, 30 F.3d 953, 956 (8th Cir. 1994).

Missouri applies the economic loss doctrine to most strict liability cases, and in those cases does not allow tort recovery for damages to the allegedly defective product itself.  *See*, *e.g.*, *Sharp Bros. Contracting Co. v. Am. Hoist & Derrick Co.*, 703 S.W.2d 901, 902 (Mo. 1986) (*en banc*) (purchaser of crane cannot recover from manufacturer for injury to crane itself).  Additionally, where the duty allegedly breached arises from a contract, Missouri law will not allow a negligence or other tort claim.  *See*, *e.g.*, *Summer Chase Second Addition Subdivision Homeowners Ass'n v. Taylor-Morley, Inc.*, 146 S.W.3d 411, 417-18 (Mo. Ct. App. 2004) (no tort claim for repair of "defects in the item built pursuant to contract").  Missouri courts have rejected the economic loss doctrine, however,

even in some cases where the parties had a contractual relationship, if the particular duty alleged to have been breached arose from the common law, as opposed to arising from the contract. *See*, *e.g.*, *School Dist. of Independence v. U. S. Gypsum Co.*, 750 S.W.2d 442 (Mo. Ct. App. 1988) (duty to prevent contamination by asbestos); *Bus. Men's Assurance Co. of Am. v. Graham*, 891 S.W.2d 438, 454 (Mo. Ct. App. 1994) (negligence suit against architect); *Laidlaw Waste Sys., Inc. v. Mallinckrodt*, 925 F. Supp. 624 (E.D. Mo. 1996) (duty to prevent contamination by hazardous waste). To determine whether the economic loss doctrine applies, therefore, the court must consider both the nature and source of the duty alleged to have been violated and the plaintiffs' rights in the property.

Bayer cites two federal cases that found claims arising from the negligent spread of GM food were barred, at least in part, by the economic loss doctrine. *See In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828 (N.D. Ill. 2002); *Sample v. Monsanto Co.*, 283 F. Supp. 2d 1088, 1092-94 (E.D. Mo. 2003). In *Starlink*, the court applied the economic loss rules of Wisconsin and Illinois to a case involving the GM contamination of corn. 212 F. Supp. 2d at 841-42. The court found that the economic loss doctrine did not apply to claims that plaintiffs' non-GM crops were contaminated, although the court said it would bar claims for any contaminated rice they had purchased. *Id.* In *Sample*, the court applied the

economic loss rule under Illinois and Iowa law to bar the farmers' public nuisance and negligence claims after they had abandoned any allegations of contamination. 283 F. Supp. 2d at 1092.

Plaintiffs did not buy LLRICE 601 or 604 from Bayer, but they allegedly were injured by Bayer's negligent contamination of the nationwide rice supply. Their damages are not to any property that was the subject of a contract, and they are not claiming damage to any property that is alleged to be defective. Rather, they claim market losses and damage to other property, including equipment, land, and rice. Because they allege damage to other property, the doctrine does not apply.

Additionally, neither *Starlink* nor *Sample* was based on Missouri law, and I do not believe the courts of Missouri would apply the doctrine to bar the claims here. Missouri has traditionally allowed tort claims even where the only damages sought were economic. *See*, *e.g.*, *Bryant v. Murray-Jones, Inc.*, 653 F. Supp. 1015 (E.D. Mo. 1984) (negligence of architect); *Miller v. Big River Concrete LLC*, 14 S.W.3d 129, 134 (Mo. Ct. App. 2000) (discussing factors to consider and allowing recovery where plaintiff had a recognized property interest). Missouri courts have never read the doctrine as broadly as Bayer urges here. Under the prevailing Missouri law, the plaintiffs' common-law tort claims are not barred by the

economic loss doctrine.

**B.**    **North Carolina Unfair Trade Practices Act**

The Bayer defendants have moved for summary judgment on plaintiffs' claims under the North Carolina Unfair Trade Practices Act, N.C. Gen. Stat. § 75-1.1 *et seq*. (2009).  It is undisputed that these Missouri plaintiffs have no North Carolina operations.  The question presented by this motion is whether the act provides a remedy to an out-of-state plaintiff to recover for out-of-state injuries allegedly resulting from unfair acts that occurred in North Carolina.  While the case law is inconsistent, I believe that the proper interpretation of the act does not extend to the claims of the plaintiffs here.

The dispute partially arises because the language of the act has changed over time.  The initial act, passed in 1969, was specifically limited to dealings between buyers and sellers "within this state."  *American Rockwool, Inc. v. Owens-Corning Fiberglass Corp.*, 640 F. Supp. 1411, 1426 (E.D.N.C. 1986).  In 1977, however, when the North Carolina General Assembly amended section 75-1.1, it omitted the reference to commerce only "in this state."  *Id.*  As amended, Section 75-1.1 declares unlawful, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce . . . ." N.C. Gen. Stat. § 75-1.1.  "Commerce," under the act, "includes all business

activities, however denominated . . . ." *Id.*

The majority of cases support Bayer's view that the act only applies if a plaintiff can show that the alleged violation had a "substantial effect on a plaintiff's in-state business operation." *See 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 501 (M.D.N.C. 1987) (requiring an in-state injury to plaintiff); *see also In re Parmalet*, 383 F. Supp. 2d 587, 604 (S.D.N.Y. 2005) (". . . the overwhelming majority of federal district courts . . . have limited Section 75-1.1's application to 'cases involving substantial effect on a plaintiff's in-state business operation.'").

Plaintiffs point to *Hardee's Food Systems., Inc. v. Beardmore*, No. 5:96-CV-508-BR(2), 1997 WL 33825259 (M.D.N.C. June 6, 1997), which supports their argument that an out-of-state plaintiff may recover for out-of-state injuries, so long as the unfair acts occurred in North Carolina. *Hardee's*, in turn, cited two other cases that are also relied on by plaintiffs here: *Broussard v. Meineke Discount Muffler Shops, Inc.*, 945 F. Supp. 901 (W.D.N.C. 1996), and *Jacobs v. Central Transportation, Inc.*, 891 F. Supp. 1088 (E.D.N.C. 1995). In both of those cases, however, the out-of-state plaintiffs had significant dealings with the North Carolina defendants, and the claims arose out of actions taken within North Carolina. *Broussard*, 945 F. Supp. 901; *Jacobs*, 891 F. Supp. 1098. Here, in

contrast, plaintiffs are not suing based on contracts with Bayer, and although some of Bayer's decision-making occurred in North Carolina, the claims of plaintiffs cannot be said to arise mainly from those North Carolina activities.

Faced with conflicting authority, I conclude that the better reasoned cases require an in-state injury to a plaintiff's in-state business operations. The North Carolina Unfair and Deceptive Trade Practices Act is intended to protect the North Carolina consumer. *See Lawrence v. UMLIC-Five Corp.*, No. 06 CVS 20643, 2007 WL 2570256, at * 6 (N.C. Super. Ct. June 18, 2007) ("In any event, it is beyond cavil that the UDTPA's primary purpose is to protect the consuming public."); *Sunbelt Rentals, Inc. v. Head & Engquist Equip. L.L.C.,* No. 00-CVS-10358, 2003 WL 21949548, at *7 (N.C. Sup. Ct. July 31, 2003) ("It is clear from the federal court opinions that the application of North Carolina's U.D.T.P.A. is reviewed on a case by case basis to determine if, under the circumstances of a particular matter, the burden on interstate commerce is excessive in relation to North Carolina's local interests."). Plaintiffs have not shown that their claims here have a sufficient effect on North Carolina business for them to benefit from this act intended to protect North Carolina commerce.

## C.  Public and Private Nuisance

The Bayer defendants have moved for summary judgment on plaintiffs'

claims for public and private nuisance. In the public nuisance claim (Count 20), plaintiffs allege that "Bayer has unreasonably interfered with the public's right to expect compliance with the federal laws" governing rice growing, and "the public's right to expect that the rice sold to the general public is free from contamination with LLRICE . . . ." In the private nuisance claim (Count 21), plaintiffs allege that Bayer's contamination of the rice supply interferes with and impairs plaintiffs' rights to the "use and enjoyment of their interests in the land on which they grow or may grow rice."

In Missouri, a public nuisance is "an offense against the public order and economy of the state" that "violates the public's right to life, health, and the use of property, while, 'at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons.'" *City of Greenwood v. Martin Marietta Materials, Inc.*, Nos. WD 69690, WD 69787, 2009 WL 2431496, at *5 (Mo. Ct. App. Aug. 11, 2009) (citations omitted).

A private nuisance, on the other hand, "is the unreasonable, unusual, or unnatural use of one's property so that it substantially impairs the right of another to peacefully enjoy his property." *Angeles v. Larson*, 249 S.W.3d 278, 283 (Mo. Ct. App. 2008) (citing *Frank v. Envtl. Sanitation Mgmt, Inc.*, 687 S.W.2d 876, 880

(Mo. 1985) (*en banc*)).  Bayer does not have to own the land on which the activity

occurs for there to be a private nuisance.  *See City of Greenwood*, 2009 WL

2431496, at *6 (plaintiff's "claim that nuisance may only arise from the

unreasonable use of one's own property is not supported in the law.").

Bayer has shown that, as matter of law, plaintiffs cannot recover for public

nuisance.  There is no evidence in the record showing the sort of public harm or

negative effect on the entire community that public nuisance law was developed to

remedy.  The majority of the cases cited by plaintiffs involve private nuisance

claims, not public nuisance claims.  Those that do discuss public nuisances are

factually distinguishable.  For example, in *State v. Fermenta ASC Corp.*, 608

N.Y.S.2d 980, 986 (N.Y. Sup. Ct. 1994), a case cited by plaintiffs as analogous to

the facts here, the court found a dispute of fact because there were questions as to

whether the presence of a certain level of chemical was, in fact, dangerous to the

health and safety of a considerable number of persons.  Here, plaintiffs have not

presented evidence sufficient to raise a similar question.  Plaintiffs have presented

evidence that LL601 and LL604 harmed the market, but they have not provided

evidence that the rice is harmful to the entire community or the general public.

Plaintiffs' private nuisance claim, however, survives summary judgment,

because factual disputes remain regarding whether contamination of plaintiffs'

crops by LLRICE may interfere with their enjoyment of their land. "The focus [of a private nuisance claim] is on defendant's unreasonable interference with the use and enjoyment of plaintiff's land." *Wallace v. Grasso*, 119 S.W.3d 567, 580 (Mo. Ct. App. 2003). A reasonable jury could conclude that Bayer's use of its cooperators' land for testing the GM rice constituted a nuisance. Plaintiffs have presented evidence that they could not plant rice on the fields where the contaminated rice had been grown, and this is an allegation that they were unable to enjoy the use and benefit of their land because of defendants' interference. A genuine issue of fact remains regarding whether plaintiffs can prove a private nuisance, and so I will deny Bayer's motion for summary judgment on this claim.

### D.    <u>Violations of Statutes or Regulations</u>

Several interrelated motions raise the issue of whether Bayer complied or failed to comply with the regulations issued by the USDA under the Plant Protection Act. The central dispute between the parties is whether any release of GM rice outside an approved purpose violates the regulations – which undisputedly happened here because the GM rice was found in the commercial rice supply – or whether the regulations allow "adventitious presence," or "low-level" amounts of LL601 or LL604 to be found in other rice.

The motions affected by these arguments are Bayer's motion for summary

judgment on plaintiffs' negligence *per se* claim; plaintiffs' motions for summary judgment on several of Bayer's affirmative defenses;[6] plaintiffs' *Daubert* motions directed to the testimony of defendants' experts Alan McHughen and Ronnie Helms; and, to some extent, Bayer's *Daubert* motion to limit the testimony of plaintiffs' expert witnesses Mark Halsey, Jeffrey Stein, and Rene Van Acker.

The Plant Protection Act, 7 U.S.C. § 7701 *et seq.*, gives the Department of Agriculture broad authority to regulate "plant pests or noxious weeds." Through its Animal and Plant Health Inspection Service (APHIS), USDA has issued regulations governing the growth, or, in the terminology of the Act and regulations, the "introduction" into the environment[7] or commerce, of plants containing certain types of genetically modified traits. 7 C.F.R. § 340 *et seq.* It is undisputed that before August 18, 2006, LL601 and LL604 were "regulated articles" covered by the act and its regulations.

APHIS allows outside growth of GM plants under either a "permit"

---

[6]Bayer's affirmative defense 13 and Starlink's affirmative defense 11 assert that defendants are not liable for any injuries because they "complied fully with all applicable statutes and regulations regarding genetically modified crops." Bayer's affirmative defense 14 and Starlink's affirmative defense 12 assert that there is no liability because defendants "have acted in conformity with generally recognized, state-of-the-art standards in the industry."

[7]"Introducing" a GM plant into the environment means growing it in the out-of-doors environment. APHIS does not regulate the development of GM plants in laboratories, and so when I refer in this opinion to "growing" a plant or to a "release" of GM materials, I mean growing a plant containing the GM trait outdoors, not in a laboratory setting.

procedure, 7 C.F.R. § 340.4, or a streamlined "notification" procedure, 7 C.F.R. §

340.3. Bayer used the notification procedure with regard to LL601 and LL604.

Under both the permit and the notification procedure, the developer is required to

"confine" the GM material, i.e., release it only as intended and prevent it from

spreading to or becoming mixed in with non-GM plants. The permit procedure is

more stringent than the notification procedure. Before granting a permit, APHIS

must approve the developer's methods and procedures for growing and testing the

regulated article in the environment. 7 C.F.R. § 340.4(b). An APHIS permit thus

would set out the rules for growing the plants, including such things as how far

test fields must be from other crops, whether or how long fields must be fallow

after a test, how GM crops are to be transported or destroyed after tests are

completed, and so on. Under the notification process, in contrast, the developer

does not provide its protocols to APHIS. *See* 7 C.F.R. § 340.3. Instead, after the

developer provides certain descriptive information, APHIS issues an

"acknowledgment," which allows the developer to proceed with the release. *Id*.

The notification procedure sets out certain "performance standards," but

unlike in the permit process, APHIS does not dictate or approve how these

standards are met. The "responsible person" (here Bayer) decides how it will meet

the standards, and APHIS never blesses the methods or protocols. Undisputed

testimony indicates that employees of developers such as Bayer often have informal conversations with employees of APHIS about the proposed methods. In this case Bayer witnesses are sure that someone at Bayer must have had such conversations with someone at APHIS, but no one remembers any definite conversations, and there are no documents showing that APHIS approved or was even aware of any particular test protocols or plans.

The performance standards appear at subsection (c) of 7 C.F.R. 340.3:

(c)     The following performance standards must be met for any introductions under the notification procedure.

     (1)     If the plants or plant materials are shipped, they must be shipped in such a way that the viable plant material is unlikely to be disseminated while in transit and must be maintained at the destination facility in such a way that there is no release into the environment.

     (2)     When the introduction is an environmental release, the regulated article must be planted in such a way that they are not inadvertently mixed with non-regulated plant materials of any species which are not part of the environmental release.

     (3)     The plants and plant parts must be maintained in such a way that the identity of all material is known while it is in use, and the plant parts must be contained or devitalized when no longer in use.

     (4)     There must be no viable vector agent associated with the regulated article.

     (5)     The field trial must be conducted such that:

          (i)      The regulated article will not persist in the environment, and

          (ii)     No offspring can be produced that could persist in the environment.

     (6)    Upon termination of the field test:

          (i)      No viable material shall remain which is likely to volunteer in subsequent seasons, or

          (ii)     Volunteers shall be managed to prevent persistence in the environment.

Bayer says that these standards must be interpreted to allow "low level" or "adventitious" presence of the regulated article in plants other than those grown under the notification approval.  Plaintiffs say that if any GM material is found other than in the intended plants, Bayer has violated the regulations.  Both sides' expert witnesses opine on the meaning of the regulations, although Bayer argues that its experts only do so because plaintiffs' experts did.

     The meaning of the regulation is a matter of law for the court to decide; expert testimony is neither helpful nor proper.  *See Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*,  320 F.3d 838, 841 (8th Cir. 2003) (citing *United States v. Klaphake,* 64 F.3d 435, 438-39 (8th Cir.1995)).  Accordingly, I must determine which side offers the correct legal interpretation.

There is no doubt that under the literal words of the regulation, adventitious presence is not allowed. The regulation says these standards "must be met," there can be "no release into the environment," the developer must plant so the regulated GM material and non-GM plant materials "are not inadvertently mixed," "plant parts must be contained or devitalized," the trial "must" be conducted so that "the regulated article will not persist in the environment," and so on. There is no suggestion in the language of the regulation that low-level escape of GM material is allowed.

Bayer points to a number of factors to argue that the regulations incorporate a concept that low-level release of GM material, or adventitious presence, is contemplated or allowed. When the contamination was discovered in this case, APHIS investigated it and decided not to take enforcement action. APHIS is currently proposing to change the regulation, and in the materials related to the proposed changes APHIS recognizes that 100% confinement is not always met. Bayer argues that the Court should defer to APHIS's interpretation of the regulation and hold that the regulation does not prohibit adventitious presence of GM material in other plants, citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997), and *Eisenrich v. Minneapolis Retail Meat Cutters & Food Handlers Pension Plan*, 574 F.3d 644, 650 (8th Cir. 2009). Bayer also argues that the regulations only prohibit

releases that infect other species, and so as long as LLRICE 601 and 604 only contaminated other rice, the regulation has not been violated.

Each side has scoured the regulatory and agency history, both before and after the regulation was promulgated, to find words supporting its particular position. Although Bayer is correct that courts should defer to an agency's interpretation of its own regulations, Bayer does not rely on an official agency interpretation. Instead, Bayer relies on an interpretation of the statute that is shown, according to Bayer, by the agency's actions. This situation is entirely different from those presented in *Auer* and *Eisenrich* and similar cases. In each case where deference to agency interpretation was given, the agency had actually made some kind of formal interpretation, even if only in published guidelines or website Q &A pages. But here APHIS has not done that.

APHIS has not, in any of the statements cited by Bayer, said that the regulations are not to be interpreted literally. APHIS's decision not to take enforcement action against Bayer is not an interpretation of the regulation, but instead is an exercise of agency discretion. *Cf. Altria Group, Inc. v. Good*, 129 S.Ct. 538, 550 (2008) ("agency nonenforcement of a federal statute is not the same as a policy of approval."). Additionally, nothing in the history of the regulations or in the current proposals to change the regulations supports a claim that the

regulations do not mean what they say. Although there are statements throughout the record to the effect that adventitious presence has happened when GM plants were being tested, that fact is not in dispute, as it undoubtedly happened here. The statements Bayer relies on do not say that the agency has interpreted the regulations to allow adventitious presence. In fact, statements made in the process of proposing new regulations support plaintiffs' arguments, because they demonstrate APHIS's recognition that the current regulations do not allow for adventitious presence.

The words of the regulations are plain and unambiguous. Even if I agreed with defendants that APHIS had interpreted the regulations differently (which I do not), it would still not be proper for me to read a meaning into the regulations that differs from their plain language. *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("... *Auer* deference is warranted only when the language of the regulation is ambiguous."); *Wards Cove Packing Corp. v. Nat'l Marine Fisheries, Serv.*, 307 F.3d 1214, 1220 (9th Cir. 2002) (district court erred by deferring to agency interpretation of unambiguous regulation). The regulations here unambiguously provide performance standards that do not allow adventitious presence of GM material outside the GM plants being tested. And nothing in the regulations suggests that they only forbid contamination of a different species –

contamination of rice or any other plant violates the regulations.

### (1)  Affirmative Defenses 11 and 13 - Compliance with Regulations

This conclusion dictates the results as to whether either side's expert witnesses may opine about the meaning of the regulations: they may not.  It also dictates summary judgment on affirmative defenses 11 and 13.  The undisputed facts show that the performance standards were not met here because the required result was not met: there was a release into the environment and the regulated article or its offspring has persisted in the environment.  Bayer's witnesses may not testify that the regulations allow adventitious presence, and Bayer may not argue that it was not negligent because it complied with the regulations.  Plaintiffs are therefore entitled to summary judgment on affirmative defenses 11 and 13.

### (2)  Negligence *Per Se*

This conclusion, however, does not mean that plaintiffs have won their negligence *per se* claim, or that the regulations provide for strict liability whenever adventitious presence is found.  Defendants are entitled to summary judgment on plaintiffs' negligence *per se* claim, to the extent it relies on a violation of the APHIS regulations.  This is because the performance standards do not provide a standard of care.  Although the regulations are not ambiguous, they also are not sufficiently

precise about what a person must do to comply, and there is no evidence that Congress or APHIS intended to create strict liability or a private right of action for every violation. As everyone agrees, the standards state the result – confinement of the GM trait. They do not dictate the method of reaching that result, and so they do not provide a standard of care.

"Negligence *per se* arises when the legislature pronounces in a statute what the conduct of a reasonable person must be, whether or not the common law would require similar conduct, and the court then adopts the statutory standard of care to define the standard of conduct of a reasonable person." *Burns v. Frontier II Props. Ltd. P'ship*, 106 S.W.3d 1, 3 (Mo. Ct. App. 2003) (citation omitted); *see also Lowdermilk v. Vescovo Bldg. & Realty Co., Inc.*, 91 S.W.3d 617, 628 (Mo. Ct. App. 2002) (citing *Monteer v. Prospectors Lounge, Inc.*, 821 S.W.2d 898, 900 (Mo. Ct. App. 1992)). So, for example, if a building code says a stair riser must be six inches tall, that is a precise directive that a builder can follow, and if someone is injured because the riser is taller or shorter, negligence *per se* could apply. A building code that says the stair riser should be of a sufficient height not to be dangerous or so that a person will not fall could not provide a basis for a negligence *per se* claim because the question of what is reasonable was not answered by the building code. If the regulations here had provided, for example, that the fields containing LL601 must

be 50 feet from any fields containing non-GM rice, then that would be the standard of care, and plaintiffs might have a negligence *per se* argument if they were injured because the fields were only 10 feet apart.  But these are not that kind of regulation, and they do not dictate what a reasonable person would do in this situation.

Plaintiffs' negligence *per se* claims based on two Missouri statutes fail for a different reason.  Both Mo. Rev. Stat. § 578.416 and Mo. Rev. Stat. § 537.353 (as it existed at the time of the actions here) require intentional conduct.  They do not provide a negligence standard of care, but instead prohibit intentional acts.  Section 578.416 provides that "[n]o person shall":

(1)     Intentionally cause the loss of any crop;

(2)     Damage, vandalize, or steal any property in or on a crop;

(3)     Obtain access to a crop by false pretenses for the purpose of performing acts not authorized by the landowner;

(4)     Enter or otherwise interfere with a crop with the intent to destroy, alter, duplicate or obtain unauthorized possession of such crop;

(5)     Knowingly obtain, by theft or deception, control over a crop for the purpose of depriving the rightful owner of such crop, or for the purpose of destroying such crop;

(6)     Enter or remain on land on which a crop is located with the intent to commit an act prohibited by this section.

Until 2007, § 537.353 provided: "Any person or entity who knowingly damages or

destroys any field crop product that is grown for personal or commercial purposes . . . shall be liable for double damages pursuant to this section."[8]  Both of these statutes require knowing and intentional conduct.  Bayer has pointed to an absence in the record of any evidence of intentional conduct that would violate the statutes. Plaintiffs have not come forward with any evidence showing intentional conduct, and so defendants are entitled to summary judgment on these claims.

### (3)     Affirmative Defense 14 - Industry Standards

As noted above, Bayer has indicated that its affirmative defense 14, which alleged that it was not liable because it complied with state-of-the art industry standards, is moot, because plaintiffs do not intend to present a claim for strict liability.  To the extent the plaintiffs' motion for summary judgment goes on to argue, as does their *Daubert* motion directed to witnesses McHughen and Helms, that Bayer's expert witnesses should not be allowed to testify about industry standards, the issue is not moot.  On plaintiffs' negligence claim, factual disputes remain about the standard of care and whether Bayer met it.  As noted in *Southern Pine,* "industry practice or standards may often be relevant in cases like the present one, and expert or fact testimony on what these are is often admissible."  320 F.3d at

---

[8]The statute has now been amended to include liability for negligent conduct, but the new statute cannot be applied to conduct occurring before its effective date.

841.  Industry practices are relevant to a determination of the standard of care and whether Bayer met it.  The regulatory scheme is also relevant to the standard of care issue, although, as stated above, neither party can rely on compliance or non-compliance with the regulations as evidence for or against liability, because the regulations do not provide a standard of care.

### E.     <u>Affirmative Defense 4 - Intervening Cause</u>

In affirmative defense 4,[9] Bayer asserts that it cannot be held liable "due to the intervening and/or superseding acts or omissions of parties or non-parties to this action for whose acts or omissions the BCS Defendants and Bayer Corporation are not liable."  Plaintiffs seek summary judgment on this affirmative defense, and Bayer argues that it has presented a jury question.  I agree with plaintiffs that, given the undisputed evidence and as a matter of law, Bayer may not assert this affirmative defense.  Although plaintiffs still have to prove proximate cause, Bayer may not argue that others may have caused the losses.

The doctrine of intervening cause applies when "a new and independent force . . . so interrupts the chain of events that it becomes the responsible, direct, proximate, and immediate cause of the injury, but it may not consist of an act of concurring or contributory negligence."  *English v. Empire Dist. Elec.Co.*, 220

---

[9]Starlink affirmative defense 5.

S.W.3d 849, 857 (Mo. Ct. App. 2007) (quoting *Simonian v. Gevers Heating & Air Conditioning, Inc.*, 957 S.W.2d 472, 475 (Mo. Ct. App. 1997)). In order for a third person's negligence to be an intervening cause, it cannot be a "foreseeable, natural product of the original negligence." *Boggs ex rel. Boggs v. Lay*, 164 S.W.3d 4, 19 (Mo. Ct. App. 2005) (quotations and citations omitted).

Bayer argues that the jury could find that "intervening actors" LSU, Riceland, the seller of Clearfield 131 rice, or others could be the cause of plaintiffs' injuries. But the negligence, if there was any, was in Bayer's handling of the GM rice that it controlled. It provided LL601 and LL604 to LSU and Dr. Lindscome for testing. Bayer was the "responsible party" who was allowed to introduce LL601 and LL604 into the environment. Bayer was the party who had the duty to do so without negligence. The risk that the GM trait might escape and contaminate other non-GM rice or other plants is precisely the known and foreseeable risk that Bayer undertook when it undertook to introduce the rice. Bayer's duty included the duty to assure that those it chose to test the rice followed proper procedures. Because LSU and Dr. Linscombe were acting as Bayer's agents and on Bayer's behalf when they handled the GM rice, their acts cannot be considered an intervening cause. If they negligently allowed the GM trait to contaminate other rice they were growing, that negligence is attributable to Bayer, and it does not matter that they might have been

growing the other rice for someone else.

Additionally, if Bayer's negligence resulted in contamination of other rice, the failure of others to detect the contamination is not an intervening cause. To the contrary, that is also an entirely foreseeable and natural product of the original negligence. "Where the likelihood of the intervening act is one of the hazards which rendered the original actor's conduct negligent, he cannot be insulated from the consequences of the chain of events he set in motion." *Plummer v. Dace*, 818 S.W.2d 317, 321 (Mo. Ct. App. 1991). At most, the other growers' or handlers' failure to learn that their rice was contaminated merely contributed to the chain of events set in motion by Bayer.[10]  Plaintiffs are entitled to summary judgment on defendants' affirmative defense of intervening cause.

## F.    Remaining *Daubert* Challenges to Liability Experts

Bayer objects to plaintiffs' witnesses Van Acker, Halsey and Stein testifying about Bayer's being the "responsible party" under the federal regulatory scheme. Bayer also objects to what it characterizes as the witnesses' "inflammatory and

---

[10]Of course, those other actors might also be liable to persons injured by the distribution of contaminated rice if they themselves were negligent. Even if other actors such as Riceland or the Cheniere commercial seed growers were also negligent, however, their negligence does not mean Bayer's negligence was not the proximate cause of the injuries plaintiffs claim here. Whether multiple negligent actors contributed to the damage does not lessen the liability of the original negligent actor, where the later alleged negligence was a foreseeable result of the original negligence. *Boggs ex rel. Boggs v. Lay*, 164 S.W.3d 4, 19 (Mo. Ct. App. 2005).

entirely unscientific assertions," such as opinions that Bayer management lacked competence, "caused" the Starlink contamination, or failed to learn from the Starlink situation. Bayer complains generally that these witnesses do not base their testimony about industry practices on empirical studies or actual experience, and that they must be prohibited from testifying about legal conclusions. Plaintiffs, in turn, object to the testimony of defense experts McHughen and Helms as lacking foundation and being outside the scope of the witnesses' expertise. Additionally, they object to McHughen's testifying about (among other things) conversations he had with APHIS personnel about this case, his characterization of APHIS and others' "findings" about this case, and his 2007 visit to LSU's facilities. They object to Helms' testimony about almost everything, including the appropriate supervision of cooperators doing GM trials, rice pricing, the feasibility of using third-party auditors, and the advantages of genetically modified rice.

Rule 702 permits expert testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The key inquiries are the (1) factual basis of the opinion, (2) reliability of the method and application, and (3) the relevance of the testimony. *Id*.; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592-93 (1993). If an expert is testifying to something within his area of expertise, he may opine as to the reasonableness of a party's

behavior.  *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,

254 F.3d 706, 715-716 (8th Cir. 2001) (hydrologist was qualified to testify that

defendant was "diligent and reasonable" in making judgment about risks of flood,

but was not qualified to testify about reasonable warehousing practices).  However,

it is not appropriate for expert witnesses to draw legal conclusions or opine on a

party's state of mind.  *See Garrett v. Albright*, No. 06-CV4137-NKL,  2008 WL

697590, at * 4  (W.D. Mo. Mar. 11, 2008).  Expert witnesses must do more than

simply summarize documents with a "tilt favoring a litigant."  *In re Prempro*

*Products Liability Litigation*, 554 F. Supp. 2d 871, 887  (E.D. Ark. 2008).

I have reviewed the reports of the proposed expert witnesses and believe that

most of the *Daubert* challenges should be denied.  Most of the things complained

about are not grounds for excluding the testimony, but are instead appropriate points

to raise during cross-examination.  As stated before, I will not allow any witness to

testify that the PPA regulations allow adventitious presence, nor will I allow any

witness to testify that Bayer "violated" the federal regulations, because the

regulations do not contain a standard of care.  I will also not allow an expert witness

to testify that Bayer is or is not liable because it is listed as the "responsible party,"

although the fact that Bayer is listed as the responsible party is certainly admissible,

and the experts can talk about the regulatory framework in general.  I agree with

plaintiffs that witness Helms may not testify about lost profits, because he is not an economic expert, but I believe he is qualified to talk about rice farming in general and most of the other subjects listed in his report. None of the experts will be allowed to recite hearsay statements they obtained from APHIS or others, or to base their testimony on conditions outside the relevant time frame (for example, McHughen's opinion of LSU's 2007 facilities and operation has no relevance). But, except as set out here, I will deny the *Daubert* motions. For the most part, the proposed testimony meets the Rule 702 requirements of relevance and reliability and has a sufficient factual basis.

### G. Agency and Successor Liability

Plaintiffs seek summary judgment establishing the status of various defendants as successors, partners and agents of one another. In an earlier order in this case, *In re Genetically Modified Rice Litig.*, 576 F. Supp. 2d 1063 (E.D. Mo. 2006), I denied motions to dismiss for lack of personal jurisdiction filed by several Bayer defendants. I ruled then that plaintiffs had shown a relationship among the defendants sufficient to support the exercise of personal jurisdiction over the foreign defendants. *Id*. Plaintiffs' motion for summary judgment now asks that I rule, as a matter of law, on the relationships between certain of the defendants.

Defendants are correct that the personal jurisdiction ruling did not establish

facts beyond the propriety of exercising personal jurisdiction over the defendants. *See id*. at 1075, n. 8. But defendants are not correct that this motion seeks an advisory opinion. It is entirely appropriate for a motion for summary judgment to establish undisputed facts, and when plaintiffs point to uncontested evidence in the record, it is the defendants' burden, as the party opposing summary judgment, to come forward with evidence showing that a genuine issue of material fact remains. *See* Fed. R. Civ. P. 56(d)(1) (if summary judgment not rendered on entire action, court "should then issue an order specifying what facts—including items of damages or other relief—are not genuinely at issue. The facts so specified must be treated as established in the action.").

### (1)    Undisputed Facts Established for Trial

Under the above standards, the facts set out in subparagraphs 5(a) through 5 (g) of plaintiffs' motion are not genuinely disputed, and are therefore established for the upcoming trial:

> a.    Bayer CropScience AG, as the survivor of its April 1, 2007, merger with Bayer CropScience GmbH ("BCS GmbH") assumed all assets and liabilities of BCS GmbH, including any liabilities which arose regarding the activities related to LibertyLink rice at issue in this litigation, and therefore is the successor to BCS GmbH, including the time periods when BCS GmbH was previously known as Aventis CropScience GmbH ("ACS GmbH") or Hoechst Schering AgrEvo GmbH ("AgrEvo GmbH"), and as successor is subject to liability for the acts of its predecessors;

b.      BBS NV, as the successor by name change to Bayer CropScience NV ("BCS NV"), Aventis CropScience NV ("ACS NV"), and Plant Genetic Systems NV ("PGS"), is subject to liability for any acts which occurred regarding the activities related to LibertyLink rice at issue in this litigation during the time periods in which it was known as BCS NV, ACS NV and/or PGS;

c.      BCS LP, as the successor by name change to ACS USA LP, is subject to liability for the activities related to LibertyLink rice at issue in this litigation during the time period in which it was known as ACS USA LP and for any such liability assumed by or transferred to ACS USA LP from AgrEvo USA Company ("AgrEvo USA") or its general partners;

d.      ACS USA LP, and thus BCS LP, assumed and had transferred to it all liabilities incurred by AgrEvo USA and its general partners regarding their activities related to LibertyLink rice at issue in this litigation during the period in which they conducted those activities;

e.      Starlink, as the successor by name change to Aventis CropScience USA Holding Inc. ("ACS USA Holding"), is subject to liability as general partner of ACS USA LP related to LibertyLink rice at issue in this litigation during the period from December 1999 to December 2001;

f.      BCS Holding Inc., as the successor by name change to Aventis CropScience USA Holding II Inc. ("ACS Holding II Inc."), is subject to liability as general partner of BCS LP related to LibertyLink rice at issue in this litigation;

g.      BCS Inc., as the successor by merger and name change from Rhone Poulenc Ag Company Inc. is subject to liability of AgrEvo USA and its general partners, AgriVet, Inc. ("AgriVet") and NOR-AM Chemical Company ("NOR-AM"), related to LibertyLink rice at issue in this litigation and which may have arisen during the time such activities were undertaken by AgrEvo USA prior to the formation of

ACS USA LP.

### (2) Joint Venture

Plaintiffs claim that the undisputed facts show that all nine Bayer defendants were members of a joint venture to develop the rice seeds at issue in this case, and, accordingly, they are jointly and severally liable for all torts committed within the scope of that joint venture.

Under Missouri law, a joint venture is "an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge." *Jeff-Cole Quarries, Inc. v. Bell*, 454 S.W.2d 5, 14 (Mo. 1970) (citations omitted). A joint venture is created by express agreement when parties make "explicit promises" to engage in a joint venture. *Rosenfeld v. Brooks*, 895 S.W.2d 132, 135 (Mo. Ct. App. 1995) (citations omitted).

Corporations may become members of joint ventures only by express agreement or contract. *Jeff-Cole Quarries, Inc.*, 454 S.W.2d at 16; *Rosenfeld v. Brooks*, 895 S.W.2d at 135; *cf. Denny v. Guyton*, 40 S.W.2d 562, 565-66, 581 (Mo. 1931) (finding sufficient evidence of a joint venture among several individuals, corporations, and partnerships when the parties expressly and orally agreed to engage in a joint venture). More specifically, because "the unequivocal existence of

a definite business form is the most reliable expression of the relationship among parties," an express corporate form gives rise to a presumption that the parties did not form a joint venture, but instead "were operating solely under the express corporate form." *Rosenfeld*, 895 S.W.2d at 135. Although a plaintiff can rebut that presumption through evidence of an "express agreement for joint venture," an agreement between corporations that fails to mention a joint venture is insufficient evidence of such express agreement. *Id.*; *Ritter v. Barnes Jewish Christian Health Sys.*, 987 S.W.2d 377, 387 (Mo. Ct. App. 1999).

Here the undisputed facts show that all defendants have a corporate form; this is unequivocal and is the "most reliable expression of the relationship among" them. *Rosenfeld*, 895 S.W.2d at 135. Factual disputes remain regarding whether plaintiffs can rebut the presumption that there is not a joint venture here.

Plaintiffs point to several pieces of evidence which they contend constitute the "express agreement" for a joint venture. These documents do not resolve the factual disputes, and so are not sufficient to show a joint venture as a matter of law. The Confidential Business Information Justifications not only omit any mention of a joint venture, they also show that the companies were operating under their express corporate forms. The Service Agreement does not state that the companies are forming a joint venture, and it points out the separate corporate identities of the

parties. From the evidence presented, I cannot conclude as a matter of law that the Bayer defendants formed a joint venture.

### (3) Principal-Agent Relationship

Plaintiffs also contend that a principal-agent relationship existed among certain defendants, resulting in the principals' liability for their agents' actions. Again, factual disputes preclude entry of summary judgment in plaintiffs' favor.

Under Missouri law, two separate corporations are generally "to be regarded as wholly distinct legal entities, even though the stock of the one is owned partly or entirely by the other." *Cent. Cooling & Supply Co. v. Missouri Dir. of Revenue*, 648 S.W.2d 546, 548 (Mo. 1982). Although a parent corporation is not usually responsible for its subsidiary corporation's actions, *Grease Monkey Int'l, Inc. v. Godat*, 916 S.W.2d 257, 262 (Mo. Ct. App. 1995), where the subsidiary is acting solely as an agent of the parent, the parent can be held liable. *Ritter*, 987 S.W.2d at 384-85. To establish a principal-agent relationship, a party must adduce evidence that the parent corporation exercised such domination and control over the subsidiary "that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal." *Blackwell Printing Co. v. Blackwell-Wielandy Co.*, 440 S.W.2d 433, 437 (Mo. 1969) (quotation omitted). Again, the evidence to which plaintiffs point for this argument

is inconclusive, and factual disputes remain and prevent summary judgment.

## III. <u>Damages Issues</u>

Defendants seek summary judgment on plaintiffs' claims to recover amounts that plaintiffs would be required to pay their "share-rent landlords." They also seek summary judgment on plaintiffs' claims for punitive damages.

Defendants also seek to exclude the expert testimony proposed by plaintiffs' market losses expert witness, Dr. Bruce Babcock, asserting that his methodology is faulty. Plaintiffs, in turn, seek to exclude the testimony of defendants' expert witness on market losses, Dr. Nicholas Kalaitzandonakes. Plaintiffs also seek to exclude the testimony of defendants' expert witnesses related to plaintiffs' individual losses, Cheryl Shuffield and Robert Winter.

### A. <u>Share-Rent Landlord Damages</u>

Defendants seek summary judgment on any claim for lost profits for amounts that plaintiffs are obligated to pay their landlords. They assert that plaintiffs are improperly attempting to recover damages that should be claimed, if at all, by the landlords. The parties address this issue as going both to the measure of damages that can be recovered, and to the question of whether plaintiffs are the real parties in interest or have standing to sue. Genuine disputes of material fact preclude the grant of summary judgment, but some general principles of law apply, and I set

them out here to guide the parties in the upcoming trial.

The parties' briefs discuss in great detail whether the relationships between plaintiffs and the landowners can be characterized as leaseholds or as tenancy in common.  In *Smith v. McNew*, the Missouri Court of Appeals noted:

> Contracts to farm on shares are apparently very common, but the proper construction of such contracts, as creating the relationship of landlord and tenant, or other legal status, is the subject of widely divergent views.

381 S.W.2d 369, 372 (Mo. Ct. App. 1964).  This is an understatement.  It would be more accurate to say the views are  "wildly" – rather than "widely" – divergent.  In general, however, if a share rent arrangement is characterized as a lease, then the tenant has the right to possession of the crop until it is harvested and divided, and so any right to sue a third party for damage to the crops belongs to the tenant, not to the landlord.  *See*, *e.g.*, *Babcock v. Miss. River Power Co.*, 113 F.2d 398, 399 (7th Cir. 1940); *Ringering v. Cleveland*, 161 Ill. App. 43 (Ill. App. Ct. 1911); *Tex. & Pac. Ry. Co. v. Bayliss*, 62 Tex. 570 (Tex. 1884).  On the other hand, if the relationship is characterized as a tenancy in common, then both the landlord and the tenant can sue, but each can seek only his own portion of the damages.  *See*, *e.g.*, *Sayers v. Missouri Pac. Ry. Co.*, 107 P. 641 (Kan. 1910); *Moulton v. Robinson*, 27 N.H. 550 (N.H. 1853).

Missouri courts have not considered the issue presented by this case, and the Missouri cases discussing whether an arrangement was a tenancy in common or a lease all involve disputes between the landlord and the tenant, and do not involve claims against a third party. *See Johnson v. Hoffman*, 53 Mo. 508 (Mo. 1873); *Smith*, *supra*; *Kamerick v. Castleman*, 23 Mo. App. 481, 1886 WL 5182 (Mo. Ct. App. Dec. 6, 1886). These cases have language, however, suggesting that Missouri courts would follow the general rule discussed above.

The exact contours of the plaintiffs' arrangements with their landowners is a fact question involving many considerations, including the intent of the parties. Many of these facts remain disputed, and so I must deny the motion for summary judgment.

I am not at all sure, however, that it is necessary to characterize precisely the relationship as both sides urge, and I certainly do not believe that allowing evidence of new assignments or amendments of the pleadings to add landlords as parties at this late date is appropriate.[11] Instead, I believe this is properly viewed simply as a question of the proper measure of damages. Under general Missouri tort law, a

---

[11]The time for amending pleadings or bringing in new discovery related to assignments has passed, as has the time for raising real party in interest challenges. Whether the landlords would be allowed to "split" their cause of action is not before me. The Bell and Hunter plaintiffs have the right to sue for the damages they suffered, and at trial they will be expected to prove those damages.

plaintiff may recover damages the plaintiff sustained and is reasonably certain of

sustaining in the future as a result of the defendant's wrongful conduct. *See, e.g.,*

MAI § 4.01 (6th ed. 2002). To the extent plaintiffs are seeking to recover lost

profits, they must produce evidence that provides an adequate basis for estimating

the lost profits with reasonable certainty. *See Ameristar Jet Charter, Inc. v. Dodson*

*Int'l Parts, Inc.*, 155 S.W.3d 50, 54-55 (Mo. 2005). "In general, in calculating lost

profits damages, lost revenue is estimated, and overhead expenses tied to the

production of that income are deducted from the estimated lost revenue." *Id*. In

*Ameristar* the Missouri Supreme Court held that in tort actions variable expenses,

but not fixed expenses, should be deducted in a calculation of lost profits. *Id*. at 56.

Farming, of course, presents an unusual situation, in that there are variable

expenses, such as seeds or fertilizer, and fixed expenses, such as equipment or

barns, but there is also the cost of land. Is the cost of land a fixed or variable

expense? Does the answer depend on whether the farmer owns the land or rents it

through a crop share rent arrangement? Although I believe crop share rent should

be characterized as a variable expense, I know of no Missouri case so holding.

Nevertheless, it seems to me that if the evidence shows that plaintiffs would have to

pay their landlords rent on the land used to grow the crops, then the amounts owed

to the landlords is an expense that should be deducted in calculating any lost profits.

*Cf. Kamerick v. Castleman*, 1886 WL 5182 at * 7 ("But the court erred in authorizing, by its instruction, the jury to find for plaintiff the full value of the corn. The plaintiff was only entitled to recover his share, . . ."); *accord Atlanta & B. Air Line Ry. v. Brown*, 48 So. 73, 77 (Ala. 1980) (plaintiff landlord "could not recover more than the amount of his damage, which covered only one-third of the crops."). I am denying the motion for summary judgment, but the parties may be guided by my understanding of the profits analysis, or they may choose to provide further law for my consideration on this issue at trial.

### B. <u>Punitive Damages</u>

The Bayer defendants have moved for summary judgment on plaintiffs' punitive damages claims. Under Missouri law, plaintiffs' claims for punitive damages survive summary judgment if plaintiffs provide enough evidence so that a reasonable juror could be clearly convinced by the evidence that the defendants acted with reckless disregard of plaintiffs' rights and interest. The plaintiffs here have provided evidence sufficient to meet this standard – although of course it is disputed – and so I will deny defendants' motion for summary judgment on plaintiffs' punitive damages claims.

A punitive damages claim must be established with clear and convincing evidence. *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104, 111 (Mo. 1996) (en

banc). Clear and convincing evidence is evidence that "instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579, 582-3 (Mo. Ct. App. 1999). Evidence may be clear and convincing even if susceptible to different interpretations which may, or may not, clearly convince a reasonable juror. *Lopez-Vizcaino v. Action Bail Bonds, Inc.*, 3 S.W.3d 891, 893 (Mo. Ct. App. 1999) ("Because a reasonable juror could or could not have been clearly convinced by the evidence concerning [defendants'] outrageous conduct and evil motive or reckless indifference, the circuit court had to let the jury decide the matter."); *see also Lynn v. TNT Logistics N.Am. Inc.*, 275 S.W.3d 304, 309 (Mo. Ct. App. 2008).

Plaintiffs must present evidence that the Bayer defendants had either an evil motive, or "showed complete indifference to or conscious disregard for the safety of others." *Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 339 (Mo. 1996) (*en banc*) (citations omitted). A negligent act may be recklessly indifferent when it:

> manifest[s] such reckless indifference to the rights of others that the law will imply that an injury resulting from it was intentionally inflicted. *Or there may be conscious negligence tantamount to intentional wrongdoing as where the person doing the act or failing to act must be conscious of his conduct, and, [though] having no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally*

*or probably result in injury.*

*Id.* (emphasis in original) (citing *Hoover's Dairy, Inc. v. Mid-Am. Dairymen, Inc.*, 700 S.W.2d 426, 435 (Mo. 1985) (*en banc*)).

The record on summary judgment shows that plaintiffs may be able to present evidence from which a reasonable jury could find Bayer was conscious that its conduct would naturally or probably result in injury. Plaintiffs have evidence showing that the risk of contamination by GM plants to non-GM plants was well known at the time of the field tests here. Bayer knew that seeds could be "admixed" through human error as simple as failing to clean equipment or boots, and that cross-pollination could occur. Numerous Bayer documents show that Bayer knew the LL601 had to be kept isolated, could not enter the food chain, and could not enter foreign markets. Bayer employees referred to Europe's "zero tolerance" policies. They discussed the effects of such an event on the market for rice, recognizing that there could be serious economic impacts. One 2000 memorandum even correctly forecast that if GM rice was found to have spread to conventional varieties, "We could make any national newscast . . . and the rice industry would be quite affected to say the least . . . ."

Plaintiffs have presented evidence from which a factfinder could conclude that, even given its knowledge of these risks and the potential for severe impact on

the market, Bayer took no steps, for example, to assure that the field trials on LL601 were not performed in the same location that other seed was being developed, to monitor whether any LL601 had moved outside areas in which it was planted, and to verify whether the cooperators were, in fact, cleaning their equipment and boots properly, properly storing the rice, or even properly documenting the processes. These are disputed questions of fact, and Bayer is not entitled to summary judgment on the claim for punitive damages.

Of course, whether plaintiffs actually make a submissible case for punitive damages at trial depends on the evidence actually presented. It is not at all unusual for a punitive damages claim to survive summary judgment but not make it to the jury. This is one of the reasons we have motions for judgment as a matter of law at the close of plaintiffs' evidence or at the close of the case. But on the record here, defendants are not entitled to summary judgment.

### C.   *Daubert* Motions

The parties have filed *Daubert* motions directed both to the market damage expert witnesses, Dr. Bruce Babcock and Dr. Nicholas Kalaitzandonakes, and to some of the individual damages experts. For the reasons that follow, I believe that the proposed testimony "will assist the trier of fact in understanding the evidence or to determine a fact in issue." Fed. R. Evid. 702. The proposed testimony is reliable,

relevant, and has a factual basis. Additionally, I reject plaintiffs' arguments that the report of Dr. Kalaitzandonakes was untimely, and I find that plaintiffs have not been prejudiced by the changes that were made to his reports. The changes, of course, can be a subject of cross-examination.

### (1) Market Damages

Plaintiffs' expert, Dr. Babcock, applies a partial equilibrium model to estimate the decrease in demand for U.S. rice after the LLRICE contamination was reported. Defendants' expert, Dr. Kalaitzandonakes, applies an event study method to calculate the impact that LLRICE contamination had on prices for U.S. rice. From my review of the reports and the other evidence, it is clear that both Dr. Babcock and Dr. Kalaitzandonakes are experts in the field of agricultural economics, that their proposed testimony is relevant, and that both of their methods use well-accepted principles of economic analysis. Each uses data sources that are supported by the evidence and are appropriate.

It is from this vantage point, where all but one element of admissibility under Rule 702 is satisfied without dispute, that I consider the reliability of the experts' testimony. In determining whether a method or principle has been reliably applied, the court must be careful to examine methodology, and not the conclusions drawn from it. *Daubert*, 509 U.S. at 595. Methodology is reliably applied if the expert

completes the required procedure, the data used is that "typically" relied upon, and the expert does not fail to account for relevant variables. *See US Salt, Inc. v. Broken Arrow, Inc.*, 563 F.3d 687, 691 (8th Cir. 2009); *Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007); *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006); *Blue Dane Simmental Corp. v. Am. Simmental Ass'n*, 178 F.3d 1035, 1040-41 (8th Cir. 1999). Proponents "do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

Defendants claim that Dr. Babcock's method is unreliable because his four-year weighted average gives inaccurate results if used differently with different data. This is not a basis for excluding his opinions. To create a projection, Dr. Babcock necessarily had to rely on data from past years. Dr. Babcock based his estimate on the assumption that the immediately preceding four years of data for the rice market was appropriate and that, based on the trends he observed, the years nearer to the contamination year should be weighted more heavily. Defendants do not argue that Dr. Babcock is basing his estimate on past data for wheat or marshmallows or some other inappropriate market, nor do they argue that he is basing his estimate on wholly inappropriate years, such as data from thirty years ago.

Likewise, defendants' arguments that Dr. Babcock did not account for other factors that could have affected demand for U.S. rice are not grounds for exclusion. Dr. Babcock did consider whether other factors affected demand, but he did not do so in the way that defendants think is proper. He tied his calculations to a common world reference price, that of Thai Rice. This reference price is intended to automatically account for all variables affecting demand for rice, such as transportation costs, and it is a reasonable and accepted reference price for him to have selected. Whether this is the proper reference point is a matter for cross-examination, and is not a basis for excluding the testimony.

Plaintiffs make similar arguments about defendants' witness, Dr. Kalaitzandonakes. Plaintiffs challenge his use of an adjusted world price as a reference price. Dr. Kalaitzandonakes uses an event study method. An event study requires a reference price, and, specifically in this case, a transactional reference price. Dr. Kalaitzandonakes is analyzing a rice market and chose the USDA's adjusted world price for rough rice. This is a reference price that may be more or less accurate as a transactional price because of the length of time that it takes for the price to change. Therefore, Dr. Kalaitzandonakes is using a reference price, as the method requires, and using one that is specifically relevant to U.S. rice markets. If a method requires a transactional reference price for rice and the expert applies a

transactional reference price for rice, then the method is reliably applied. Any concerns regarding whether the reference price is the best possible choice may be addressed on cross.

Plaintiffs' other challenges to Dr. Kalaitzandonakes's methodology are similarly insufficient grounds for exclusion. For example, plaintiffs assert that Dr. Kalaitzandonakes's cointegration calculations are statistically invalid and that he used the incorrect critical value. Specifically, they claim he used a 10% critical value instead of a 5% critical value. Dr. Kalaitzandonakes performed the cointegration analysis, as his method requires. He has used a critical value, as his method requires. Even if he should have used the "Dickey-Fuller" critical value or the "augmented Dickey-Fuller" critical value, as plaintiffs' argue, his error only affects his accuracy, not whether he has reliably applied the methodology.

Each party has shown that its market damage expert applied a reliable method in a reliable manner. As a result, neither expert's testimony will be excluded under *Daubert*.

### (2) Individual Damages

Plaintiffs seek to exclude the testimony of defendants' experts Cheryl Shuffield and Robert Winter. Plaintiffs do not directly challenge Shuffield and Winters' expert qualifications in accounting. Shuffield and Winter each hold

degrees in either accounting or forensic accounting. They both have significant

accounting experience and Shuffield has testified in dozens of cases as an expert in

accounting matters.

Plaintiffs primarily dispute Shuffield's and Winter's expertise in applying the

conclusions of the defendants' other experts to their own analysis. For instance, as

part of their testimony Shuffield and Winter apply Dr. Kalaitzandonakes's market

loss calculations to individual plaintiffs. Plaintiffs argue that Shuffield and Winter

do not have the expertise to apply Dr. Kalaitzandonakes's results.

Generally, an expert must be qualified in a particular field by "knowledge,

skill, experience, training, or education." Fed. R. Evid. 702. Experts must rely on

"sufficient facts or data" and their conclusions must be based on "reliable principles

and methods." *Id.* Therefore, the issue is whether Shuffield and Winter may rely on

another expert's conclusions as the "facts or data" underlying their own expert

opinions. It "is common in technical fields for an expert to base an opinion in part

on what a different expert believes on the basis of expert knowledge not possessed

by the first expert." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613

(7th Cir. 2002); *see also Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*,

Nos. 95-4018, 95-4029, 1996 WL 466673, at *7-8 (10th Cir. Aug. 16, 1996).

Shuffield and Winter agree that they do not have the depth of understanding

of statistics and economics to themselves perform Dr. Kalaitzandonakes's analysis. However, they are not being asked to create a scientifically reliable economic model. Instead, they are only being asked to apply the results of another expert, who is qualified, to individual plaintiffs' claims of damages. This task only requires that Shuffield and Winter calculate an individual plaintiffs' income, or lost income, using a given value for market losses. This is the type of calculation that an accountant ordinarily performs. Therefore, assuming a proper foundation is provided at trial for Dr. Kalaitzandonakes's conclusions, Shuffield and Winter may apply them using their own expertise.

The above rationale is equally applicable to most of plaintiffs' other challenges to Shuffield's and Winter's testimony. For example, plaintiffs claim that Shuffield and Winter are not experts in crop rotation and therefore should be excluded from testifying about whether a farmer's damages would have been mitigated had he rotated his crops properly. But if there is evidence in the case showing that the farmer should have rotated his crops, then Shuffield and Winter may testify as to their calculations of how much that farmer would have lost or saved had he done so. The same applies to plaintiffs' claims regarding their testimony about the Chicago Board of Trade data and their testimony regarding reduced yield damages. If defendants provide a proper foundation for the prior

opinion, Shuffield and Winter may rely on it to provide a damages calculation.

Finally, plaintiffs argue that Shuffield and Winter cannot criticize Dr. Carter's and Dr. Babcock's methodologies because they do not understand economics or statistics. As noted above, Shuffield and Winter are not qualified to criticize the validity of the methodology. However, as forensic accountants they routinely audit claims based on the sufficiency of the documentation. Therefore, they are qualified to criticize the validity of the documentation used by plaintiffs in calculating damages, whether or not they understand the basis for a particular model.

## IV.  <u>Conclusion</u>

To summarize the decisions discussed above, I am granting summary judgment to defendants on the Missouri plaintiffs' Count 20 (public nuisance), Counts 22, 23, and 24 (negligence *per se*) and Count 33 (North Carolina Unfair and Deceptive Trade Practices Act). Plaintiffs have withdrawn Counts 26 and 27 (strict liability). I am granting plaintiffs' motion for summary judgment on agent and successor liability only to the extent that certain uncontested facts are deemed established for trial. I am granting plaintiffs' motions for summary judgment on defendants' affirmative defenses 11 and 13 (compliance with regulations) and on their affirmative defense 4 (intervening cause). Defendants have withdrawn affirmative defense 14 (compliance with industry standards), because this defense

only applied to plaintiffs' withdrawn strict liability claims. I am denying all other motions for summary judgment.

I have denied the *Daubert* motions, except that I have limited some areas of testimony, as set out above.

The claims of the Bell and Hunter plaintiffs that will go to trial on November 2 are Count 21 (private nuisance) and Count 25 (negligence).

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for summary judgment on defendants' affirmative defenses no. 4 and 14 [#1431] is granted.

**IT IS FURTHER ORDERED** that defendants' motion for summary judgment [# 1434] is granted in part and denied in part.

**IT IS FURTHER ORDERED** that defendants' motion to exclude testimony under Rule 702 [#1436] is granted only to the extent set out above and is denied in all other respects.

**IT IS FURTHER ORDERED** that plaintiffs' motions to exclude testimony of Alan McHughen [# 1438], Nicholas Kalaitzandonakes [#1441], Ronnie Helms [#1443], and Cheryl Shuffield and Robert Winter [#1450] are granted only to the extent set out above and are denied in all other respects.

**IT IS FURTHER ORDERED** that plaintiffs' motion for partial summary

judgment on successor, general partner and agency status [#1445] is granted only to the extent that certain facts as set out above are deemed established for trial; the motion is denied in all other respects.

**IT IS FURTHER ORDERED** that plaintiffs' motion for partial summary judgment on defendants' affirmative defense nos. 11 and 13 [#1447] is granted.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of October, 2009.